## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

ADRIANA NOVOA, SAMUEL
RECHEK, and the FIRST
AMENDMENT FORUM AT
UNIVERSITY OF SOUTH FLORIDA,

      *Plaintiffs,*

     v.

MANNY DIAZ, JR., in his official
capacity as the Commissioner of the
Florida State Board of Education;
TIMOTHY M. CERIO, RICHARD
CORCORAN, AUBREY EDGE,
PATRICIA FROST, NIMNA
GABADAGE, EDWARD HADDOCK,
KEN JONES, DARLENE LUCCIO
JORDAN, BRIAN LAMB, ALAN
LEVINE, CHARLES H. LYDECKER,
CRAIG MATEER, DEANNA
MICHAEL, STEVEN M. SCOTT, ERIC
SILAGY, and KENT STERMON in
their official capacities as members of
the Florida Board of Governors of the
State University System; JULIE
LEFTHERIS in her official capacity as
the Inspector General of the Florida
Board of Governors of the State
University System; THE
UNIVERSITY OF SOUTH FLORIDA
BOARD OF TRUSTEES; and
TIMOTHY L. BOAZ, SANDRA
CALLAHAN, MICHAEL CARRERE,

Civil Action No.:

_____

**VERIFIED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

N. ROGAN DONELLY, MICHAEL E.
GRIFFIN, OSCAR HORTON,
LAURAN MONBARREN, NITHIN
PALYAM, SHILEN PATEL,
FREDRICK PICCOLO, MELISSA
SEIXAS, JENIFER JASINSKI
SCHNEIDER, and WILLIAM
WEATHERFORD in their official
capacities as members of the
University of South Florida Board of
Trustees,

*Defendants*.

---

GREG HAROLD GREUBEL*
PA. Bar No. 321130; NJ No. 171622015
ADAM STEINBAUGH*
PA. Bar No. 326475
JT MORRIS*
TX Bar No. 2409444
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut Street; Suite 1250
Philadelphia, PA 19106
Tel:   (215) 717-3473
Fax:   (215) 717-3440
greg.greubel@thefire.org
adam@thefire.org
jt.morris@thefire.org

*Pro Hac Vice* Motions Forthcoming

GARY S. EDINGER, ESQUIRE
Fla. Bar No.: 0606812
BENJAMIN, AARONSON,
    EDINGER & PATANZO, P.A.
305 N.E. 1st Street
Gainesville, Florida 32601
Tel:   (352) 338-4440
Fax:   (352) 337-0696
GSEdinger12@gmail.com

## **TABLE OF CONTENTS**

INTRODUCTION .............................................................................1

JURISDICTION AND VENUE......................................................... 3

THE PARTIES ................................................................................. 4

FACTUAL ALLEGATIONS.............................................................. 9

    I.    Despite Florida's Statutory Commitment to Free Expression on Campus, It Passes Law Banning "Instruction" on Specific Viewpoints in Higher Education........ 9

        A.    The Campus Free Expression Act Protects Access to Information....................................................................... 9

        B.    Lawmakers Nationwide Move to Suppress "Divisive Concepts." ..........................................................................10

        C.    Florida Political Leaders Introduce the "Stop WOKE Act" Following K–12 Ban.................................................. 11

        D.    The Stop WOKE Act Expands Florida's Discrimination Law to Ban Viewpoints............................12

        E.    The Stop WOKE Act's Sponsors Explain Its Intent: Eradicate Ideology, Personal Beliefs, or Materials Offering "Unique Perspectives." ...................................... 17

        F.    The Board of Governors Adopts Regulations Implementing the Stop WOKE Act. ............................... 22

        G.    USF Ignores Constitutional Concerns and Issues 'Stop WOKE' Guidance to Faculty................................... 24

        H.    Other Florida Universities and Colleges Issue Guidance on the Stop WOKE Act. ...................................27

    II.    Violating the Stop WOKE Act Risks Severe Penalties. .............31

        A.    Violations Risk Millions of Dollars in Annual Funding. ...........................................................................31

B.   Faculty Members Said to Violate the Stop WOKE Act Are Subject to Discipline and Exposed to Litigation. ........................................................ 34

C.   The Stop WOKE Act's Ambiguous Application to "Instruction" Chills Introduction of Written Materials and Guest Speakers. ........................................ 35

III.   The Stop WOKE Act Infringes on Plaintiffs' Constitutional Rights. ......................................................................... 37

A.   Professor Novoa's Instruction of Course Materials and Classroom Discussions Would Violate the Stop WOKE Act. ......................................................... 37

B.   Professor Novoa's Instruction in Her Science in Cultural Context Course and Its Assigned Materials Violate the Stop Woke Act. ................................ 40

C.   Professor Novoa's Instruction in Her History of Sports Course and Its Assigned Materials Violate the Stop WOKE Act. ........................................... 44

D.   Professor Novoa's Instruction in Her Modern Latin America Course and Its Assigned Materials Violate the Stop WOKE Act. ........................................... 50

E.   If Not Enjoined, the Stop WOKE Act Prohibits Professor Novoa's Instruction and Jeopardizes USF Funding. ........................................................... 53

F.   The Stop WOKE Act Is Currently Imposing the "Pall of Orthodoxy" on Rechek and Members of the First Amendment Forum. ........................................ 56

CAUSES OF ACTION ................................................................. 60

FIRST CAUSE OF ACTION
Violation of the First Amendment ........................................... 60

SECOND CAUSE OF ACTION
Violation of the First Amendment—
Viewpoint Discrimination ..................................................... 65

ii

THIRD CAUSE OF ACTION
        Violation of First Amendment—
        Prior Restraint ..............................................................67

FOURTH CAUSE OF ACTION
        Violation of First Amendment—
        Right to Receive Information and Ideas ................................... 71

FIFTH CAUSE OF ACTION
        Violation of the First Amendment—
        Facial Overbreadth ...................................................74

SIXTH CAUSE OF ACTION
        Violation of Due Process—
        Vagueness ................................................................77

SEVENTH CAUSE OF ACTION
        Violation of the Campus Free Expression Act .......................... 82

PRAYER FOR RELIEF ................................................... 85

VERIFICATION OF ADRIANA NOVOA................................... 87

VERIFICATION OF SAMUEL RECHEK ................................... 88

## **INTRODUCTION**

1. Plaintiffs—a professor of history, an undergraduate student, and a student organization founded to foster the free exchange of ideas on campus—bring this constitutional challenge to the higher education provisions of Florida's "Stop WOKE Act."[1]

2. In flagrant disregard of our Supreme Court's admonition that academic freedom in higher education is a "special concern" of the First Amendment, the Stop WOKE Act prohibits "instruction" on eight specific "concepts" related to "race, color, national origin, or sex." Fla. Stat. § 1000.05(4)(a). In a clause that has engendered much confusion, the law then vaguely purports to allow instruction on those blacklisted topics if it is given in "an objective manner without endorsement."

3. Worse, the Stop Woke Act's enforcement provisions encourage anyone to report individuals "advancing" opinions on the blacklisted topics to state authorities and defunds institutions if a violation is deemed to have occurred.

---

[1] Although introduced in the legislature as the "Individual Freedom" law, the law's proponents have publicly branded it as the "Stop the Wrongs to Our Kids and Employees (W.O.K.E.) Act." Plaintiffs refer to it using the name identified by its proponents and recognized by the public: the "Stop WOKE Act."

4.      In dictating to faculty and students what ideas are true and false, Florida runs headlong into the Bill of Rights. More than a half-century ago, the Supreme Court of the United States recognized that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom," where "truth" is discovered not by "authoritative selection," but "out of a multitude of tongues." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) (cleaned up). This is because professor and student alike "must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise, our civilization will stagnate and die." *Keyishian*, 385 U.S. at 603 (quoting, in part, *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)). But today, Florida's "Stop WOKE" clampdown imposes precisely the "pall of orthodoxy" that the Supreme Court warned about decades ago. *Id.*

5.      In addition to the First Amendment's strong medicine against state orthodoxy, the Stop WOKE Act is also irreconcilable with a law Florida adopted just one year earlier—the Campus Free Expression Act. That law obligates public universities to refrain from "shield[ing] students" from "access to, or observation of, ideas and opinions"—expressly including "faculty research, lectures, writings, and commentary"—on the basis that

2

the ideas may be "uncomfortable, unwelcome, disagreeable, or offensive."
Fla. Stat. § 1004.097(2)(f), (3)(a), (3)(f).

6.   Plaintiffs bring this lawsuit to vindicate the constitutional and
statutory rights of faculty and students in college classrooms to engage in
debate uninhibited by state orthodoxy.

## JURISDICTION AND VENUE

7.   This action arises under the First and Fourteenth Amendments
to the United States Constitution; 42 U.S.C. §§ 1983 and 1988; and the
Declaratory Judgment Act, 28 U.S.C. §§ 2201–02. Accordingly, this Court
has jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343.

8.   Additionally, this Court has supplemental jurisdiction over the
claims alleged in the Sixth Cause of Action for violation of the Campus Free
Expression Act, Fla. Stat. § 1004.097(4)(a). These state law claims are so
related to the federal claims that they form part of the same case or
controversy. *See* 28 U.S.C. § 1367(a).

9.   Venue is proper in this Court under 28 U.S.C. § 1391(b)(2)
because a substantial part of the events giving rise to the claim occurred in
this district.

## THE PARTIES

### *Plaintiffs*

10.     Plaintiff Adriana Novoa grew up under a dictatorship in Argentina before immigrating to the United States. Professor Novoa is an associate professor of history at the University of South Florida (USF), where she has taught as a professor since 2001.

11.     Professor Novoa teaches several undergraduate courses at USF, including **Science in Cultural Context**, **History of Sports from National to Global Contexts**, and **Modern Latin America**.

12.     Professor Novoa's instruction in each of these three courses (and others) involves "advancing" concepts prohibited by the Stop Woke Act.

13.     The Stop WOKE Act has had (and will continue to have) a chilling effect on Professor Novoa. The first moment she endorses a prohibited viewpoint or advances a student's argument on a prohibited concept—which she has done before and intends to do this academic year—she will expose herself to disciplinary action and liability for attorney's fees and will expose her university to the loss of approximately $73 million in annual funding.

14.     Plaintiff Samuel Rechek is an undergraduate student enrolled at USF. Rechek will take Professor Novoa's **Science in Cultural Context** in the Spring 2023 semester, which covers the Stop WOKE Act's prohibited concepts.

15.     In class, he desires to engage in debate with Professor Novoa and his fellow students on the Stop WOKE Act's prohibited concepts.

16.     Rechek is also the president of Plaintiff First Amendment Forum at University of South Florida, which has been a registered student organization at USF since 2020. The organization's mission is to ensure that "[e]ach student has the right to speak their mind," recognizing that "[o]n a large and diverse campus, the academic value of the First Amendment . . . cannot be understated." The group has "civil discussions about hot-button issues, advocate[s] for student rights policy reform, host[s] events and workshops to involve the student body with their rights, and help[s] cultivate a community that embraces the merit of the First Amendment." The organization has five members on its executive committee, each an undergraduate student enrolled at USF.

17.     The Stop WOKE Act's prohibitions also deprive Rechek and other members of the First Amendment Forum of access to education free from the "pall of orthodoxy" imposed by Florida's political leaders.

*Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). That limitation limits students' ability to hear from—and chills students' willingness to ask questions of—faculty whose views may be contrary to those of the State of Florida. Rechek and the First Amendment Forum sue to preserve students' right to information unfiltered by state orthodoxy.

### Defendants

18.     Defendant Manny Diaz, Jr. was a principal sponsor of the Stop WOKE Act when he served previously as a member of the Florida Senate. Currently, he serves as the Commissioner of the Department of Education. As Commissioner, Diaz has oversight over the Chancellor of the Florida College System. By statute, Defendant Diaz, as the Commissioner of Education, is also a member of the Florida Board of Governors of the State University System. Fla. Stat. § 1001.70(1). Defendant Diaz is sued only in his official capacities as the Commissioner of the Department of Education and as a member of the Board of Governors.

19.     The Board of Governors is endowed with the responsibility to govern the state university system and has the authority to adopt rules for implementing and enforcing the Stop WOKE Act. Fla. Const. art. IX § 7(b); Fla. Stat. §§ 20.155(4)(a), 1000.05(6)(b).

20.     The Board of Governors has the additional authority to revoke tens of millions of dollars in annual funding if it finds that a violation of the Stop WOKE Act has occurred at a constituent university. Fla. Stat. § 1001.92(5).

21.     The Board of Governors is headquartered in Tallahassee, Florida.

22.     Fourteen of the seventeen members of the Board of Governors are appointed by the Governor of Florida.

23.     Defendant Brian Lamb is a member and officer of the Board of Governors, serving as its Chair. In that capacity, Lamb presides over meetings of the Board of Governors and exercises all of the "powers and duties that inure to the office of Chair of a body corporate." Bd. of Govs. Op. Procedures, Art. IV, § D. Defendant Lamb is sued only in his official capacity.

24.     Defendant Eric Silagy is a member and officer of the Board of Governors, serving as its Vice Chair. In that capacity, Silagy possesses "the same power and authority in the absence or disability of the Chair." Bd. of Govs. Op. Procedures, Art. IV, § E. Defendant Silagy is sued only in his official capacity.

25.    Defendants Timothy M. Cerio, Richard Corcoran, Aubrey Edge, Patricia Frost, Nimna Gabadage, Edward Haddock, Ken Jones, Darlene Luccio Jordan, Alan Levine, Charles H. Lydecker, Craig Mateer, Deanna Michael, Steven M. Scott, and Kent Stermon are the remaining members of the Board of Governors. They are sued only in their official capacities.

26.    Defendant Julie Leftheris is the Inspector General of the Board of Governors. Under the Board of Governors' regulations implementing the Stop WOKE Act, the Office of Inspector General is required to conduct investigations into universities' compliance with the Stop WOKE Act. Bd. of Govs. Reg. No. 10.005(4)(a), (b). Defendant Leftheris is sued only in her official capacity.

27.    Defendant The University of South Florida Board of Trustees is a corporate body established by the State of Florida with the capacity to be sued. *See* Fla. Stat. §§ 1001.72(1), 1004.097(4).

28.    The University of South Florida Board of Trustees sets policy for and serves as the legal owner and final authority for the University of South Florida. Univ. of S. Fla. Bd. of Trs. Op. Procedures, Art. I, § (D).

29.    Defendants Timothy L. Boaz, Sandra Callahan, Michael Carrere, N. Rogan Donelly, Michael E. Griffin, Oscar Horton, Lauran Monbarren, Nithin Palyam, Shilen Patel, Fredrick Piccolo, Melissa Seixas, Jenifer

8

Jasinski Schneider, and William Weatherford are members of the USF

Board of Trustees. They are sued only in their official capacities.

30.    At all relevant times to the Complaint, Defendants and their

agents were, and are, acting under color of state law.

## **FACTUAL ALLEGATIONS**

31.    "Recently, Florida has seemed like a First Amendment upside

down." *Honeyfund.com, Inc. v. DeSantis*, No. 4:22-cv-227, 2022 WL

3486962, at *1 (N.D. Fla. Aug. 18, 2022). In 2021, Florida amended the

Campus Free Expression Act to bolster the rights of students and faculty

under the First Amendment. Fla. Stat. § 1004.097. One year later, Florida

would blatantly endorse censorship on campus by passing the Stop WOKE

Act.

**I.    Despite Florida's Statutory Commitment to Free Expression on Campus, It Passes Law Banning "Instruction" on Specific Viewpoints in Higher Education.**

**A.    *The Campus Free Expression Act Protects Access to Information.***

32.    The Campus Free Expression Act obligates public universities

and colleges to refrain from "shield[ing] students" from "access to, or

observation of, ideas and opinions"—expressly including "faculty research,

lectures, writings, and commentary"—on the basis that the ideas may be

"uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. § 1004.097(2)(f), (3)(a), (3)(f).

33.    In adopting the Campus Free Expression Act, Florida recognized—as does the First Amendment—that students have a right to access ideas, opinions, and concepts unhampered by orthodoxy.

34.    Despite recognizing the need to affirm the importance of free and robust debate on campus in 2018, Florida legislators in 2021 moved to strip the right to free speech on campus away.

### B.    *Lawmakers Nationwide Move to Suppress "Divisive Concepts."*

35.    Between 2021 and 2022, lawmakers in at least 36 states introduced some 191 bills restricting discussion of race, gender, sexuality, and American history in public schools, universities, and colleges.

36.    These bills were overwhelmingly partisan: Of the 137 bills introduced in 2022, only one had attracted a single Democratic co-sponsor.

37.    These proposals were patterned after a federal Executive Order on "Combatting Race and Sex Stereotyping," which banned nine "divisive concepts," or viewpoints, from government-contractor trainings. Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020).

38.    President Trump issued Executive Order 13950 on September 22, 2020, in response to "people . . . pushing a different vision of America,"

10

a "destructive ideology . . . grounded in misrepresentations of our country's history." *Id.*

39.     Although a federal court issued a nationwide injunction enjoining enforcement of Executive Order 13950 on the grounds that it unconstitutionally restricted speech,[2] Florida proceeded to introduce its own version of the law banning nearly identical viewpoints in public educational institutions from kindergarten through graduate education.

## C.     *Florida Political Leaders Introduce the "Stop WOKE Act" Following K–12 Ban.*

40.     In June 2021, at the request of Gov. Ron DeSantis, Florida's Department of Education adopted a provision prohibiting teaching that is not "factual and objective," seeks to "suppress or distort significant historical events," or "define[s] American history as something other than the creation of a new nation based largely on the universal principles stated in the Declaration of Independence." FLA. ADMIN. CODE 6A-1.094124(3)(b).

41.     In a speech promoting the effort, Defendant Corcoran said textbook "publishers are just infested with liberals" and his goal was to "keep all the crazy liberal stuff out."

---

[2]     *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 540–50 (N.D. Cal. 2020).

42.    In December 2021, Gov. DeSantis held a press conference and issued a press release announcing the Stop WOKE Act. The press release described the Act as a "legislative proposal . . . to fight back against woke indoctrination" that "builds on actions Governor DeSantis has already taken to ban Critical Race Theory and the New York Times' 1619 Project in Florida's schools."

43.    Gov. DeSantis's press release was accompanied by a handout promising "CONSEQUENCES" in the form of a "private right of action."

### D.    *The Stop WOKE Act Expands Florida's Discrimination Law to Ban Viewpoints.*

44.    The Stop WOKE Act amended the Florida Educational Equity Act (FEEA), which prohibits public universities and colleges from subjecting students to discrimination in an "education program or activity" on the basis of certain characteristics, including race, color, national origin, or sex. Fla. Stat. § 1000.05.

45.    The STOP Woke Act expands the FEEA by creating a new category of purported "discrimination"—"instruction" in a public university or college that "espouses, promotes, advances, inculcates, or compels" a student "to believe" any viewpoint contained on an enumerated blacklist. Fla. Stat. § 1000.05(4)(a).

12

46.    The Stop WOKE Act does not provide a definition for "instruction."

47.    The Stop WOKE Act does not provide a definition for "espouses."

48.    Ordinary definitions of "espouse" include "to take up and support as a cause."

49.    The Stop WOKE Act does not provide a definition for "promotes."

50.    Ordinary definitions of "promote" include "to contribute to the growth or prosperity of" or to "further."

51.    The Stop WOKE Act does not provide a definition for "advances."

52.    Ordinary definitions of "advance" include "to bring forward for notice, consideration, or acceptance," to "propose," and "to accelerate the growth or progress of."

53.    The Stop WOKE Act does not provide a definition for "inculcates."

54.    Ordinary definitions of "inculcate" include "to teach."

55.    At present, the STOP Woke Act prohibits the following viewpoints:

1) Members of one race, color, national origin, or sex are morally superior to members of another race, color, national origin, or sex;

2) A person, by virtue of his or her race, color, national origin, or sex is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

3) A person's moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, national origin, or sex;

4) Members of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex;

5) A person, by virtue of his or her race, color, national origin, or sex bears responsibility for, or should be discriminated against or receive adverse treatment because of, actions committed in the past by other members of the same race, color, national origin, or sex;

6) A person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion;

7) A person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex; or

8) Such virtues as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist, or were created by members of a particular race, color, national origin, or sex to oppress members of another race, color, national origin, or sex.

Fla. Stat. § 1000.05(4)(a)(1)-(8).

56.    The "concepts" prohibited by the Stop WOKE Act are nearly identical to those banned by President Trump's Executive Order.

57.    Far from regulating discriminatory conduct, the Stop WOKE Act bans expression of specific viewpoints, much like Executive Order 13950.

58.    Although the Stop WOKE Act purports to include a limitation on the reach of the viewpoint-based categories, stating that the statute is "not to be construed to prohibit discussion of the concepts . . . as part of a larger course of training or instruction," if the "instruction is given in an objective manner without endorsement of the concepts," the Act fails to define "objective manner" or "endorsement." Fla. Stat. § 1000.05(4)(b).

59.    This language does not significantly narrow the enormous scope of the statute or limit its censorial effect.

60.    "[F]ew terms are as loaded and contested as 'objective.'" *Honeyfund.com, Inc. v. DeSantis*, No. 4:22-cv-227, 2022 WL 3486962, at *13 (N.D. Fla. Aug. 18, 2022).

61.    The Stop WOKE Act does not provide a definition for the ambiguous term "objective manner." The provision is intended to prohibit faculty from including their "emotions," "beliefs," "opinions," or "points of

view" when discussing any material, content, or lectures that could be read to "advance" or "promote" a prohibited concept.

62.    The Stop WOKE Act also fails to define "endorsement of the concepts."

63.    The sponsors of the bill have interpreted the "endorsement" clause to, among other things:

> (a)    Prohibit faculty members from sharing their own views about a given concept;
>
> (b)    Prohibit faculty from taking a feigned, "devil's advocate" position to spur discussion;
>
> (c)    Require faculty to censor guest lecturers whose views might be interpreted as supporting a banned concept; and
>
> (d)    Prohibit the introduction of textbooks, articles, videos, or other materials that argue in favor of a prohibited concept.

64.    University administrations tasked with interpreting and enforcing the Stop WOKE Act have similarly struggled to define "objective" or "endorsement".

65.    Consequently, educators in Florida, including Professor Novoa, have reasonably refrained—and will continue to refrain—from teaching prohibited subjects out of fear of violating the Stop WOKE Act.

66.    House Bill 7 (HB 7)—the bill creating the Stop WOKE Act— asserts that the bill contains "legislative findings" in support of the law.

67.    HB 7 contains no "legislative findings" pertaining to higher education, much less findings that would substantiate a need for or identify the purpose of the Stop WOKE Act. A copy of HB 7 is attached as Exhibit 1 to this Complaint.

68.    The Stop WOKE Act does not contain a savings clause under the First Amendment, like that applied to other provisions of the FEEA. *See* Fla. Stat. § 1000.05(8)(c) (pertaining to definitions of anti-Semitism, such as "a certain perception of the Jewish people, which may be expressed as hatred[.]").

69.    On its face, the Stop WOKE Act even prohibits commentary concerning the wisdom or constitutionality of the law itself, since such statements could be viewed as subjective endorsement or advocacy for the racial and social concepts censored by the Act.

### E.    *The Stop WOKE Act's Sponsors Explain Its Intent: Eradicate Ideology, Personal Beliefs, or Materials Offering "Unique Perspectives."*

70.    Florida's legislature held four committee hearings on the Stop WOKE Act and substantively discussed the bill on four separate occasions on the House and Senate floors.

71.    Before the committee votes and the House votes on the Stop WOKE Act, Representative Avila explained the intent and meaning of the legislation and answered other members' questions.

72.    Rep. Avila explained the general purpose of the Stop WOKE Act:

     (a)   Preventing instructors from offering "any sort of ideology or personal beliefs when presenting" materials, or otherwise "insert[ing] their opinion, or their belief, or their take on" events such as the Holocaust or slavery.

     (b)   Ensuring that no student "feels uncomfortable because they feel that the instructor is not being objective."

     (c)   "[E]nsur[ing] that absolutely no student feels as if they are being blamed for something that occurred in our nation's history [or] a sense of guilt because they're a part of a particular group, race or sex."

     (d)   Allowing educators to "teach any subject area they choose in a way that upholds the American belief that all people are created equally."

73.    Asked to identify specific examples of what the Stop WOKE Act would "eradicate or accomplish," Rep. Avila identified:

     (a)   A discussion in which participants "discuss their 'privilege'";

     (b)   A training program that argued that "America is a system of white supremacy";

     (c)   A training arguing that "capitalism is fundamentally racist" and asking participants to "deconstruct their racial and sexual identities and then rank themselves on a hierarchy of 'privilege'";

(d)  Specific books, articles, and a video concerning race, which Rep. Avila said were "obviously egregious and obviously extremely offensive" materials the Stop WOKE Act was intended to address:

  i.  Adam Serwer, *America's Racial Contract Is Killing Us*, The Atlantic, May 8, 2020, *available at* https://bit.ly/3wAEgjJ;

  ii.  Peggy McIntosh, *White Privilege: Unpacking the Invisible Knapsack*, Peace & Freedom Mag., July/Aug. 1989 at pp.10–12, *available at* https://bit.ly/38waXqz;

  iii.  Layla Saad, *Me and White Supremacy: Combat Racism, Change the World, and Become a Good Ancestor*;

  iv.  Robin DiAngelo, *White Fragility: Why It's So Hard for White People to Talk About Racism*; and

  v.  A video pertaining to anti-racism.

74.  During the hearings and Floor debate, Rep. Avila repeatedly explained that the Stop WOKE Act reached both in-class statements and the materials presented:

(a)  In his prepared remarks during the second reading of the bill, Rep. Avila explained: "Teachers may teach any subject area they choose in a way that upholds the American belief that all people are created equally, using education materials consistent with this shared value."

(b)  Rep. Avila was asked about whether the "specific assignments" of "materials" staking out a particular view to facilitate classroom discussion of those would violate the Stop WOKE Act. Rep. Avila responded: "All material has to be in line with the principles that are set forth in this bill and if that material in any way, shape, or form does not align with the principles in this bill, then that

19

material would certainly not be permissible within a classroom."

(c)  Rep. Avila explained that under the Stop WOKE Act, teachers could not introduce materials offering "unique perspectives" on history and should instead "stick to those core American principles that really are the bedrock of our society."

75.     During the hearings and Floor debate, Rep. Avila repeatedly explained that the intent of the "objective manner without endorsement of the concepts" language was to prevent educators from making their personal views known to students. Rep. Avila explained that it was intended to "ensure that a teacher does not," in class discussions; "insert their personal belief or take"; "inject any sort of ideology or personal beliefs"; "insert[] their opinion, or their belief, or their take on" historic events; or "inject" their "personal point of view into the discussion."

76.     As a state senator and sponsor of the Stop WOKE Act, Defendant Diaz, speaking in support of his bill during his closing speech before the Florida Senate, echoed Rep. Avila, arguing that students "should *never* know" an instructor's "politics" and "*never* know where [they] stand on those issues." Defendant Diaz made the same point during debate on the Senate Floor, arguing that "students should not know your perspective or your point of view on a specific thing," as that would "impose your personal view on a student."

20

77.    During the March 1, 2022 hearing of the Senate Rules Committee, Defendant Diaz—then a state senator and sponsor of the Stop WOKE Act—echoed Rep. Avila, arguing that "Students come to the school with the values that are instilled by their families, and it is not for a teacher or professor to change those views."

78.    After the Stop WOKE Act received a favorable vote by the House Judiciary Committee on January 26, 2022, Speaker Chris Sprowls issued a press release pledging that under the Stop WOKE Act, "lessons and textbooks" would have to "uphold the shared principles of individual freedom and not indoctrinate students with a particular point of view."

79.    In a February 25, 2022 article written by Rep. Avila for the Family Research Council, he wrote that the intent of the Stop WOKE Act was to ensure that teachers do not teach "divisive ideologies."

80.    The Florida House of Representatives passed HB 7 in a strictly party-line vote on February 24, 2022. The Florida Senate also passed the bill in a strictly party-line vote on March 10, 2022.

81.    Gov. DeSantis signed the bill into law on April 22, 2022. In a contemporaneous speech, Gov. DeSantis said that the bill was intended to prevent the "use [of] your tax dollars to teach our kids to hate this country or to hate each other."

21

82.     After advocacy groups criticized the law's impact on higher education, Gov. DeSantis' spokesperson argued that the law sought to prevent "indoctrinating students with CRT-inspired discriminatory ideology."

### F.     *The Board of Governors Adopts Regulations Implementing the Stop WOKE Act.*

83.     On June 30, 2022, the Board of Governors issued a public notice that it intended to adopt regulations implementing the Stop WOKE Act.

84.     On August 26, 2022, the Board of Governors adopted the regulations without debate or amendment. A copy of the regulations is attached as Exhibit 2 to this Complaint.

85.     The regulations define "instruction," which was not defined by the Stop WOKE Act, to mean: "the process of teaching or engaging students with content about a particular subject by a university employee or a person authorized to provide instruction . . . within a course." Bd. of Govs. Reg. No. 10.005(1)(c).

86.     But the regulations, like the Stop WOKE Act, make no effort to define "objective manner without endorsement."

87.    The regulations require that each university adopt its own regulations effectuating the Stop WOKE Act and establishing a method for submitting complaints. Bd. of Govs. Reg. No. 10.005(2)(a).

88.    The regulations do not require that a complaint be a student, faculty, or employee of the institution. Consequently, complaints may be made by any person, including members of the public with no connection to the institution.

89.    The regulations require that each university conduct investigations into "credible complaints that identify . . . instruction that espouses, promotes, advances, inculcates, or compels a student . . . to believe any of the concepts." Bd. of Govs. Reg. No. 10.005(3)(a).

90.    If an "instruction . . . is inconsistent with university regulation," it must be reported to "the Board of Governors through the Office of the Inspector General[,]" and the university must "take prompt action to correct the violation by mandating" that the offending professor "modify" their teaching "to be consistent" with the Stop WOKE Act. Bd. of Govs. Reg. 10.005(3)(c). The university, "where appropriate," must issue "disciplinary measures" and "remove, by termination if appropriate," faculty members who fail or refuse "to comply with the mandate." *Id.*

91.    If a university fails to comply with these directives, the Inspector General is required to initiate an investigation to determine whether a university "failed to correct a violation[.]" Bd. of Govs. Reg. No. 10.005(4)(a).

92.    If the members of the Board of Governors determine that the corrective measures implemented by a university were not sufficiently "appropriate," the university will not be eligible for performance funding during the next fiscal year. Bd. of Govs. Reg. No. 10.005(4)(d).

93.    As a result, universities have a strong incentive to terminate faculty members to ensure that the Board of Governors will determine that the corrective measure was "appropriate."

### G.    USF Ignores Constitutional Concerns and Issues 'Stop WOKE' Guidance to Faculty.

94.    On April 22, 2022, the Foundation for Individual Rights and Expression (FIRE) sent letters to each of Florida's public institutions of higher education, warning their leadership that the law was unconstitutional and calling on them to refuse to enforce the law in violation of the First Amendment rights of their faculty. FIRE did not receive a response from USF.

95.     Instead, on July 1, 2022, the University of South Florida's Office of General Counsel issued "Initial Guidance" concerning the Stop WOKE Act, before the Board of Governors issued its proposed regulations.

96.     On August 30, 2022, following the Board of Governors' final adoption of regulations implementing the Stop WOKE Act, the University of South Florida's Office of General Counsel updated its guidance.

97.     Each version of the USF Office of General Counsel guidance:

(a)     Admits uncertainty about "how broadly" the Stop WOKE Act must be interpreted;

(b)     Acknowledges uncertainty about the "extent" to which "discussing" the forbidden concepts will be "held to be 'endorsing' those concepts";

(c)     Relies on dictionary definitions of "objectivity" to caution that discussion of prohibited concepts, in order to be "objective," must be "uninfluenced by the instructor's emotions, and without the instructor showing subjective favoritism, approval, or personal bias in favor of any of those concepts";

(d)     Warns faculty that the law prohibits "urg[ing] a student to believe a particular concept";

(e)     Urges faculty to add disclaimers to "class materials" that discussions are "intended to be objective"; and

(f)     Urges faculty to refrain from disclosing their own views during discussions and, if students ask about their own views, to respond: "my own conclusions and beliefs are not part of the discussion."

98.    On August 26, 2022, USF revised Policy USF10.200, concerning personnel matters, to commit that USF "will comply with the most current laws regarding" the Stop WOKE Act and directed "[c]omplaints regarding possible violations of" the Stop WOKE Act to the USF Office of Ethics and Compliance.

99.    USF Policy USF0-007 requires administrators and faculty to comply with Florida's anti-discrimination law, including the Stop WOKE Act.

100.   Under Policy USF0-007, all "members of the faculty" are "supervisory employees" required to "promptly report . . . allegations, reports, or instances of discrimination/harassment by . . . any USF employee(s)" on pain of disciplinary action.

101.   As a result, all USF faculty members are required to report colleagues to USF's administration if they learn of mere "allegations" that the faculty member has introduced a concept prohibited by the Stop WOKE Act.

102.   On or about August 26, 2022, the USF Office of Ethics and Compliance website was updated to admonish that "[s]tudents, staff, and faculty are strongly encouraged to report discrimination . . . including

violations of" the Stop WOKE Act—including "known or suspected"

violations—using a provided form.

### H.   Other Florida Universities and Colleges Issue Guidance on the Stop WOKE Act.

103.   The administrations of other Florida universities and colleges

also began distributing guidance to faculty members and students before

and after the Board of Governors issued its proposed regulations.

104.   **North Florida College.** On August 11, 2022, faculty at North

Florida College were required to attend a presentation by the college's

attorney. The presentation warned faculty that:

>   (a)   The Stop WOKE Act prohibits faculty members from attempting to "persuade students to a particular viewpoint inconsistent with" the law;

>   (b)   Faculty cannot endorse "any opinion unless you are endorsing an opinion issued by the Department of Education";

>   (c)   The Stop WOKE Act requires that "no group . . . be labeled as oppressors or oppressed based solely on the group's race, national origin, gender, or color";

>   (d)   "Classes in History, Sociology, and Law are the most likely to be directly impacted by" the Stop WOKE Act;

>   (e)   A faculty member teaching a class on U.S. History and Jim Crow laws could not tell students the historical fact that "white people were responsible for enacting" Jim Crow laws;

(f)     Classroom and reading materials "including news articles, movies, books, and other items may not meet the requirements of" the Stop WOKE Act;

(g)     While faculty are "still free to open a classroom for discussion," they should preface the discussion with a disclaimer that "the opinions stated by your fellow students do not reflect those of the College"; and

(h)     Faculty teaching science, technology, engineering, and mathematics classes should "avoid using race, national origin, sex, or color as a defining characteristic in word problems."

105.   **Florida A&M University.** While the Stop WOKE Act was still pending before the state legislature, Florida A&M's Government Relations team sent periodic updates to the campus community about the bill and hearings on the bill. These updates indicate that the university interpreted the Stop WOKE Act to "ban books and other supporting materials," and warned that the bill required that "instructional materials" be "consistent with the principle of individual freedom."

106.   On May 3, 2022, Florida A&M University's Chief Compliance and Ethics Officer distributed guidance intended to "support compliance" with the Stop WOKE Act. That guidance cautioned that:

(a)     the "objective manner" language required faculty to avoid "indicat[ing] a preference for a particular concept";

(b)     "the University, or you personally, could face civil litigation and financial penalties"; and

(c)    the university could be rendered ineligible for performance-based funding.

107.   **University of Florida.** In May 2022, the University of Florida issued preliminary guidance consisting of a video message from the university's president and a slideshow warning faculty that a violation of the Stop WOKE Act could result in "large financial penalties." UF's administration followed that guidance with a website providing "recommendations about how to remain within the law's requirements." UF's guidance, among other things:

(a)    Asserts that guest speakers in classes are subject to the Stop WOKE Act;

(b)    Directs faculty members to provide speakers with a copy of the law and ask whether "their presentation and materials are consistent" with the Stop WOKE Act;

(c)    Directs faculty members to cancel guest speakers whose presentations or materials are not consistent with the Stop WOKE Act; and

(d)    Commits to following the material provisions of the Board of Governors' proposed regulations, including the requirements that offenses be reported to the Board of Governors and that the university take disciplinary action against faculty members "where appropriate."

108.   **St. Petersburg College.** Training provided by an attorney in advance of the 2022–2023 school year cautioned that the Stop WOKE Act "does not limit who could be sued," suggesting individual faculty members may be exposed to legal liability for violating the law.

109.  **Florida State University.** On July 29, 2022, FSU issued a proposed regulation mirroring that of the Board of Governors. FSU also warned that the law applies to "class content" including "assigned materials") and "guest lecturers or speakers brought in by" a faculty member.

110.  **Florida Polytechnic University.** On August 15, 2022, FPU issued guidance interpreting "objective manner and without endorsement" to require that faculty lectures be "uninfluenced by the instructor's emotions[.]" FPU's Vice Provost of Academic Affairs cautioned that faculty members may discuss a prohibited concept so long as nobody "perceive[s] they should feel guilty or responsible in some way."

111.  **Valencia College.** On July 28, 2022, Valencia College issued guidance to its faculty. Like FSU, it warned that the law applies to "class content" including "assigned materials." The college warned that the Stop WOKE Act's use of double negatives rendered it "difficult to know what is prohibited." For example, the guidance surmised that the Act's statement that "[m]embers of one race, color, national origin, or sex cannot and should not attempt to treat others without respect to race, color, national origin, or sex" "appears to be about colorblindness," and thus warned that

any "critique of colorblindness or insistence on identity consciousness could constitute discrimination."

## II.   Violating the Stop WOKE Act Risks Severe Penalties.

112.   A violation of the Stop WOKE Act creates significant legal exposure to both the university as an institution and the instructor as a private person.

### A.   *Violations Risk Millions of Dollars in Annual Funding.*

113.   After the Stop WOKE Act was introduced, the Florida legislature adopted—and Gov. DeSantis signed—a separate enforcement measure that provides: If a "court of law, a standing committee of the Legislature, or the Board of Governors" determines that there has been any "substantiated violation" of the Stop WOKE Act, the entity "*shall* be ineligible to receive performance funding during the next fiscal year[.]" Fla. Stat. § 1001.92(5) (emphasis added).

114.   Performance funding represents a significant part of the amount of state funding received by USF each year. Since 2017–2018, USF has received between $73,009,247 and $84,603,488 annually in performance funding. These allocations represent approximately 15–22% of the total state appropriations received by USF each year.

115.    The Stop WOKE Act is violated upon the first introduction of "instruction" that "espouses, promotes, [or] advances" student belief in any one of the prohibited "concepts," unless the training is (1) part of a larger course of instruction which (2) is given in an objective manner without endorsement of the concept.

116.    Under the Stop WOKE Act, the law may be violated upon the first mention of one of the prohibited "concepts" in "instruction," even if the concept is not pervasive within the broader course of instruction or offensive to any student, if the instruction is not given in an "objective" manner or endorses the concept.

117.    Because a university will be ineligible for a substantial amount of state funding if the Stop WOKE Act is violated and because the law is violated on the first introduction of a prohibited concept, educational institutions have a strong incentive to avoid offering courses in which a faculty member or guest speaker *might* discuss the prohibited topics or something even tangential to them.

118.    The Board of Governors' proposed regulations would compound this risk by rendering a university ineligible for performance funding if its members subjectively deem a response to a violation of the

Stop WOKE Act insufficiently "appropriate." Bd. of Govs. Reg. No.

10.005(4)(d).

119.   As a result, universities have a strong incentive to discipline and

terminate any faculty member's violation of the law in order to avoid a

response that the appointed members of the Board of Governors may see as

too weak to be "appropriate."

120.   In addition to the possibility of action by the Board of

Governors, the standing committees of the Florida legislature are

authorized to make a "finding" that the Stop WOKE Act has been violated

and render the institution ineligible for performance funding. Fla. Stat.

§ 1001.92(5).

121.   Neither the Stop WOKE Act nor the provision authorizing

cutting of performance funding provide any guidance to the legislature's

standing committees about the vague and confusing prohibitions in the

Stop WOKE Act.

122.   Nor are the standing committees bound by the Board of

Governors' regulations.

123.   Neither the Stop WOKE Act nor Section 1001.92(5) require the

legislature's standing committees to provide faculty members with an

opportunity to be heard before making a "finding" against their institutions.

124.   Faculty members like Professor Novoa have a strong incentive to avoid the risk of exposing their institutions to a loss of tens of millions of dollars in revenue.

### B.   *Faculty Members Said to Violate the Stop WOKE Act Are Subject to Discipline and Exposed to Litigation.*

125.   In addition to the institutional consequences, violations of the Stop WOKE Act expose faculty members to significant personal consequences.

126.   Because faculty members accused of introducing prohibited "instruction" are subject to a lawsuit under Fla. Stat. § 1000.05(9), even the unintentional introduction of a prohibited viewpoint exposes faculty to the cost, stress, and other burdens that come with defending against a lawsuit.

127.   Faculty members found by a state court to have violated the ambiguous provisions of the Stop WOKE Act are exposed not only to the cost of their own attorney's fees, but may also be ordered to pay for the plaintiff's attorney's fees under Fla. Stat. § 1000.05(9).

128.   Because of the possibility of losing substantial amounts of funding, institutions have an incentive to impose professional sanctions on —including termination of—on a faculty member for even incidental or unintentional violations of the Stop WOKE Act.

129.   Faculty members who are thought to have introduced written materials containing prohibited concepts or are suspected of having discussed prohibited concepts in their courses, risk an investigation and finding by a legislative committee that they have violated the law.

130.   Because a violation of the Stop WOKE Act occurs on the first introduction of prohibited "instruction," no matter how brief or incidental, the weight of potential consequences will—as intended—result in self-censorship.

131.   To put it starkly, under the Stop WOKE Act and its enforcement provisions, faculty members can cost their institutions tens of millions of dollars with two words in response to a student's expression of a prohibited viewpoint: "I agree."

## C.  *The Stop WOKE Act's Ambiguous Application to "Instruction" Chills Introduction of Written Materials and Guest Speakers.*

132.  The Stop WOKE Act's uncertain and ambiguous application to "instruction" is now chilling and will continue to chill faculty members' willingness to continue using written materials or guest speakers that may be perceived as endorsing a prohibited viewpoint.

133.   Universities and colleges offering authoritative guidance to faculty members have cautioned that written materials and guest speakers may themselves violate the Stop WOKE Act.

134.   One such institution went so far as to enlist faculty members in censoring guest speakers if the speaker's lecture would endorse a viewpoint prohibited by the Stop WOKE Act.

135.   These institutions' authoritative interpretations are consistent with the express intent of the sponsors of the Stop WOKE Act—voiced at press conferences, in public statements, and in legislative debates— to prohibit written materials that offer "unique" perspectives.

136.   As a result of the Stop WOKE Act's intent and ambiguity in its use of the term "instruction," faculty members—including Professor Novoa—are being chilled from introducing written materials and guest lecturers out of concern that the Stop WOKE Act prohibits them from so doing.

137.   This chilling effect has considerable ramifications for faculty members and students alike because it threatens critical pedagogical tools. In order to confront viewpoints some may consider odious, faculty and students alike must be able to evaluate arguments that may be best articulated by primary source documents, unobjective argument in support

of a prohibited concept, or a guest speaker who resolutely believes and endorses a prohibited viewpoint.

## III.  The Stop WOKE Act Infringes on Plaintiffs' Constitutional Rights.

### A.  *Professor Novoa's Instruction of Course Materials and Classroom Discussions Would Violate the Stop WOKE Act.*

138.   Professor Novoa immigrated to the United States in 1989 from Argentina—which had been governed by a military junta between 1976 and 1983.

139.   Professor Novoa earned the equivalent of a bachelor's degree from the University of Buenos Aires in 1987. She was in the process of obtaining a master's degree from the Instituto Torcuato Di Tella in 1989 when she was admitted to the doctoral program at University of California, San Diego, where she earned a master's degree and also earned her Ph.D. in History in 1998.

140.   In 2001, Professor Novoa first began teaching at University of South Florida.

141.   After a brief visiting position teaching at Lehigh University, Professor Novoa resumed her appointment as Assistant Professor at USF in 2005.

142.   Since 2005, Professor Novoa has continuously served on USF's faculty.

143.   Professor Novoa's expertise covers, among other things, race and gender in Latin America, the history of science and Darwinism in Latin America, Latin American film, modern Argentine society and history, and global history.

144.   Professor Novoa has co-authored two books: *¡Darwinistas! The Creation of Evolutionary Thought in Argentina, 1870–1910*, published in 2012, and *From Man to Ape: Darwinism in Argentina, 1870–1920*, published in 2010.

145.   As described more fully below, because Professor Novoa is a cultural historian by training, all of her courses deal with modern culture, race, ethnicity, racism, gender, and race in one way or another.

146.   Consequently, in analyzing any culture in the nineteenth and twentieth centuries she must "advance" concepts prohibited by the Stop WOKE Act.

147.   Professor Novoa regularly teaches undergraduate or graduate-level classes at USF, including:

> (a)   **Science in Cultural Context**—introducing students to science studies through engagement with scientific texts considered from a variety of historical, philosophical, and cultural views;

(b) **History of Sports**—analyzing the development of modern sports in the Americas, including discussion of the meaning of sports in modern culture from the end of the nineteenth century to globalization; and

(c) **Modern Latin America**—exploring how students' worldviews are shaped by personal values, identity, cultural rules, and biases as they explore the foundation of Latin American societies defined by social inequity, poverty, racism, and violence, and review how intellectuals and artists reflected on national identity.

148. Since early July 2022, Professor Novoa has been reviewing her syllabi from each of her courses to determine if the Stop WOKE Act prohibits any assigned materials or lecture topics.

149. Professor Novoa has found several assigned readings and lecture topics that must be removed to comply with the Stop WOKE Act.

150. Without judicial intervention, Professor Novoa will be forced to remove assigned readings and lecture topics from her courses to comply with the Stop WOKE Act.

151. The Stop WOKE Act chills Professor Novoa's ability to discuss the subjects of each of these classes, as the content of her lectures and class materials violate the Stop WOKE Act.

**B.**   ***Professor Novoa's Instruction in Her Science in Cultural Context Course and Its Assigned Materials Violate the Stop Woke Act.***

152.   Professor Novoa has taught **Science in Cultural Context** at USF since 2020. She expects to teach the class during the Spring 2023 semester.

153.   Registration for Spring 2023 courses opens to undergraduate USF students on October 31, 2022. As discussed in greater detail below, Plaintiff Rechek intends to enroll in Professor Novoa's Science in Cultural Context class.

154.   To prepare this course for the Spring 2023 semester, Professor Novoa is currently designing the course and selecting the materials for use in the class. This process is conducted, in part, through a graduate-level course in which graduate students and Professor Novoa discuss the concepts covered in the planned Science in Cultural Context course.

155.   Due to the Stop WOKE Act, Professor Novoa must remove materials she assigned in previous iterations of the course and revise her lecture topics accordingly.

156.   Professor Novoa has determined that her instruction in previous iterations of the course, if repeated, would violate the Stop WOKE Act.

157.   The Science in Cultural Context course is a general education course satisfying mandatory curricular requirements for earning an undergraduate degree.

158.   In Science in Cultural Context, Professor Novoa teaches students about the historical development of science as a source of authoritative knowledge, with the goal of the class being to "understand the complicated ways in which science and the cultures in which it is embedded interact and shape each other."

159.   This course discusses race and the way in which Darwin's theory of natural selection was used by individuals such as Herbert Spencer to "promote" Social Darwinism—effectively using "scientific processes" to justify the perceived inferiority of indigenous peoples vis-à-vis European society.

160.   Professor Novoa also teaches that the history of science is replete with examples of individuals' national origin, color, or race determining their "status as . . . privileged[.]"

161.   For example, Professor Novoa will assign her book, *From Man to Ape: Darwinism in Argentina, 1870–1920*, in which she and her co-author "propose to study the vibrant scientific interaction between Europe and Latin America from the perspective of the latter. On the whole,

41

treatments of this relationship tend to assume a strict vertical hierarchy in the flow of scientific knowledge, relegating Latin American scientists to the *status of derivative thinkers*" (emphasis added).

162.   As this quote from her book makes clear, Professor Novoa "advances" the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race, color, [or] national origin" in violation of Florida Statutes § 1000.05(4)(a)(3).

163.   Professor Novoa's *From Man to Ape: Darwinism in Argentina, 1870-1920* is an academic work that is pedagogically relevant to the Science in Cultural Context course.

164.   In assigning her book, Professor Novoa necessarily endorses the viewpoints she advances and promotes in the book.

165.   But for the Stop WOKE Act and its enforcement penalties, Professor Novoa would assign and provide "instruction" on *From Man to Ape: Darwinism in Argentina, 1870–1920* in the Science in Cultural Context course.

166.   In the class, Professor Novoa also assigns a book by Nancy Stepan, *Picturing Tropical Nature*, in which Stepan argues that American and European intellectuals created the concept of "tropical" and examines the impact of this construction on modern culture.

167.   *Picturing Tropical Nature* is an academic work that is pedagogically relevant to the Science in Cultural Context course.

168.   In *Picturing Tropical Nature*, Stepan argues that "our idea of tropical nature as a particular kind of place or space, with its own characteristic ensembles of plants and animals . . . is fundamentally a modern one, belonging, that is, to our post-Enlightenment era."

169.   Stepan focuses on "three areas of knowledge [that] were especially important to the emerging definition of tropical nature in European thought": (1) natural history, (2) the new human sciences, and (3) medicine.

170.   Stepan describes the "new human sciences" as "aimed at ordering all varieties of humankind into a single natural hierarchy of difference and similarity. It was in the new anthropology that racial differences between human groups became a chief means by which the human world was mapped."

171.   In the book, Stepan "advances" the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race [or] color[]" in certain cultures.

172.    In engaging students in discussion, reflection, and debate, Professor Novoa intends to "advance" the arguments made in *Picturing Tropical Nature* that violate the Stop WOKE Act as described above.

173.    But for the Stop WOKE Act and its enforcement penalties, Professor Novoa would again assign and provide "instruction" on *Picturing Tropical Nature* in the Science in Cultural Context course.

### C.    *Professor Novoa's Instruction in Her History of Sports Course and Its Assigned Materials Violate the Stop WOKE Act.*

174.    Professor Novoa has taught **History of Sports from National to Global Contexts** each year since 2015 and is expected to offer it again this coming academic year.

175.    "History of Sports" is one of the most popular history courses offered by Professor Novoa's department.

176.    In the class, Professor Novoa has historically assigned an academic article by Adrian Burgos, Jr., *Left Out: Afro-Latinos, Black Baseball, and the Revision of Baseball's Racial History* (*Left Out*).

177.    *Left Out* argues that the historical narrative of racial integration in Major League Baseball frames "well-intentioned white folks" as the benevolent actors who ended segregation. It argues that popular historical narratives focus on players who did not complain about segregation, as this

44

narrative allows white people to avoid feeling guilt or responsibility for Jim Crow. *Left Out* does so by contrasting the outrage at the "snubbing" of Buck O'Neil from the National Baseball Hall of Fame against the "more muted reaction" to the omission of Afro-Latino Orestes 'Minnie' Miñoso, arguing that the "popular narratives about black baseball history" ultimately "minimize[] the impact on, and contributions of, Afro-Latinos."

178.   *Left Out* "advances," "promotes," or "espouses" several viewpoints prohibited by the Stop WOKE Act:

(a)   In arguing that figures like Buck O'Neil are elevated in discourse about segregation because they offer "absolution" to (and "assuage the guilt" of) white people, *Left Out* "promotes" or "advances" the concept, prohibited by Florida Statutes § 1000.05(4)(a)(7), that a person "bears personal responsibility for and must feel guilt [or] anguish . . . because of actions, in which the person played no part, committed in the past by other members of the same race, color, [or] national origin[.]"

(b)   In arguing that "revisionist history" casts Miñoso as "the foreign Latino [perceived] as having traveled a less precarious path, due primarily to his Cuban ethnicity," *Left Out* "advances" the viewpoint, prohibited by Florida Statutes § 1000.05(4)(a)(3), that Miñoso's "status as . . . privileged is necessarily determined by his . . . race [or] national origin[.]"

(c)   In arguing that Afro-Latino players are not "recognized as black, due to their origins from different" nations, *Left Out* violates Florida Statutes § 1000.05(4)(a)(3) because it "promotes" the concept that a person's "status as . . . oppressed is necessarily determined by his or her . . . national origin."

45

      (d)    In rejecting the "understanding of integration [of baseball] as a redemption . . . enacted by whites" and endorsing an analysis that "invalidates the invocation of white privilege . . . while seeking absolution for the wrongs of a segregated society viewed as existing in only the distant past," *Left Out* violates Florida Statutes § 1000.05(4)(a)(3) because it "promotes" the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race [or] color[.]"

179.   In her teaching, Professor Novoa advances concepts in *Left Out*.

180.   In her lectures, Professor Novoa uses *Left Out* to advance the arguement that Afro-Latino baseball players, despite coming from different backgrounds and cultures, were reduced to their perceived racial identity. In so doing, Professor Novoa provides "endorsement" of the concept, prohibited by Florida Statutes § 1000.05(4)(a)(3), that a person's "status as . . . oppressed is necessarily determined by his or her race [or] color[.]"

181.   *Left Out* is pedagogically relevant to the course because it offers an argument as to the role race and national origin played in the color barrier and how its elimination is perceived today.

182.   But for the Stop WOKE Act and its enforcement penalties, Professor Novoa would again assign and provide "instruction" on *Left Out* in the History of Sports course.

183.   In her History of Sports course, Professor Novoa also assigns a reading by Peter Dreier, *Jackie Robinson's Legacy: Baseball, Race, and Politics*.

184.   In *Jackie Robinson's Legacy*, Dreier argues that despite making progress on racial issues, the United States remains segregated by race. After highlighting statistics supporting the argument that America largely remains segregated by race, Dreier writes:

> Even when black people move to the suburbs, they are likely to live in segregated areas—not because they prefer to do so, but because of persistent (though subtle) racial bias by banks and real estate brokers. As a result of residential segregation, our public schools are still segregated by race as well as income. Blacks and Latinos still feel the sting of discrimination in the workplace and by the police and the criminal justice system.

185.   Dreier's *Jackie Robinson's Legacy* also posits that the "essence of America's troubled race relations" is that "corporate America has learned to live with affirmative action and laws against racial discrimination, but it steadfastly opposes policies to promote full employment, universal health care, and affordable housing for all"—policies that "challenge the foundation of the business elite's power and profits."

186.   In teaching this class, Professor Novoa has historically advanced arguments in *Jackie Robinson's Legacy*.

47

187.   If she continued to teach it in that manner, Professor Novoa's use of Dreier's *Jackie Robinson's Legacy* would violate Florida Statutes § 1000.05(4)(a)(3) in that it "promotes" or "advances" the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race [or] color[.]"

188.   *Jackie Robinson's Legacy* is pedagogically relevant to the class because it covers the topic of race in baseball.

189.   In engaging students in discussion, reflection, and debate, Professor Novoa intends to "advance" the arguments made in *Jackie Robinson's Legacy* that violate the Stop WOKE Act as described above.

190.   But for the Stop WOKE Act and its enforcement penalties, Professor Novoa would again assign and provide "instruction" on *Jackie Robinson's Legacy* in the History of Sports course.

191.   In her History of Sports course, Professor Novoa also assigns a book by Gerald R. Gems, *The Athletic Crusade, Sports and American Cultural Imperialism*.

192.   In *The Athletic Crusade, Sports and American Cultural Imperialism*, Gems argues that modern American sports are the product of American imperialism.

193.   Gems argues that white Americans have historically been privileged to the detriment of non-white groups (which Gems refers to as "subordinate groups"), and that sports have perpetuated the privileged status of whites, while also giving "subordinate groups" the opportunity to "challenge whiteness, Social Darwinism, and cultural hegemony by establishing their own physical prowess, claiming a measure of esteem, and creating a greater sense of national identity."

194.   In Novoa's teaching of *The Athletic Crusade, Sports and American Cultural Imperialism*, she violates Florida Statutes § 1000.05(4)(a)(3) by promoting or advancing the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race [or] color[.]"

195.   *The Athletic Crusade, Sports and American Cultural Imperialism* is pedagogically relevant to the class because it discusses the role American-dominated sports play in other countries.

196.   But for the Stop WOKE Act and its enforcement penalties, Professor Novoa would again assign and provide "instruction" on *The Athletic Crusade, Sports and American Cultural Imperialism* in the History of Sports course.

### D. Professor Novoa's Instruction in Her Modern Latin America Course and Its Assigned Materials Violate the Stop WOKE Act.

197.   In **Modern Latin America**, Professor Novoa teaches history of "oppression" of certain groups by other, more "privileged" groups.

198.   Professor Novoa regularly teaches Modern Latin America about "[t]he period that followed the end of the independence movements [that] . . . set the foundation of societies defined by social inequality, poverty, racism, and violence."

199.   In Professor Novoa's first module, "From Colonies to Nations," she covers the clashes of civilizations and subsequent subjugations of conquered peoples that characterized the colonial period using texts such as "Civilization and Barbarism; Views of Latin America, 1810–1860" and "Race in Latin America."

200.   In Professor Novoa's second module, "The Crisis of the Liberal Order & New Revolutionary Cycle," she discusses how societal tensions which resulted from colonialism caused violent revolutions.

201.   In Professor Novoa's third module, "State Terrorism, Neoliberalism & Globalization," she explores how socioeconomic dynamics that exist throughout Latin America today reflect decisions made to confront uncomfortable aspects of these legacies.

202.   In this course, Professor Novoa also teaches about the concept of collective guilt.

203.   In one reading entitled *Collective Guilt and the Crucifixion* by Geoffrey Turner, students learn that the "idea of collective guilt . . . asks us to believe that a person may share the guilt of others who have committed a crime by being a member of the same 'collective', the same social group."

204.   *Collective Guilt and the Crucifixion* and the concept of collective guilt are pedagogically relevant to Professor Novoa's course because they help provide context for Modern Latin America societies.

205.   In the course of her teaching on collective guilt, Professor Novoa must "advance" the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race [or] color[]" in certain cultures to explain how societies have experienced collective guilt based on race, color, and national origin.

206.   Similarly, Professor Novoa's teaching on collective guilt "advances" the concept that "[a] person, by virtue of his or her race, color, sex, or national origin, bears personal responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which the person played no part, committed in the past by other members of the same race, color, national origin, or sex[.]"

51

207.   As an example, Professor Novoa teaches about the case of Damiana-Kryygi, an indigenous member of the Aché community, an indigenous people of Paraguay. A group of European explorers killed Damiana-Kryygi's parents, kidnapped her as a small child, and took her to live in Buenos Aires, Argentina, where she was a maid of a famous physician. After she died, Damiana-Kryygi's head was severed and sent to Berlin for phrenological and other pseudoscientific studies because it was believed that her "race" was extinguishing.

208.   Recently, the descendants of the Aché sued the museums for the return of Damiana-Kryygi's head and other remains to give them proper burial.

209.   Professor Novoa teaches about Damiana-Kryygi and speaks about the collective responsibility that Argentina had in the treatment and extermination of indigenous peoples.

210.   Professor Novoa uses Damiana-Kryygi's story to illustrate the dangers of racism, but the Stop WOKE Act prohibits her from stating that race continues to play a role in establishing social order in Argentine society.

211.   In teaching this example, Professor Novoa "advances" the idea that, by virtue of her Argentine national origin, she "bears personal

responsibility for and must feel guilt, anguish, or other forms of psychological distress because of actions, in which [she] played no part, committed in the past by other members of the same . . . national origin[.]"

212.   As this example makes clear, the Stop WOKE Act prohibits Professor Novoa from advancing the pedagogically relevant concept of collective guilt as a part of her course instruction.

213.   Professor Novoa teaches this course on a rotation every year and a half.

214.   But for the Stop WOKE Act and its enforcement penalties, Professor Novoa would again assign and provide "instruction" on *Collective Guilt and the Crucifixion* and on Damiana-Kryygi's story in the Modern Latin America course.

### E.   *If Not Enjoined, the Stop WOKE Act Prohibits Professor Novoa's Instruction and Jeopardizes USF Funding.*

215.   Professor Novoa intends to engage in expressive activity proscribed by the Stop WOKE Act.

216.   The State of Florida, Board of Governors, and USF intend to enforce the law, violations of which carry severe consequences for Professor Novoa, her colleagues, and her institution.

217.   Because Professor Novoa cannot determine whether (a) her teaching will, as USF's guidance cautions, be interpreted as "uninfluenced by [her] emotions"; (b) her discussions or course materials will not be interpreted by a student as showing "favoritism, approval, or personal bias in favor of" a given concept; or (c) whether her discussions or course materials will be interpreted to "endorse" a given concept, Professor Novoa will be forced to choose between teaching her students to the best of her abilities or face catastrophic—and collective—punishment for herself, her colleagues, and her institution.

218.   Given Professor Novoa's commitment to teaching her students about the subject matter of her assigned courses and given the Defendants' commitment to quashing and censoring these same concepts, there is no question that:

> (a)   Much of Professor Novoa's teaching implicates the Stop WOKE Act; and

> (b)   The Defendants will discipline Professor Novoa and USF if she teaches the same subject matter she has taught in prior years and intends to teach this school year and in coming years.

219.   A faculty member of ordinary firmness would be chilled from teaching the material for fear the Stop WOKE Act will be enforced against them and their institution.

220.  Florida's enactment, implementation, and preparations to enforce the Stop WOKE Act have caused and, unless enjoined, will continue to cause irreparable harm to the constitutional rights of Professor Novoa under the First and Fourteenth Amendments.

221.  Specifically, Professor Novoa will be forced to remove all assigned reading materials that "promote," "advance," or otherwise support any concept prohibited by the Stop WOKE Act, such as *From Man to Ape: Darwinism in Argentina, 187–1920*; *Picturing Tropical Nature*; *Left Out*; *Jackie Robinson's Legacy: Baseball, Race, and Politics*; *The Athletic Crusade, Sports and American Cultural Imperialism*; and *Collective Guilt and the Crucifixion*.

222.  Professor Novoa will also be forced to revise her lectures to remove any subject matter that would lead her to "promote" or "advance" a concept prohibited by the Stop WOKE Act, such as discussing the role of science in creating societies where an individual's race established their place in a social order, the role of racism in modern baseball, the roots of racism in Latin America, and the phenomena of collective guilt in modern cultures such as Argentina and the United States.

223.  Professor Novoa will also be forced to self-censor during debates amongst students, prohibiting her from engaging in the free exchange of ideas that is the hallmark of a successful debate.

224.  This chilling effect is consistent with other contemporaneous reports from Florida's public universities and colleges.

225.  For example, the president of St. Petersburg College candidly told a journalist that the law had already had a chilling effect on faculty, "especially those who teach history and American government," who are in a "tough spot" and asking whether they should "scratch [material] out of the books" used in their classes.

### F.     *The Stop WOKE Act Is Currently Imposing the "Pall of Orthodoxy" on Rechek and Members of the First Amendment Forum.*

226.  When registration for the Spring 2023 semester opens on October 31, 2022, Plaintiff Rechek intends to enroll in Professor Novoa's Science in Cultural Context class.

227.  As adults, college students are free to consider the views advanced by Professor Novoa and the materials in her courses and decide for themselves whether they have merit.

228.  Rechek is an adult capable of determining for himself whether the viewpoints advanced in Professor Novoa's class are defensible.

229.   To know whether the viewpoints advanced in Professor Novoa's class are defensible, Rechek must first have an opportunity to encounter them.

230.   Professor Novoa is a willing speaker and Rechek is a willing listener. They desire to engage in academic discussion concerning topics prohibited by the Stop WOKE Act in the **Science in Cultural Context** course.

231.   As students enrolled at USF, Rechek and the members of the First Amendment Forum benefit from a learning environment in which academic freedom is uninhibited by the "pall of orthodoxy."

232.   Other members of the First Amendment Forum are also interested in taking Professor Novoa's courses, as well as other courses offered by USF, free from the censorship imposed by the Stop WOKE Act.

233.   The First Amendment Forum exists to protect and advance access to civil discussions concerning matters of public and academic concern, recognizing that the academic value of the First Amendment is crucial at diverse institutions like USF.

234.   The rights of the members of the First Amendment Forum are in jeopardy because the Stop WOKE Act currently imposes an express "pall

of orthodoxy" over the courses and lectures available to them as students enrolled at USF.

235.   The interests that the First Amendment Forum seeks to protect—access to information and the ability to engage in a broad range of discussion, unfettered by the "pall of orthodoxy," about matters of scholarly and public concern—are germane to its purpose. Its members cannot engage in a full and frank discussion of contested matters—race and its role in both history and modern society are among the most fraught issues in the United States—if they fear that a professor's response to their questions may be reported to administrators, an Inspector General, or state lawmakers for disciplinary action.

236.   The First Amendment Forum's asserted claims and requested relief do not require the participation of its individual members.

237.   Florida's enactment and implementation of the Stop WOKE Act have caused and, unless enjoined, will continue to cause irreparable harm to the constitutional rights of Plaintiffs Rechek and the First Amendment Forum under the First Amendment.

238.   In particular, Plaintiffs Rechek and the First Amendment Forum's injuries under the Stop WOKE Act include:

(a)     The prohibition of engaging in a historical debate with Professor Novoa on the topics prohibited by the Stop WOKE Act;

(b)     The Stop WOKE Act chills the ability of Rechek and other students to access information unfettered by ideologically-driven filters imposed by political officials, causing harm that cannot be quantified or redressed through monetary damages; and

(c)     Rechek and other students fear that if they raise concepts prohibited by the Stop WOKE Act during a class discussion, they will risk contributing to or soliciting "instruction" that violates the law and jeopardizes their institution's funding.

239.   The speech rights of each of the Plaintiffs has been chilled now and will be chilled in the future, as the Stop WOKE Act infringes on their First Amendment rights (and threatens Novoa's livelihood) if they continue to engage in the kind of expression forbidden by the law.

240.   Unless the actions, policies, and practices of Defendants are enjoined by this Court, all of the Plaintiffs will suffer the continuing loss of their constitutional rights.

241.   All of the Plaintiffs have suffered irreparable injury and continue to suffer irreparable injury as a result of the Stop WOKE Act and the Defendants' efforts to enforce it.

242.   None of the Plaintiffs has a plain, adequate or complete remedy to protect their constitutional rights and to redress the wrongs and illegal acts complained of, other than preliminary and continuing injunctive relief.

243.   None of the Plaintiffs has an adequate remedy at law. Deprivation of rights guaranteed under the Constitution is an irreparable injury for purposes of injunctive relief. In cases involving the loss of First Amendment rights, such as in this case, damages are both inadequate and unascertainable.

244.   The public interest would be served by the granting of injunctive relief. In fact, the public interest is disserved by laws, such as the Stop WOKE Act, which interfere with the public's rights guaranteed under the First and Fourteenth Amendments.

245.   Plaintiffs have retained FIRE and Benjamin, Aaronson, Edinger & Patanzo, P.A. as their attorneys to represent them in this action. Defendants are obligated to pay for the cost of Plaintiffs' reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of the First Amendment
### (42 U.S.C. § 1983)
### (All Plaintiffs against all Defendants)

246.   Plaintiffs re-allege and incorporate paragraphs 1-7 and 9-245 of this Complaint.

247.   At public universities and colleges, faculty members' speech related to scholarship or teaching, or classroom speech related to matters of public concern, is protected by the First Amendment.

248.   Each of the concepts prohibited by the Stop WOKE Act addresses matters of public concern, regardless of whether some find those concepts uncomfortable, unwelcome, disagreeable, or offensive.

249.   In this way, the Stop WOKE Act prospectively limits the content of faculty members' speech—like Professor Novoa's—about the prohibited concepts in any class or other form of "instruction" at any public university or college in Florida, no matter the subject matter of the class or even if the "instruction" occurs outside the classroom.

250.   The Act also prospectively limits the protected right of students (like Recheck and members of the First Amendment Forum) and the public to receive information on matters of public concern.

251.   Thus, the Stop WOKE Act is a content-based and direct regulation of speech at Florida's institutions of higher education, triggering strict scrutiny.

252.   Under strict scrutiny, content-based laws like the Stop WOKE Act "are presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

253.   The Stop WOKE Act fails strict scrutiny.

254.   First, the State of Florida lacks any compelling interest for restricting speech on the basis of content at the State's public colleges and universities.

255.   The State of Florida has no compelling interest in prohibiting disfavored, politicized "concepts" from discussion in college classrooms.

256.   In adopting the Campus Free Expression Act, the State has disclaimed any interest in shielding college students from ideas they might find deeply offensive. Fla. Stat. §§ 1004.097(2)(f), (3)(f). Florida's political leaders cannot selectively abandon this principle when they themselves find the ideas "uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. § 1004.097(2)(f).

257.   In contrast, by adopting the Stop WOKE Act, the State has picked winners and losers in the "marketplace of ideas" as the statute makes eight specific viewpoints off limits and unlawful.

258.   Second, the Stop Woke Act fails strict scrutiny because it is far from being the least restrictive means of satisfying any state interest.

259.   For example, and without limitation, existing anti-discrimination measures—provided by Title VI of the Civil Rights Act of 1964, Title IX of the Educational Amendments of 1972, the Florida

Educational Equity Act, Florida Board of Governors Regulation 2.003, and policies promulgated by each educational institution—adequately address any state interest in preventing and remedying discriminatory harassment or conduct.

260.   Further, terminating a faculty member for speaking out on matters of public concern or defunding the institution that employs that faculty member are not the least restrictive means of regulation.

261.   Third, the Stop WOKE Act also fails strict scrutiny because it is not narrowly tailored. By targeting speech about a host of ideas on matters of public concern, the Stop WOKE Act suppresses far more speech than necessary to meet any state interest.

262.   The Stop WOKE Act fails strict scrutiny and is unconstitutional under the First Amendment (as incorporated against the states under the Fourteenth Amendment), both facially and as-applied to the Plaintiffs.

263.   Defendants are responsible for enforcing the Stop WOKE Act. There exists a credible threat that they will enforce the Stop WOKE Act.

264.   As a direct and proximate result of the Stop WOKE Act and its enforcement, Plaintiffs will suffer irreparable injury from the violation of their constitutional rights.

265.   Plaintiffs are entitled to preliminary and permanent injunctive relief, including but not limited to, an order enjoining all Defendants from enforcing the Stop WOKE Act.

266.   Unless Defendants are enjoined from enforcing the Stop WOKE Act, Plaintiffs will continue suffering irreparable harm.

267.   Plaintiffs have no other adequate remedy by which to prevent or minimize the continuing irreparable harm to their rights under the First and Fourteenth Amendments.

268.   Plaintiffs are also entitled to declaratory relief. An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their rights under the United States Constitution.

269.   Plaintiffs desire a judicial determination of their First Amendment rights and legal relations against Defendants as they pertain to their rights to speak or to receive information unfettered by the "pall of orthodoxy" imposed by legislative decree.

270.   Without declaratory and injunctive relief from this Court, Defendants' unconstitutional actions will continue, and Plaintiffs will suffer irreparable harm indefinitely.

**SECOND CAUSE OF ACTION**
**Violation of the First Amendment—**
**Viewpoint Discrimination**
**(42 U.S.C. § 1983)**
**(Prof. Novoa against all Defendants)**

271.   Plaintiffs re-allege and incorporate paragraphs 1-7 and 9-245 of this Complaint.

272.   At public universities and colleges, faculty members' speech related to scholarship or teaching, or classroom speech related to matters of public concern, is protected by the First Amendment. *Demers v. Austin*, 746 F.3d 402 (9th Cir. 2014); *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021).

273.   Each of the concepts prohibited by the Stop WOKE Act addresses matters of public concern, regardless of whether some find those concepts uncomfortable, unwelcome, disagreeable, or offensive.

274.   The Stop WOKE Act's prohibition against "endorsement" of a concept is viewpoint-discriminatory and therefore, presumptively unconstitutional. In particular, the Act prohibits those viewpoints which advocate, endorse, or advance the eight suspect categories of ideas.

275.   Because it is viewpoint-discriminatory, the prohibition limits classroom discussion, depriving faculty—including Professor Novoa—of important pedagogical tools in classroom teaching, including the ability to

feign a position to encourage discussion and critical thinking, such as devil's advocacy or Socratic dialogue.

276.   The Stop WOKE Act's requirement that prohibited concepts be discussed only in an "objective manner without endorsement" is viewpoint-discriminatory and therefore, presumptively unconstitutional.

277.   The Stop WOKE Act's "objective manner without endorsement" requirement fails strict scrutiny.

278.   The Stop WOKE Act's higher education provisions do not advance, nor are they narrowly tailored to serve, any compelling interest.

279.   Professor Novoa intends to engage in conduct proscribed by the Stop WOKE Act. Unless it is enjoined, the Stop WOKE Act requires Professor Novoa to revise curriculum for three of her classes: (1) Science in Cultural Context; (2) History of Sports; and (3) Modern Latin America.

280.   Unless the Stop WOKE Act is enjoined, Professor Novoa will be precluded from debating and interacting with her students with regard to the prohibited concepts and ideas which make up the core of her curriculum.

281.   Defendants are responsible for enforcing the Stop WOKE Act. There exists a credible threat that they will enforce the Stop WOKE Act.

282.   Professor Novoa is entitled to preliminary and permanent injunctive relief, including but not limited to, an order enjoining all Defendants from enforcing the Stop WOKE Act.

283.   Unless Defendants are enjoined from enforcing the Stop WOKE Act, Professor Novoa will continue suffering irreparable harm.

284.   Professor Novoa is also entitled to a declaration under 28 U.S.C. § 2201 that the Stop WOKE Act unlawfully favors one viewpoint and violates the First and Fourteenth Amendments to the United States Constitution.

285.   Without declaratory and injunctive relief from this Court, Defendants' viewpoint discrimination against Professor Novoa's freedom of speech will continue, and Professor Novoa will suffer irreparable harm indefinitely.

### THIRD CAUSE OF ACTION
### Violation of First Amendment—Prior Restraint
### (42 U.S.C. § 1983)
### (Prof. Novoa against all Defendants)

286.   Plaintiffs re-allege and incorporate paragraphs 1-7, 9-245, and 247-249 of this Complaint.

287.   The Stop WOKE Act is an unconstitutional blanket restriction on college and university faculty's speech on matters of public concern.

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995); *Barrett v. Thomas*, 649 F.2d 1193 (5th Cir. 1981).

288.   The Stop WOKE Act imposes a legislative prior restraint on faculty like Professor Novoa before judicial review of particular speech and without preserving the status quo, all in violation of *Freedman v. State of Md.*, 380 U.S. 51 (1965).

289.   Prior restraints on speech are "the most serious and the least tolerable infringement on" freedom of expression. *Neb. Press Ass'n v. Stuart,* 427 U.S. 539, 559 (1976).

290.   The Stop WOKE Act restricts faculty before speaking by prohibiting them from speaking in a way "that espouses, promotes, advances, inculcates, or compels [any] student . . . to believe" one of the prohibited issues stated in the Act, even though each of those prohibited issues bear on a matter of public concern.

291.   By restricting faculty speech on those issues to "objective" speech, the Act also restricts faculty before speaking on campus to only those viewpoints on matters of public concern approved by the State.

292.   A blanket prior restraint on faculty speaking on matters of public concern cannot survive unless it "furthers some vital government

end by a means that is least restrictive" of free speech. *Barrett*, 649 F.2d at 1200 (quotations omitted).

293.   Defendants can point to no vital government end that requires faculty to refrain from speaking out about the prohibited topics of public concern in the way the Stop WOKE Act requires them to. In essence, the Stop WOKE Act demands faculty "toe the prescribed political line." *Id.*

294.   The impact of the speech prospectively limited by the Stop WOKE Act does not outweigh the interests in free speech and debate of the vast number of students and faculty (both current and future) at Florida's institutions of higher education to engage in or hear such speech.

295.   Students and faculty have a well-established interest in preserving the classroom as a marketplace of ideas unfettered by the authoritative selection of Florida's political leaders.

296.   In adopting the Campus Free Expression Act, the State has recognized students' unfettered right to access ideas and opinions. Fla. Stat. § 1004.097(2)(f), (3)(a), (3)(f).

297.   These interests do not only inure to the benefit of Professor Novoa or faculty, but also include students and the the broader public, as the right of unfettered discourse "is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian*, 385 U.S. at 603.

298.   To the contrary, the Stop WOKE Act's limits on teaching undermine the university's "chief mission" to "equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022).

299.   Unless it is enjoined, the Stop WOKE Act will force Professor Novoa to refrain from speaking about those prohibited matters of public concern.

300.   Defendants are responsible for enforcing the Stop WOKE Act. There exists a credible threat that they will enforce the Stop WOKE Act.

301.   Professor Novoa is entitled to preliminary and permanent injunctive relief, including but not limited to, an order enjoining Defendants from enforcing the Stop WOKE Act.

302.   Unless Defendants are enjoined from enforcing the Stop WOKE Act, Professor Novoa will continue suffering irreparable harm.

303.   Professor Novoa is also entitled to a declaration under 28 U.S.C. § 2201 that the Stop WOKE is a blanket prior restraint against the right to speak on matters of public concern that violates the First and Fourteenth Amendments to the United States Constitution.

304.  Without declaratory and injunctive relief from this Court, Defendants' restriction of Professor Novoa's freedom of speech will continue, and Professor Novoa will suffer irreparable harm indefinitely.

**FOURTH CAUSE OF ACTION**
**Violation of First Amendment—Right to Receive**
**Information and Ideas**
**(42 U.S.C. § 1983)**
**(Plaintiffs Rechek & First Amendment Forum against all**
**Defendants)**

305.  Plaintiffs re-allege and incorporate paragraphs 1-7 and 9-245 of this Complaint.

306.  As students enrolled in a public institution of higher education, Rechek and the members of the First Amendment Forum have an interest in learning and debating the views of the faculty members they pay to teach them, including—but not limited to—those courses taught by Professor Novoa.

307.  The First Amendment protects the right of university students to "receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

308.  The First Amendment protects the right—of Rechek and the members of the First Amendment Forum—to access to information

unfettered by a legislated "pall of orthodoxy." *Keyishian*, 385 U.S. at 603 (1967).

309.  The interests of Plaintiffs Rechek and the members of the First Amendment Forum are commensurate with the "chief mission" of the university: "to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic and political life of our democratic republic." *Speech First*, 32 F.4th at 1128.

310.  The Stop WOKE Act imposes a content-based, ideologically-driven barrier to accessing information and ideas, declaring some ideas permissible and the "endorsement" of others prohibited. Yet, "[u]nder the First Amendment, there is no such thing as a false idea." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974).

311.  The State of Florida lacks any compelling interest in enforcing the Stop WOKE Act to suppress the flow of information and ideas on matters of public concern to students in its public colleges and universities.

312.  Because the Act suppresses information and ideas on a broad range of public issues, it is neither narrowly tailored nor the least restrictive means for meeting any state interest.

313.   In sum, the Stop WOKE Act is depriving and will keep depriving Rechek and First Amendment Forum of their constitutional right to receive information and ideas on matters of public concern.

314.   Defendants are responsible for enforcing the Stop WOKE Act. There exists a credible threat that they will enforce the Stop WOKE Act.

315.   Rechek and First Amendment Forum are entitled to preliminary and permanent injunctive relief, including but not limited to, an order enjoining Defendants from enforcing the Stop WOKE Act.

316.   Unless Defendants are enjoined from enforcing the Stop WOKE Act, Rechek and First Amendment Forum will continue suffering irreparable harm.

317.   Rechek and First Amendment Forum are also entitled to a declaration under 28 U.S.C. § 2201 that the Stop WOKE Act unlawfully restricts their right to receive information and ideas on matters of public concern and thus violates the First and Fourteenth Amendments to the United States Constitution.

318.   Without declaratory and injunctive relief from this Court, Defendants' infringement on Rechek and First Amendment Forum's First Amendment rights will continue, and they will suffer irreparable harm indefinitely.

## FIFTH CAUSE OF ACTION
## Violation of the First Amendment—Facial Overbreadth
## (42 U.S.C. § 1983)
## (Prof. Novoa against all Defendants)

319.   Plaintiffs re-allege and incorporate paragraphs 1-7, 9-245, and 247-249 of this Complaint.

320.  The STOP Woke Act "prohibits a substantial amount of protected expression." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 237 (2002).

321.   First, it prohibits a sweeping amount of protected speech related to scholarship or teaching, or classroom speech over matters of public concern. The First Amendment protects that speech regardless of whether some find those concepts uncomfortable, unwelcome, disagreeable, or offensive.

322.   What's more, the Stop WOKE Act's prohibition on any "instruction that espouses, promotes, advances, inculcates, or compels [any] student . . . to believe" a forbidden concept reaches a real and substantial range of protected expression, including much of Professor Novoa's curriculum.

323.   First, in repeatedly referencing "[a] person" in the prohibited concepts, the Stop WOKE Act reaches discussion of a concept in relation to

*any* "person" and is not limited to a "student or employee"—language the

legislature had at its disposal and did not use—in the classroom. Thus, the

Stop WOKE Act restricts speech about potentially any person related to a

host of public issues beyond the campus boundaries—even though

"[s]peech on matters of public concern is . . . at the heart of the First

Amendment's protection." *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011)

(citation and internal quotation marks omitted).

324.   Second, in employing the operative terms "espouses, promotes,

advances, inculcates, or compels," the Stop WOKE Act reaches any speech

which merely supports, furthers, contributes to the growth of, or simply

brings forward for consideration, even if that result is only an incidental

effect and not the express intent or purpose of the instruction.

325.   The Stop WOKE Act contains no definitions or other

meaningful limiting principles that might constrain these terms that

restrict a wide range of speech on matters of public concern. Nor does the

Act does not even seem to require that a faculty member to specifically

intend that his or her speech fulfill one or more of the enumerated

prohibitions.

326.   The requirement that each concept be discussed only in an

"objective" manner is no such limiting principle—the Act fails to define

"objective." At the same time, it is a content-based limitation on speech reaching a real and substantial range of protected expression on matters of public concern. Under this ill-defined requirement, even the teaching of well-accepted ideas are censored by the Stop WOKE Act's broad scope.

327.  The Stop WOKE Act serves no objective other than prohibiting a substantial amount of protected expression. *See United States* v. *Stevens*, 559 U.S. 460, 473 (2010). This renders the Stop WOKE Act facially unconstitutional, as the substantial protected expression the Act prohibits is well beyond any possible "plainly legitimate sweep" of the Act. *See Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).

328.  The "likelihood that the statute's very existence will inhibit free expression" by "inhibiting the speech of third parties who are not before the Court" also shows why the Stop WOKE Act is facially overbroad. *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 799, 800 (1984). These parties include the thousands of faculty members at Florida's colleges and universities who must consider self-censorship because of the Stop WOKE Act's sweeping prohibitions on matters of public concern.

329.  The Court should preliminarily and permanently enjoin the Stop WOKE Act because it is facially overbroad and chills a substantial amount of protected speech.

330.  Defendants are responsible for enforcing the Stop WOKE Act. There exists a credible threat that they will enforce the Stop WOKE Act.

331.  Unless Defendants are enjoined from enforcing the Stop WOKE Act, Professor Novoa and other faculty will continue suffering irreparable harm to their First Amendment rights.

332.  Professor Novoa is also entitled to a declaration under 28 U.S.C. § 2201 that the Stop WOKE Act is facially overbroad.

333.  Without declaratory and injunctive relief from this Court, the chilling effects from the Act's sweeping overbreadth will only deepen, and exacerbate the irreparable harm suffered by Professor Novoa, university faculty, and their students.

### SIXTH CAUSE OF ACTION
### Violation of Due Process—Vagueness
### (42 U.S.C. § 1983)
### (Prof. Novoa against all Defendants)

334.  Plaintiffs re-allege and incorporate paragraphs 1-7, 9-245, and 247-249 of this Complaint.

335.   The Due Process Clause prohibits the State of Florida from depriving "life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.

336.   The Fourteenth Amendment is violated where a law "fails to give ordinary people fair notice of the conduct it punishes," or is so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). This is because a "fundamental principle" of the American legal system is that laws "must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012).

337.   Avoiding vagueness is critical in laws affecting speech because of the "obvious" potential for a "chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997).

338.   The STOP Woke Act is void for vagueness because it infringes on Plaintiffs' constitutionally protected rights under the First Amendment and provides inadequate notice of the conduct it purports to prohibit.

339.   The STOP Woke Act and the Board of Governors' regulations fail to define "objective manner without endorsement."

340.  Whether speech—particularly speech on hotly-contested issues fraught with emotion—is "objective" is inherently vague and subject to the interpretation of audiences inside and outside of the classroom.

341.  As evidenced by USF's interpretation, the meaning of "objective manner without endorsement" turns on the faculty member's subjective "emotions" and whether, in the eyes of others, their discussion suggests "favoritism, approval, or personal bias." As a result, faculty members' exposure to disciplinary action—and their institution's eligibility for tens of millions of dollars in annual funding—turns on others' perceptions of the thoughts within their heads.

342.  This definition is buttressed by lawmakers' express intent in including the language: to prevent instructors from sharing their thoughts, views, or interpretations of given material, events, theories, or concepts— unless those thoughts, views, or interpretations affirm the state's viewpoint.

343.  In other words, faculty members will be said to violate the law if their classroom discussion (or, in the absence of a recording of the discussion, a student's recollection about or interpretation of what their professor *meant*) is thought to have, in any way, introduced their "take" on contested matters.

344.   The vagueness inherent in the law renders faculty members uncertain as to whether feigning a position—that is, engaging in devil's advocacy or Socratic dialogue, both important pedagogical tools used for millennia by collegiate lecturers to spur discussion—violates the Stop WOKE Act, or whether taking a position is only prohibited if a faculty member subjectively believes in that position.

345.   The risk that discussions will be deemed unobjective is all the more pronounced in light of the unfettered authority of state lawmakers to declare that the law has been violated, risking a politicized and standardless evaluation of classroom discussion.

346.   The Stop WOKE Act is also rendered unconstitutionally vague because of the conflict between its authorization of "objective" discussion and its prohibition of "instruction that espouses, promotes, advances, inculcates, or compels [a] student . . . to believe" a prohibited concept, as objective discussion itself has a tendency to "promote" or "advance" belief in a given concept.

347.   The vagueness in the Stop WOKE Act is evidenced and exacerbated by guidance issued by the state's institutions of higher education, including USF, conceding that the law is uncertain and warning faculty that it reaches a wide range of lectures, materials, and speakers.

348.   The Stop WOKE Act is also vague because of its conflict with existing Florida law, the Campus Free Expression Act, which obligates faculty to refrain from "shield[ing] students . . . from expressive activities" on the basis that they may be "uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. § 1004.097(2)(f), (3)(f).

349.   The resulting conflict—that faculty must shield students from the Stop WOKE Act's prohibited concepts because they are offensive, but must also refuse to shield students from ideas because they may be offensive—requires faculty to violate one law or the other.

350.   Because of the vagueness in the Stop WOKE Act and its conflict with the Campus Free Expression Act, faculty are exposed to the possibility of arbitrary and discriminatory enforcement.

351.   As a direct and proximate result of this unconstitutional vagueness, Professor Novoa is being deprived of her constitutional rights.

352.   Defendants are responsible for enforcing the Stop WOKE Act. There exists a credible threat that they will enforce the Stop WOKE Act.

353.   Professor Novoa is entitled to preliminary and permanent injunctive relief, including but not limited to, an order enjoining Defendants from enforcing the Stop WOKE Act.

354.   Professor Novoa is also entitled to a declaration under 28 U.S.C. § 2201 that the Stop WOKE Act is unconstitutionally vague under the Fourteenth Amendment.

355.   Without declaratory and injunctive relief from this Court, the chilling effects from the Act's sweeping overbreadth will only deepen, and Professor Novoa will suffer irreparable harm indefinitely.

**SEVENTH CAUSE OF ACTION**
**Violation of the Campus Free Expression Act**
**(Fla. Stat. § 1004.097)**
**(Plaintiff Rechek & First Amendment Forum against**
**Defendant USF Board of Trustees)**

356.   Plaintiffs re-allege and incorporate paragraphs 1-7, 9-245, and 247-249 of this Complaint.

357.   The Campus Free Expression Act prohibits a public university from denying students "access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. §§ 1004.097(2)(f), (3)(f).

358.   The Campus Free Expression Act expressly includes "faculty research, lectures, writings, and commentary" as among the sources of information that may not be restricted. Fla. Stat. § 1004.097(3)(a).

359.   The Campus Free Expression Act expressly includes a right of access to—and a right to engage in expression consisting of—"faculty

research, lectures, writings, and commentary" without interference on the basis that the ideas conveyed may be upsetting or offensive to others.

360.   The Stop WOKE Act and the steps taken by the University of South Florida to implement its provisions are intended to shield students from access to or observation of opinions, beliefs, or points of view on the basis that their expression may make a student uncomfortable.

361.   Plaintiff Rechek and the members of the First Amendment Forum are willing listeners who want to hear from a willing speaker. All that stands in their way is the Stop WOKE Act and its implementation.

362.   Plaintiffs Rechek and the First Amendment Forum is entitled to declaratory and injunctive relief from enforcement of the Stop WOKE Act to inhibit access to "concepts" that may make him uncomfortable. Fla. Stat. §§ 1004.097(4)(a); 1000.05(4)(a).

363.   As a direct and proximate result of Defendants' actions as described above, Rechek and First Amendment Forum are being deprived of their rights under the Campus Free Expression Act. As a legal consequence of Defendants' violations of Plaintiffs' Campus Free Expression Act rights, which are irreparable injuries *per se*, Rechek and First Amendment Forum are entitled to injunctive relief, including but not limited to, an order enjoining Defendant USF from enforcing the Stop

WOKE Act. Rechek and First Amendment Forum are also entitled to a declaration that the Stop WOKE Act's Amendments to the Florida Civil Rights Act of 1992 unlawfully restrict their right to receive information and violate the Campus Free Expression Act.

364.   The Campus Free Expression Act allows persons injured by its violation to bring an action against "a public institution of higher education" to obtain declaratory and injunctive relief. Fla. Stat. § 1004.097(4)(a).

365.   Plaintiffs Rechek and the First Amendment Forum is entitled to an award of costs and reasonable attorney's fees paid from nonstate funds. Fla. Stat. § 1004.097(4)(a).

366.   Plaintiffs Rechek and First Amendment Forum have no adequate legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their rights under the First and Fourteenth Amendments and the Campus Free Expression Act.

367.   Without declaratory and injunctive relief from this Court, Defendants' unlawful actions will continue, and Plaintiffs Rechek and First Amendment Forum will suffer irreparable harm indefinitely.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants and issue the following forms of relief:

A.      Declare that the provisions of Florida Statutes § 1000.05 added by the Stop WOKE Act are facially unconstitutional under the First and Fourteenth Amendments;

B.      Declare that the provisions of Florida Statutes § 1000.05 added by the Stop WOKE Act are unconstitutional under the First and Fourteenth Amendments, as applied to Professor Novoa;

C.      Declare that the provisions of Florida Statutes § 1000.05 added by the Stop WOKE Act are unconstitutional under the First and Fourteenth Amendments, as applied to Plaintiffs Rechek and the First Amendment Forum;

D.      Issue preliminary and permanent injunctive relief, without bond, enjoining Defendants and their employees, agents, and successors in office from enforcing the Stop WOKE Act against Plaintiffs;

E.      Award reasonable attorney's fees, expenses, and costs of litigation under 42 U.S.C. § 1988 and other applicable law, including Florida Statutes § 1004.097(4)(a); and

F.      Award such other relief as this Court deems just and proper.


DATED:     September 6, 2022

Respectfully submitted,

/s/ Greg H. Greubel          |  /s/ Gary S. Edinger
GREG HAROLD GREUBEL*          |  GARY S. EDINGER, ESQUIRE
PA. Bar No. 321130; NJ No. 171622015  |  Fla. Bar No.: 0606812
ADAM STEINBAUGH*             |  BENJAMIN, AARONSON, EDINGER &
PA. Bar No. 326475          |      PATANZO, P.A.
JT MORRIS*                   |  305 N.E. 1st Street
TX Bar No. 2409444          |  Gainesville, Florida 32601
FOUNDATION FOR INDIVIDUAL RIGHTS AND  |  Tel:   (352) 338-4440
    EXPRESSION               |  Fax:  (352) 337-0696
510 Walnut Street; Suite 1250  |  GSEdinger12@gmail.com
Philadelphia, PA 19106
Tel:   (215) 717-3473
Fax:  (215) 717-3440
greg.greubel@thefire.org
adam@thefire.org
JT.Morris@thefire.org

*Pro Hac Vice Motions Forthcoming

    Counsel for Plaintiffs Adriana Novoa, Sam Rechek, and the First
    Amendment Forum

86

## **VERIFICATION OF ADRIANA NOVOA**

Pursuant to 28 U.S.C. § 1746, I, ADRIANA NOVOA, declare as follows:

1.　　I am an Assistant Professor in the Department of History at the University of South Florida and a plaintiff in this civil action.

2.　　I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

3.　　I have personal knowledge of the factual allegations in paragraphs 10-13, 132, 136, 138-152, 154-218, 220-223, and 230 of the Complaint and know them to be true.

4.　　With respect to the factual allegations in paragraphs 35-36 and 94-102 of the Complaint, which concern the University of South Florida but of which I do not have personal knowledge, I believe them all to be true based on my review of the statutes, policies, or guidance cited in those allegations.

I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on September 6, 2022.

_____
Adriana Novoa

87

## VERIFICATION OF SAMUEL RECHEK

Pursuant to 28 U.S.C. § 1746, I, SAMUEL RECHEK, declare as follows:

1.     I am a Plaintiff in the present case and a citizen of the United States of America.

2.     I am the president of the First Amendment Forum at University of South Florida ("First Amendment Forum"), a plaintiff in the present case.

3.     I have read the foregoing Verified Complaint for Declaratory and Injunctive Relief.

4.     I have personal knowledge of the factual allegations in paragraphs 14-17, 153, 226-235, and 237-238 of the Complaint, and know them to be true.

5.     I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on September 6, 2022.

_____
Samuel Rechek