# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

|  |  |
|---|---|
| ADRIANA NOVOA, SAMUEL RECHEK, and the FIRST AMENDMENT FORUM AT UNIVERSITY OF SOUTH FLORIDA, | Case No. 4:22cv324-MW/MF |
| *Plaintiffs,* | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW** |
| v. | |
| MANNY DIAZ, JR., in his official capacity as the Commissioner of the Florida State Board of Education, *et al.*, | |
| *Defendants.* | |

Under Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs move for a preliminary injunction enjoining Defendants from enforcing as unconstitutional Fla. Stat. §§ 1000.05(4) and 1001.92(5), the higher education provisions of the "Stop WOKE Act." In support of this motion, Plaintiffs submit the following:

(1)   Memorandum of Law;

(2)   Declaration of Adam Steinbaugh in Support of Plaintiffs' Motion for Preliminary Injunction, September 15, 2022, and accompanying Exhibits 1 through 29; and

(3)   Declaration of Adriana Novoa in Support of Plaintiffs' Motion for Preliminary Injunction, September 15, 2022, and accompanying Exhibits A through F.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................v

MEMORANDUM OF LAW ...............................................................1

PRELIMINARY STATEMENT ...........................................................1

STATEMENT OF FACTS....................................................................3

    I.    The Stop WOKE Act's Unclear Language Draws on Efforts to Suppress "Woke" Viewpoints...................................................3

        A.    Stop WOKE is introduced to combat "divisive ideologies."...........................................................................4

        B.    The Stop WOKE Act imposes vague and viewpoint-based campus speech restrictions, with severe penalties for violations........................................................5

        C.    The manner in which Florida institutions have implemented the Stop WOKE Act tracks its framers' intent and the Act's ambiguities. .....................................7

    II.    The Stop WOKE Act Chills Plaintiffs' Protected Expression. ....................................................................8

        A.    The Stop WOKE Act chills Professor Novoa from introducing viewpoints necessary to teaching her courses..................................................................9

        B.    The Stop WOKE Act limits the access of Rechek and members of the First Amendment Forum to information and ideas.....................................................11

        C.    Plaintiffs sue to vindicate their rights ..............................13

ARGUMENT .....................................................................................13

    I.    There Is a Strong Likelihood That Plaintiffs Will Succeed on the Merits.....................................................................14

A.   Plaintiffs have standing to challenge the "Stop WOKE Act.".................................................................14

    1.   Plaintiffs intend to engage in protected expression arguably proscribed by the Act. ............15

    2.   There is a credible threat Defendants will enforce the Stop WOKE Act. ..................................16

    3.   First Amendment Forum has organizational standing. ................................................................18

B.   The First Amendment protects Plaintiffs' rights to free expression and access to information and ideas.......19

    1.   The First Amendment protects faculty speech related to scholarship and teaching. ......................19

    2.   The First Amendment and Florida state law protect students' access to information and ideas against laws imposing the "pall of orthodoxy." ........................................................... 22

C.   The Stop WOKE Act Violates the First and Fourteenth Amendments and Conflicts with the Campus Free Expression Act. ......................................... 23

    1.   Because the Stop WOKE Act discriminates against viewpoints, it is presumptively unconstitutional. ................................................... 24

    2.   The Stop WOKE Act is not necessary to serve a compelling state interest and is not narrowly tailored................................................................. 26

    3.   The Stop WOKE Act also fails scrutiny under National Treasury Employees Union. .................... 29

    4.   The Stop WOKE Act is unconstitutionally overbroad............................................................... 33

5.    The Stop WOKE Act is unconstitutionally vague and conflicts with the Campus Free Expression Act. ...................................................... 34

II.    Plaintiffs Satisfy the Remaining Requirements to Obtain a Preliminary Injunction. .............................................................. 36

A.    Plaintiffs will suffer irreparable injury absent an injunction. ........................................................................ 36

B.    The Balance of Equities and Public Interest Sharply Favor Plaintiffs .................................................................37

C.    Plaintiffs Should Be Excused from Posting Security ........37

CONCLUSION .................................................................... 38

REQUEST FOR ORAL ARGUMENT .................................................. 38

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B) ....... 40

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 24.1 ...........41

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F) ........ 42

CERTIFICATE OF SERVICE .......................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*6th Cong. Dist. Republican Comm. v. Alcorn*,
 913 F.3d 393 (4th Cir. 2019) ............................................................... 33

*Adamian v. Jacobsen*,
 523 F.2d 929 (9th Cir. 1975) ............................................................... 30

*Adams v. Trs. of the Univ. of N.C.-Wilmington*,
 640 F.3d 550 (4th Cir. 2011) ......................................................... 19, 21

*Austin v. Univ. of Fla. Bd. of Trs.*,
 No. 1:21cv184-MW/GRJ, 2022 U.S. Dist. LEXIS 11733
 (N.D. Fla. Jan. 21, 2022) ..................................................................... 20

*BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*,
 *LLC*, 425 F.3d 964 (11th Cir. 2005) .....................................................37

*Bishop v. Aronov*,
 926 F.2d 1066 (11th Cir. 1991) .....................................................31, 32

*Buchanan v. Alexander*,
 919 F.3d 847 (5th Cir. 2019) ................................................................21

*Burson v. Freeman*,
 504 U.S. 191 (1992) ............................................................................. 26

*Citizens for Police Accountability v. Browning*,
 572 F.3d 1213 (11th Cir. 2009) ........................................................... 26

*Club Madonna, Inc. v. City of Miami Beach*,
 924 F.3d 1370 (11th Cir. 2019) ............................................................. 3

*DeJohn v. Temple Univ.*,
 537 F.3d 301 (3d Cir. 2008) ................................................................ 27

*Demers v. Austin*,
 746 F.3d 402 (9th Cir. 2014) ................................................................21

*Elrod v. Burns,*
    427 U.S. 347 (1976). ............................................................ 36

*Epperson v. Arkansas,*
    393 U.S. 97 (1968)............................................................... 17

*Falls v. DeSantis,*
    No. 4:22-cv-00166-MW-MJF (N.D. Fla. July 8, 2022) ..................... 20

*Fitzgerald v. Alcorn,*
    285 F. Supp. 3d 922 (W.D. Va. 2018)................................... 33

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ......................................................21, 32

*Gay Students Org. of Univ. of N.H. v. Bonner,*
    367 F. Supp. 1088 (D.N.H. 1974).......................................13

*Gertz v. Robert Welch,*
    418 U.S. 323 (1974) ........................................................ 20

*Hardy v. Jefferson Cmty. Coll.,*
    260 F.3d 671 (6th Cir. 2001)......................................... 19, 20

*Healy v. James,*
    408 U.S. 169 (1971) .........................................................13

*Honeyfund.com, Inc. v. DeSantis,*
    No. 4:22cv227-MW/MAF, 2022 U.S. Dist. LEXIS 147755
    (N.D. Fla. Aug. 18, 2022) ...................................... 24, 27, 34

*Keyishian v. Bd. of Regents,*
    385 U.S. 589 (1967)....................................................*passim*

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972)..........................................................17

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ........................................................ 34

*LaCroix v. Town of Fort Myers Beach,*
    38 F.4th 941 (11th Cir. 2022).............................................37

*Lane v. Franks,*
573 U.S. 228 (2014) ............................................................ 32

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ............................................................ 14

*Martin v. Struthers,*
319 U.S. 141 (1943) ............................................................ 22

*Matal v. Tam,*
137 S. Ct. 1744 (2017) ........................................................ 30

*Mech v. Sch. Bd. of Palm Beach Cty.,*
806 F.3d 1070 (11th Cir. 2015) ........................................... 20

*Meriwether v. Hartop,*
992 F.3d 492 (6th Cir. 2021) ......................................... 19, 21

*Molpus v. Fortune,*
432 F.2d 916 (5th Cir. 1970) ............................................... 13

*Neb. Press Ass'n v. Stuart,*
427 U.S. 539 (1976) ............................................................ 31

*Reno v. ACLU,*
521 U.S. 844 (1997) ............................................................ 35

*Ridley v. Mass. Bay Transp. Auth.,*
390 F.3d 65 (1st Cir. 2004) ............................................ 26, 27

*Rodriguez v. Maricopa Cty. Comm. Coll. Dist.,*
605 F.3d 703 (9th Cir. 2009) ............................................... 30

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819 (1995) ................................................. 21, 24, 26

*Santa Cruz Lesbian & Gay Cmty. Center v. Trump,*
No. 20-cv-07741-BLF, ECF No. 80 (N.D. Cal., Dec. 22, 2020) .......... 16

*Sentinel Commc'ns Co. v. Watts,*
936 F.2d 1189 (11th Cir. 1991) ............................................. 3

*Shelton v. Tucker,*
    364 U.S. 479 (1960) .................................................... 3

*Shurtleff v. City of Boston,*
    142 S. Ct. 1583 (2022) ........................................... 20

*Simon v. E. Ky. Welfare Rts. Org.,*
    426 U.S. 26 (1976) ................................................. 14

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) ..................... 15, 16, 18, 23

*Stanley v. Georgia,*
    394 U.S. 557 (1969) .............................................. 22

*Stuart v. Camnitz,*
    774 F.3d 238 (4th Cir. 2014) ................................... 33

*Stuart v. Loomis,*
    992 F. Supp. 2d 585 (M.D.N.C. 2014) ................... 33

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 14 (2014) ................................................. 15

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957) ................................... 20, 22, 27

*United Food & Com. Workers Union Loc. 751 v. Brown Grp.,*
    517 U.S. 544 (1996) .............................................. 18

*United States v. Nat'l Treasury Emps. Union,*
    513 U.S. 454 (1995) .................................. 29, 30, 31

*United States v. Stevens,*
    559 U.S. 460 (2010) .............................................. 33

*Urofsky v. Gilmore,*
    216 F.3d 401 (4th Cir. 2000) ................................. 20

*Vital Pharms., Inc. v. Alfieri,*
    23 F.4th 1282 (11th Cir. 2022) .............................. 14

*W. Va. State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) ................................................................ 24

*Warth v. Seldin,*
   422 U.S. 490 (1975) ............................................................... 18

*Whole Woman's Health v. Jackson,*
   142 S. Ct. 522 (2021) ............................................................ 18

*Winter v. Nat'l Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................... 36

*Wollschlaeger v. Governor,*
   848 F.3d 1293 (11th Cir. 2017) ................................. 15, 26, 34

## Statutes

Campus Free Expression Act, Fla. Stat. § 1004.097 ........................... *passim*

Fla. Stat. § 1000.05(4)(a) ........................................................... 5, 6, 29

Fla. Stat. § 1000.05(4)(b) ............................................................. 6

Fla. Stat. § 1000.05(6)(b) ............................................................. 19

Fla. Stat. § 1001.92(5) .............................................................. 7, 18

## Regulations

Bd. of Govs. Reg. No. 10.005(1)(c) ............................................. 5, 31

Bd. of Govs. Reg. No. 10.005(2)-(4) ............................................. 18

Bd. of Govs. Reg. No. 10.005(3)(c) ............................................. 6

## Rules

Federal Rules of Civil Procedure, Rule 65(c) ............................... 45

## Other Authorities

Cass R. Sunstein, *Democracy and the Problem of Free Speech*
      169 (1993) .......................................................................................... 26

Kurt Vonnegut, *Books Into Ashes*, N.Y. Times (Feb. 7, 1982), .................... 38

*PEN America: America's Censored Classrooms* (Aug. 17, 2022) ................. 4

*What Does 'Woke' Mean?*, Merriam-Webster .............................................. 4

## MEMORANDUM OF LAW

## PRELIMINARY STATEMENT

The higher education provisions of the Stop WOKE Act are a naked viewpoint-based restriction on protected speech, violating the First and Fourteenth Amendments. Just as the First Amendment bars a legislature from proscribing ideas by banning certain speakers and groups because of their views, so too does it bar legislatures from banning the views themselves. This includes banning views from college classrooms, which the First Amendment guards against a state-imposed "pall of orthodoxy." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

Banning views from college classrooms is exactly what the Stop WOKE Act does. Its proponents have proudly argued as much, abandoning the pretext of the Act's formal name ("Individual Freedom") in favor of an informal name better conveying its audacious attack on the First Amendment: "Stop WOKE." If not enjoined, the authority to declare some ideas "divisive" and *per se* unlawful will be deployed to burden speech across the ideological spectrum, transforming college classrooms from "peculiarly the 'marketplace of ideas'" into party-line echo chambers. *Id.*

Plaintiffs ask the Court to enjoin the Act's enforcement and stop its vast chilling effect on protected student and faculty speech. The Court should grant Plaintiffs' motion for four reasons:

1.      Plaintiffs have standing to challenge the Act. Each can point to an injury-in-fact to their First Amendment rights traceable to Defendants.

2.      Plaintiffs are likely to succeed on the merits. The Stop WOKE Act is presumptively unconstitutional because it violates Plaintiffs' First Amendment rights to speak and receive information—rights essential to the robust debate essential to higher education. The Act is also an overbroad, blanket restriction on faculty speech for which Defendants lack any justification.

3.      Plaintiffs will continue to suffer irreparable harm to their First Amendment rights without immediate injunctive relief.

4.      The public interest always favors robust and free debate on matters of public concern. By contrast, Florida lacks any interest in suppressing that debate through a viewpoint-driven law.

## STATEMENT OF FACTS[1]

Plaintiff Adriana Novoa teaches Latin American history at the University of South Florida (USF). She is joined by Plaintiff Samuel Rechek, an undergraduate student who founded Plaintiff First Amendment Forum at USF, a student organization dedicated to fostering the diverse exchange of ideas on their campus. Plaintiffs are willing speakers and willing listeners who oppose how the Stop WOKE Act controls what they can freely discuss at their university, where the "vigilant protection of constitutional freedoms is nowhere more vital[.]" *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).

## I.   The Stop WOKE Act's Unclear Language Draws on Efforts to Suppress "Woke" Viewpoints.

The drafters of Stop WOKE drew the Act's language from previous efforts—already struck down as unconstitutional—to suppress teaching in higher education. They coupled the unclear language of the Act with severe penalties for faculty, their colleagues, and their institutions to accentuate the Act's chilling effect. And they succeeded: Florida's universities and colleges are issuing guidance effectuating that chilling effect.

---

[1]   Because Plaintiffs' core claims are primarily facial challenges, the individual facts are largely irrelevant except to establish standing and the claims are ripe for review without the need to develop an extensive factual record. *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1197 (11th Cir. 1991); *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019). Facts establishing standing and supporting Plaintiffs' constitutional claims are set forth at length in the Verified Complaint. (Doc. 1).

**A.   Stop WOKE is introduced to combat "divisive ideologies."**

The "Stop Wrongs Against Our Kids and Employees (W.O.K.E.) Act" is Florida's entry in the rush of 191 measures introduced nationwide to target amorphous conceptions of "critical race theory."[2] Although the enacting bill purported to make supportive "legislative findings," it lacked any findings relating to higher education. Steinbaugh Decl. ¶ 3; Exh 1.

But its proponents intended the Act to stop "woke" views in higher education.[3] For example, Governor DeSantis heralded the Act as "build[ing] on" his efforts to "ban Critical Race Theory and the New York Times' 1619 Project." Steinbaugh Decl. ¶¶ 7, 18; Exhs. 10, 21.  Its sponsors pledged it would restrict "divisive ideologies" and bar faculty from offering "any sort of ideology or personal beliefs," or "their opinion, or their belief, or their take," to ensure that no professor might "change" a student's views. *Id.* ¶¶ 10, 14, 16; Exhs. 12 (at 51:13, 1:18:44), 15 (at 6:07:07), 19.

---

[2]    *PEN America: America's Censored Classrooms* (Aug. 17, 2022), https://pen.org/report/Americas-censored-classrooms. These measures attracted only one Democratic co-sponsor.

[3]    "Woke," is a slang term owing its origins to African-American Vernacular English, evolving first to become a "watch word in parts of the black community for those who were self-aware, questioning the dominant paradigm" and then to become a shorthand identifier for left-leaning political views. *What Does 'Woke' Mean?,* Merriam-Webster, https://bit.ly/3BaeJ36 (last visited Sept. 11, 2022). It has since been repurposed as a pejorative caricature of ideological perspectives ascribed to the political left—akin, perhaps, to "politically correct."

In passing the Stop WOKE Act, the Florida legislature did an about-face from the state's Campus Free Expression Act. Just a year earlier, it amended that law to ensure students' right to "access to . . . ideas and opinions," including lectures, and prohibiting universities from "shield[ing] students" from concepts on the basis that the ideas may be "uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. § 1004.097(2)(f), (3)(a), (3)(f).

### B. The Stop WOKE Act imposes vague and viewpoint-based campus speech restrictions, with severe penalties for violations.

The Stop WOKE Act adds a new category of discrimination to the Florida Educational Equity Act (FEEA): "instruction" that "espouses, promotes, advances, inculcates, or compels" a student "to believe" any of eight enumerated viewpoints. Fla. Stat. § 1000.05(4)(a). Each viewpoint (which the Act deems "concepts") references "[m]embers of one race," "[a] person," or certain "virtues." *Id.*

The Stop WOKE Act's implementing regulations confirm that "instruction" broadly encompasses anything within "the process of teaching or engaging students with content about a particular subject . . . within a course." *See id*; Bd. of Govs. Reg. No. 10.005(1)(c). It does not require that "instruction" be evaluated for whether it constituted actionable

discrimination under federal anti-discrimination laws, narrowly limited to repetitious, severe conduct. (See pp. 27-28, *infra*). Without these narrowing features, the first introduction of a prohibited viewpoint violates the Act.

The Stop WOKE Act purports to limit its reach, but both its text and its drafters' statements reveal it to be unrestrained. Although the Act states that it excludes "discussion of the concepts" if "part of a larger course of training or instruction" and if "given in an objective manner without endorsement of the concepts," it fails to define either "objective manner" or "endorsement." Fla. Stat. § 1000.05(4)(b). What's more, its drafters made clear that these terms were intended to prevent faculty from sharing their views on a prohibited viewpoint. Steinbaugh Decl. ¶¶ 10, 13, 14; Exhs. 12 (at 51:13, 59:18, 1:18:44), 14 (at 43:49), 15 (at 6:07:07).

A professor who violates these vague, viewpoint-based restrictions— which may be reported by students, colleagues, or the general public[4]—faces heavy consequences. For instance, their university can "modify"—that is, censor—their teaching. *See, e.g.*, Bd. of Govs. Reg. No. 10.005(3)(c). Worse, the university may discipline or terminate the professor. *Id.* Faculty may

---

[4]   USF provides a complaint form and urges that "[s]tudents, staff, and faculty are strongly encouraged to report" even "suspected" violations of the Stop WOKE Act. Steinbaugh Decl. ¶ 24, Exh. 28. USF policy obligates faculty to report colleagues' violations. *Id.* ¶ 23, Exh. 27 (all "members of the faculty" are "supervisory employees" required to "promptly report" even "allegations" of harassment).

also be sued by any person aggrieved by her lecture. Fla. Stat. § 1000.05(9). And if a court, the Board of Governors, or a legislative committee determines that there has been any "substantiated violation" of the Act, the university "*shall* be ineligible" for annual performance funding. Fla. Stat. § 1001.92(5) (emphasis added). For USF, this means a potential annual loss of approximately $80,000,000. Steinbaugh Decl. ¶ 20; Exhs. 23–24.

### C. The manner in which Florida institutions have implemented the Stop WOKE Act tracks its framers' intent and the Act's ambiguities.

Just as the legislature intended, institutions enforcing the Act have interpreted its uncertain and broad provisions to reach a vast range of academic expression, directing faculty to avoid suggesting that "white people were responsible for enacting" Jim Crow laws, offering any "critique of colorblindness," or mentioning a protected characteristic in "word problems" in science courses. *Id*. ¶ 6; Exhs. 8, 9. Much of the guidance has focused on the potential for budgetary consequences and warned faculty they may be sued. *See, e.g.*, *id*. ¶ 6; Exhs. 4, 5.

The Act's "objective manner and without endorsement" provision has been interpreted—again, as intended—to prohibit any attempt to "persuade" students or "indicate a preference for a particular concept," and even to require that faculty be "uninfluenced by emotions." *Id*. ¶ 6; Exhs. 4, 7, 9.

Putting a fine point on it, one college's attorney directed faculty not to endorse "any opinion unless [it is] an opinion issued by the Department of Education." *Id.* ¶ 6; Exh. 9.

Likewise, "instruction" reaches the component parts of a class: faculty are warned to place disclaimers on course materials, cautioned that "assigned materials" may violate the Act, and instructed to cancel guest lecturers whose presentations or materials may violate the Act. *Id.* ¶ 6; Exhs. 5, 6, 8, 9.

The net chilling effect, as one college president candidly remarked, is that faculty are asking whether they must "scratch [material] out of the books" in their classes. *Id.* ¶ 19; Exh. 22.

## II.   The Stop WOKE Act Chills Plaintiffs' Protected Expression.

Plaintiffs want to engage in uninhibited academic discussion about matters of public concern, including topics Novoa teaches. Verified Complaint, Doc. 1 (Compl.), ¶¶ 154, 230, 232.[5] They cannot because the Stop WOKE Act prospectively restricts Novoa's speech and Rechek's and the First Amendment Foundation members' ability to receive instruction free of state-imposed filters. *Id.* ¶¶ 14-15, 17, 153, 226−35.

---

[5]   All citations to the Verified Complaint are to a verified allegation.

### A. The Stop WOKE Act chills Professor Novoa from introducing viewpoints necessary to teaching her courses.

At USF, Novoa's courses draw on her expertise in race and gender in Latin America and the history of science. *Id.* ¶¶ 10, 143. Novoa has also co-authored two books, including *From Man to Ape: Darwinism in Argentina, 1870–1920*. *Id.* ¶ 144. Because Novoa is a cultural historian by training, her courses deal with modern culture, ethnicity, gender, and race in some way. *Id.* ¶ 145. These issues cover the "concepts" the Stop WOKE Act prohibits. *Id.* ¶ 146. To "instruct" her students on any culture in the nineteenth and twentieth centuries, Novoa must "advance" concepts prohibited by the Act. *Id.*

Since July, Novoa has been scrutinizing her syllabi to determine whether Stop WOKE prohibits assigned materials or lecture topics. *Id.* ¶ 148. She has concluded that assigned readings and lectures in these undergraduate classes she regularly teaches violate the Act: (1) Science in Cultural Context, (2) History of Sports, and (3) Modern Latin America. *Id.* ¶ 147.

***Science in Cultural Context.*** Novoa has taught the undergraduate course Science in Cultural Context since 2020 and expects to teach it next semester. *Id.* ¶¶ 152, 157. In this class, Novoa introduces and discusses

issues like (i) the historical development of science to "understand the complicated ways in which science and the cultures in which it is embedded interact and shape each other[,]" *id.* ¶ 158, and (ii) how race and the theory of natural selection was used to "promote" Social Darwinism, including the perceived inferiority of indigenous peoples. *Id.* ¶¶ 158-59.

Novoa also assigns her book, which discusses the relationship between European and Latin American scientists and how the relationship has relegated Latin American scientists "to the *status of derivative thinkers.*" *Id.* ¶¶ 161, 163 (emphasis added); Novoa Decl. ¶ 6, Exh. E at p. 2. In assigning her book, Novoa necessarily "endorses" viewpoints she advances in it. Compl. ¶ 164. In engaging students in discussion, reflection, and debate on these issues, Novoa intends to "advance" those viewpoints. Compl. ¶ 172. The Stop WOKE Act inhibits this instruction. *Id.* ¶¶ 155-56, 165.

**_History of Sports._** Novoa has taught History of Sports annually since 2015 and expects to teach it this academic year. *Id.* ¶ 174. Historically, Novoa has assigned an article, *Left Out: Afro-Latinos, Black Baseball, and the Revision of Baseball's Racial History* (*Left Out*). *Id.* ¶176; Novoa Decl. ¶2, Exh. A. In lectures, Novoa uses *Left Out* to "advance" the argument that Afro-Latino baseball players, despite coming from different backgrounds

10

and cultures, were reduced to their perceived racial identity. Compl. ¶ 180. The Stop WOKE Act inhibits this instruction. *Id*. ¶ 182.

*Modern Latin America.* In this course, Novoa teaches the history of "oppression" of certain groups by other, more "privileged" groups. *Id*. ¶ 197. Novoa regularly teaches about "[t]he period that followed the end of the independence movements [that] . . . set the foundation of societies defined by social inequality, poverty, racism, and violence." *Id*. ¶ 198. She also teaches about collective guilt, which requires her to "advance" the concept that a person's "status as . . . privileged . . . is necessarily determined by his or her race [or] color[]" in certain cultures to explain how societies have experienced collective guilt based on race and national origin. *Id*. ¶¶ 202, 205. The Act bars Novoa from again providing "instruction" on these issues. *Id*. ¶ 224.

## B. The Stop WOKE Act limits the access of Rechek and members of the First Amendment Forum to information and ideas.

When registration for the coming semester opens on October 31, 2022, Rechek intends to enroll in Novoa's Science in Cultural Context class. *Id*. ¶¶ 153, 226. Rechek is also president of Plaintiff First Amendment Forum at USF. *Id*. ¶ 16. Its members are also interested in taking Novoa's courses and others offered at USF. *Id*. ¶ 232.

Rechek and members of First Amendment Forum are adults capable of determining whether viewpoints Novoa introduces are sound. *Id.* ¶¶ 227-28. Still, they cannot assess these viewpoints unless they are able to encounter them. *Id.* ¶ 229. Novoa and Rechek—a willing speaker and willing listener—want to engage in academic discussion about the topics in Novoa's course. *Id.* ¶ 230.

The Stop WOKE Act prevents Rechek and members of First Amendment Forum from benefitting from robust debate. *See id.* ¶¶ 235, 238. Instead, the Act threatens their First Amendment rights because it narrows, for ideological purposes, the range of viewpoints available to these students. *Id.* ¶ 234. For example, the First Amendment Forum's members cannot engage in a full and frank discussion of contested matters—like issues over race and its historic and modern roles—if they fear a professor's response to their questions may be reported to administrators, the Inspector General, or lawmakers. *Id.* ¶¶ 235, 238(c). More broadly, the Act chills the ability of students to access information unfettered by ideological filters imposed by political officials. *Id.* ¶ 238(b).

### C.    Plaintiffs sue to vindicate their rights

On September 6, 2022, Plaintiffs initiated this action, seeking declaratory and injunctive relief to protect their constitutional rights. (Doc. 1).

### ARGUMENT

The Stop WOKE follows a long line of governments' failed attempts to close the "classroom [as] peculiarly the 'marketplace of ideas.'" *Keyishian*, 385 U.S. at 603. True to the First Amendment's demands, courts have long rejected attempts by lawmakers and administrators to skew campus debate toward favored viewpoints and away from disfavored ones.[6]

Plaintiffs are entitled to a preliminary injunction because they (1) the have a likelihood of success on the merits, as the Stop WOKE Act violates firmly established First Amendment principles, including its steadfast bar against viewpoint discrimination; (2) impairment of First Amendment rights is always irreparable harm; and (3) the Act serves no legitimate public interest; rather, it will damage the paramount public interest in unfettered

---

[6]    These include efforts to curtail who may teach (*Keyishian*, 385 U.S. at 603), who may be invited to speak (*Molpus v. Fortune*, 432 F.2d 916, 917 (5th Cir. 1970)), and what student organizations may be recognized (*Healy v. James*, 408 U.S. 169 (1971)); *Gay Students Org. of Univ. of N.H. v. Bonner*, 367 F. Supp. 1088 (D.N.H. 1974)).

discourse. *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1290–91 (11th Cir. 2022) (setting forth preliminary injunction standards).

## I.   There Is a Strong Likelihood That Plaintiffs Will Succeed on the Merits.

The Stop WOKE Act imposes a viewpoint-discriminatory prohibition on a broad range of protected expression. It discriminates against any expression that does no more than "advance" "concepts" disfavored by the state—without being narrowly tailored to any state interest, let alone a compelling one. This restriction burdens Novoa's pedagogically relevant speech on matters of public concern. For Rechek and the members of the First Amendment Forum, the Act imposes an ideological constraint on ideas they are unafraid to confront.

### A.   Plaintiffs have standing to challenge the "Stop WOKE Act."

Plaintiffs have standing, as each can establish (1) an injury-in-fact (2) fairly traceable to the defendants (3) that can likely "be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). The "injury requirement is most loosely applied . . . where first amendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Hallandale Prof. Fire*

*Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991) (cleaned up). Indeed, self-censorship flowing from legislation is a "harm" even without specific enforcement. *Wollschlaeger v. Governor*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc). Thus, Plaintiffs need to show only that they (1) intend to "engage in a course of conduct arguably" protected by the First Amendment; (2) the Act arguably proscribes that conduct; and (3) there is a credible threat of enforcement. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1119–20 (11th Cir. 2022) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

### 1. Plaintiffs intend to engage in protected expression arguably proscribed by the Act.

Each Plaintiff satisfies the first and second elements of this test. For instance, Novoa intends to introduce pedagogically-relevant material with viewpoints falling within the Act's prohibited "concepts." Compl. ¶¶ 11–12, 136, 145, 149–52, 154–215, 230. As shown below, the First Amendment protects Novoa's expression. *See* Argument Part II(B)(1). That expression arguably "advances" these prohibited "concepts" in violation of the Act. *See* pp. 9–11, *supra*, and pp.24–26, *infra*; *see also* Compl. ¶¶ 158–172, 176–180, 183–189, 191–195, 197–211.

Rechek is enrolled in USF courses and plans to enroll in Novoa's courses. Compl. ¶¶ 14, 226. As detailed below, the Stop WOKE Act stifles

Rechek's and other students' First Amendment rights to information unadulterated by ideological filters imposed by the state. *Keyishian*, 385 U.S. at 603. These rights also inure to the benefit of Rechek's fellow students, members of Plaintiff First Amendment Forum. These students share Rechek's desire to take Novoa's courses and others at USF, implicating their First Amendment right to receive information free from state-imposed viewpoint filters. *See* Argument Part II(B)(2), *infra*; *see also* Compl. ¶¶ 232, 234–35.

### 2. There is a credible threat Defendants will enforce the Stop WOKE Act.

A credible threat of enforcement exists whenever "the operation or enforcement of the government policy would cause a reasonable would-be speaker to self-censor." *Speech First*, 32 F.4th at 1120 (cleaned up). The Stop WOKE Act would cause any reasonable classroom participant to self-censor. Indeed, the Act is *intended* to chill speech. Its authors populated it with language already struck down as unconstitutionally vague,[7] publicized it under the banner of eradicating "woke" ideas, and insisted that faculty refrain from disclosing their personal views. Steinbaugh Decl. ¶¶ 7, 10, 13–18; Exhs. 10, 12 (at 51:13, 59:18, 1:18:44), 14 (at 43:49), 15 (at 6:07:07), 18–

---

[7]  *Santa Cruz Lesbian & Gay Cmty. Center v. Trump*, No. 20-cv-07741-BLF, ECF No. 80, at *24–27 (N.D. Cal., Dec. 22, 2020).

21. Were that not enough, lawmakers precariously balanced tens of millions of dollars of state funding on administrators' willingness to crack down on even perceived violations of the Act. Fla. Stat. § 1001.92(5). A lionhearted faculty member might risk their own career by introducing a transgressive concept, but only a fool would risk their colleagues' funding.

Novoa is hardly alone, and evidence of an injury-in-fact flowing from an objective chill is not difficult to find. Consider the candid remark by a Florida college president—a leader responsible for *enforcing* the Stop WOKE Act—that faculty, "especially those who teach history" (like Novoa), were "very uncomfortable" and asking: "Well, do we just scratch this out of books?" Steinbaugh Decl. ¶ 19, Exh. 22.

The Stop WOKE Act does not just chill faculty speech. Its chilling effects reach the students who learn from conflicting viewpoints, as it burdens the intertwined "freedom of teachers to teach and of students to learn." *Epperson v. Arkansas*, 393 U.S. 97, 105 (1968). It thus imperils the "crucial" right to "an uninhibited marketplace of ideas in which truth will ultimately prevail"—a right "nowhere more vital" than in universities. *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972).

This threat of enforcement and resulting injuries are traceable to Defendants, who "may or must take enforcement actions[.]" *Whole*

*Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021); *cf. Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1117–18 (11th Cir. 2022) ("bias-related incident" policy allowed students to be "anonymously accused of an act of 'hate or bias'"); Fla. Stat. § 1000.05(6)(b); Bd. of Govs. Reg. No. 10.005(2)-(4). Enjoining the Act's enforcement is necessary to stop the chilling injury to protected expression and prevent irreparable harm.

### 3.   First Amendment Forum has organizational standing.

First Amendment Forum also has organizational standing. First, Rechek and other members have standing. *United Food & Com. Workers Union Loc. 751 v. Brown Grp.*, 517 U.S. 544, 551–53 (1996); *see also, Warth v. Seldin*, 422 U.S. 490, 511 (1975) (association can "allege that its members, or any one of them," will be injured). Second, the Forum's interests—access to ideas free from state censorship—are germane to its purpose of protecting unfettered discourse at USF. *Brown Grp.*, 517 U.S. at 553; *see also* Compl. ¶ 233. Third, the Forum's individual members' participation is "not normally necessary" when a suit seeks prospective injunctive relief. *Brown Grp.*, 517 U.S. at 552.

### B.   The First Amendment protects Plaintiffs' rights to free expression and access to information and ideas.

As to Plaintiffs, the content-based Stop WOKE Act violates two core First Amendment rights. First, it restricts Novoa's right to share information and materials pedagogically relevant to her courses. Second, it infringes the rights of students like Rechek to receive information and ideas free of ideologically driven state interference.

### 1.   The First Amendment protects faculty speech related to scholarship and teaching.

At public universities and colleges, faculty members' speech related to scholarship or teaching and classroom speech related to matters of public concern both are protected by the First Amendment. *See, e.g.*, *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 562 (4th Cir. 2011) (discrimination against professor's "outspoken Christian and conservative beliefs"); *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021) (professor's refusal to use students' preferred gender pronouns in teaching). This First Amendment protection extends to viewpoints that "however repugnant," are "germane to the classroom subject matter." *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 683 (6th Cir. 2001). So, too, does it extend to viewpoints some might consider false; the First Amendment

19

recognizes no such thing as "a false idea."[8] *Gertz v. Robert Welch*, 418 U.S. 323, 339 (1974). Instead, the First Amendment demands correction of viewpoints not through authoritative selection, "but on the competition of other ideas." *Id.* at 339–340. This is particularly so "in the social sciences, where few, if any, principles are accepted as absolutes." *Keyishian*, 385 U.S. at 603 (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)).

Novoa's scholarship and classroom speech enjoy strong First Amendment protection. Defendants may urge that faculty members' academic speech is not their own speech, but *government* speech subject to total state control. *See Falls v. DeSantis*, No. 4:22-cv-00166-MW-MJF, ECF No. 68 at *5 (N.D. Fla. July 8, 2022). Not so.[9]

---

[8]   This is why even though the Stop WOKE Act prohibits certain "concepts" the state declares false, those concepts are presumptively protected speech. Each addresses matters of public concern, as the "content of academic inquiry" inherently "involves matters of political and social concern because 'academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned.'" *Austin v. Univ. of Fla. Bd. of Trs.*, No. 1:21cv184-MW/GRJ, 2022 U.S. Dist. LEXIS 11733, at *62 (N.D. Fla. Jan. 21, 2022) (quoting *Urofsky v. Gilmore*, 216 F.3d 401, 428 (4th Cir. 2000) (Wilkinson, J., concurring)). Moreover, "race, gender, and power conflicts in our society"—the very concepts at the center of the Act—are "matters of overwhelming public concern[.]" *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 680 (6th Cir. 2001).

[9]   The government speech doctrine is inharmonious with higher education. The doctrine fits comfortably where there is an extensive history of regulation, the listening audience is likely to attribute the speech to the government, and the government has taken direct action to control the message. *See Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1589–90 (2022)*; see also*, *Mech v. Sch. Bd. of Palm Beach Cty.*, 806 F.3d 1070, 1074–75 (11th Cir. 2015). Faculty, by contrast, have traditionally been afforded *freedom* from rigorous regulation because they are expected to offer the very "multitude of

The relevant Supreme Court decision, *Garcetti v. Ceballos,* by its "plain language . . . explicitly left open the question of whether its principles apply" to faculty members engaged in "scholarship or teaching." *Adams*, 640 F.3d at 561–63 (holding that *Garcetti* is inapplicable "in the academic context of a public university"); *see Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006) (declining to hold that its analysis would apply "to a case involving speech related to scholarship or teaching"). Otherwise, it would "imperil First Amendment protection of academic freedom in public colleges and universities," which encompasses "the teaching of a public university professor." *Garcetti*, 547 U.S. at 438 (Souter, J., dissenting).

Courts answering *Garcetti*'s open question have held it does not apply to faculty at postsecondary institutions.[10] That answer recognizes that universities' purpose is best served by learning from a "multitude of tongues,

_____

tongues" that advance *conflicting* views, not one message controlled by the state. *Keyishian*, 385 U.S. at 603. While universities prescribe broad topics to be taught, no public university prohibits entire topics of discussion, much less censors specific viewpoints. *Compare Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831, 115 S. Ct. 2510, 2518 (1995) ("If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one.").

[10]   *See, e.g.*, *Demers v. Austin*, 746 F.3d 402, 406 (9th Cir. 2014) (expression "related to scholarship or teaching" falls outside of *Garcetti*); *Meriwether*, 992 F.3d at 505 (expression when "engaged in core academic functions, such as teaching and scholarship" falls outside of *Garcetti*); *Adams*, 640 F.3d at 563; *Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019) (applying *Pickering-Connick* balancing test to professor's in-class speech).

rather than through any kind of authoritative selection." *Keyishian*, 385 U.S. at 603 (cleaned up). That is why "academic freedom" is an area "in which government should be extremely reticent to tread." *Sweezy*, 354 U.S. at 250.

In the end, Novoa's classroom speech is her own, not the state's, and remains protected under the First Amendment.

> ### 2. The First Amendment and Florida state law protect students' access to information and ideas against laws imposing the "pall of orthodoxy."

The Supreme Court explained that because of the unique role universities occupy, the First Amendment prohibits "laws that cast a pall of orthodoxy over the classroom." *Keyishian*, 385 U.S. at 603. First Amendment protection against state-imposed campus orthodoxy flows from two core First Amendment rights: the right to convey information— that is, to speak—and the right to "receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). This is because the First Amendment protects the "right to distribute" information and the corollary "right to receive it." *Martin v. Struthers*, 319 U.S. 141, 143 (1943). In turn, these harmonizing First Amendment rights serve the "chief mission" of the university: "to equip students to examine arguments critically and, perhaps even more importantly, to prepare young citizens to participate in the civic

and political life of our democratic republic." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022).

Thus, Rechek and First Amendment Forum members have a First Amendment right to receive information and ideas in the classroom. And the State of Florida agrees. One year before adopting the Stop WOKE Act, Florida amended the Campus Free Expression Act to reinforce students' rights under the First Amendment. Fla. Stat. § 1004.097. As amended, the Campus Free Expression Act recognizes students' right to "access to . . . ideas" and prohibits universities from shielding them from ideas on the basis that students might find them "uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat. §§ 1004.097(2)(f), (3)(f).

## C.    The Stop WOKE Act Violates the First and Fourteenth Amendments and Conflicts with the Campus Free Expression Act.

The raison d'être of the Stop WOKE Act is plain: driving viewpoints that some officials dislike out of the classroom. But distorting the "marketplace of ideas" via state-imposed ideological litmus tests is as obvious a First Amendment violation as they come. As the Supreme Court held, no official "high or petty" can prescribe which concepts "shall be orthodox in politics, nationalism, [or] other matters of opinion" without

darkening a "fixed star in our constitutional constellation[.]" *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

**1. Because the Stop WOKE Act discriminates against viewpoints, it is presumptively unconstitutional.**

Content-based limitations on speech like the Stop WOKE Act are presumptively unconstitutional. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). This presumption is even stronger when the restriction is viewpoint-based, where speech is targeted "because of its message," its "motivating ideology," or the "perspective" it offers. *Rosenberger*, 515 U.S. at 828–29. Viewpoint discrimination is "of the most egregious types of First Amendment violations," particularly in the educational context. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1279 (11th Cir. 2004).

The Stop WOKE Act is viewpoint-discriminatory on its face. It permits faculty members to discuss state-disfavored "concepts" *only* if their instruction refrains from "endorsement" of the concept. *See Honeyfund.com, Inc. v. DeSantis*, No. 4:22cv227-MW/MAF, 2022 U.S. Dist. LEXIS 147755, at *29–30 (N.D. Fla. Aug. 18, 2022) (*Honeyfund*). While the Act permits criticism of the eight banned viewpoints, it simultaneously forbids faculty from "endorsing" one of those viewpoints. In contrast, the Act puts no restrictions on professors toeing the party line by proclaiming the "objective fact" that we live in a racially colorblind society.

For example, Novoa could vociferously condemn the view that historically, Afro-Latino baseball players were reduced to their perceived racial identity. *See* Compl. ¶¶ 176-180. But if she merely "advances" that view—as she does in her History of Sports class—and tells a student she agrees with the view, she violates the Act's prohibited "concept" that person's "status as. . . oppressed is necessarily determined by his or her race [or] color[.]" *Id.*; Fla. Statute § 1000.05(4)(a)(3).

Even under the Act's narrowest construction, Novoa can present an "objective" discussion of a prohibited concept, but she cannot present *her* opinion. And she most pointedly cannot do so if that opinion favors the concept. Consider too—the effects of this viewpoint discrimination extend to students like Rechek and members of First Amendment Forum. Because of the Stop WOKE Act, they cannot enjoy their First Amendment right to receive ideas and information and in turn engage those ideas as part of the campus discussion.

This is further reason to hold the Act unconstitutional. Speech restrictions driven by ideology violate the "bedrock principle of viewpoint neutrality," which "demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying

ideology or perspective that the speech expresses." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004).

Because it demands and codifies viewpoint-discrimination, the Stop WOKE Act is presumptively unconstitutional. *Rosenberger*, 515 U.S. at 828.

> ### 2. The Stop WOKE Act is not necessary to serve a compelling state interest and is not narrowly tailored.

Restrictions on content create a "large risk that the restriction really stems from something illegitimate: an effort to foreclose a controversial viewpoint, to stop people from being offended by certain topics and views, or to prevent people from being persuaded by what others have to say." *Wollschlaeger*, 848 F.3d at 1307–08 (quoting Cass R. Sunstein, *Democracy and the Problem of Free Speech* 169 (1993)). Content-based limitations on speech like the Stop WOKE Act pass constitutional scrutiny only where both "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." *Citizens for Police Accountability v. Browning*, 572 F.3d 1213, 1217 (11th Cir. 2009) (quoting *Burson v. Freeman*, 504 U.S. 191, 198 (1992)).

The Stop WOKE Act is not necessary to serve a compelling government interest and is not narrowly tailored.

What interest the Act serves is unclear. Its drafters purported to make "findings" but failed to make any findings concerning higher education. Steinbaugh Decl. ¶ 3, Exh. 1. Given the plain text of the Act and the context of its adoption, the Stop WOKE Act has only one purpose: to suppress disfavored ideologies. That can never be a legitimate interest, let alone a compelling one. *See Ridley*, 390 F.3d at 82. The state has no legitimate interest "impos[ing] any strait jacket upon the intellectual leaders in our colleges and universities," as the Stop WOKE Act does. *Sweezy v. New Hampshire,* 354 U.S. 234, 250 (1957). In short, the Stop WOKE Act has *no* legitimate purpose. *Honeyfund* at *38.

Because existing anti-discrimination laws like FEEA and Title IX provide adequate remedies for hostile environment harassment, Stop WOKE cannot be said to be "necessary." Further, the Act ignores the narrow tailoring those laws have, like limiting violations to "a showing of severity or pervasiveness" and speech "objectively and subjectively creat[ing] a hostile environment," thus providing "shelter for core protected speech." *DeJohn v. Temple Univ.*, 537 F.3d 301, 317–18 (3d Cir. 2008). In contrast, the Stop WOKE Act targets expression under a categorical approach: a concept is *per se* discrimination even if no person in the room subjectively finds it offensive and even if it is mentioned only once. Nor is the Act limited to intentional or

knowing violations. Because it lacks these speech-protective measures, the Stop WOKE Act sweeps far beyond any purpose it might harbor—if it had any at all.

Among its many constitutional defects, perhaps most egregious is the extreme overreach of the Act. Its plain language reaches any "instruction" which "espouses, promotes, advances, inculcates, or compels." These encompass speech that merely supports, furthers, contributes to the growth of, or simply brings forward a concept for consideration. This is true even where support for a prohibited concept is only an incidental or unintended effect of instruction, or serves simply as a pedagogical framing device to initiate discussion and debate.

Consider the professor playing devil's advocate during a discussion of a forbidden viewpoint. Or consider the well-meaning professor who, responding to a student inquiry about which research sources to use in researching an assigned paper on the history of race relations, recommends a book or article that supports one of the forbidden topics. Each violates the Stop WOKE Act.

These are just two of many examples showing how the Act reaches speech essential to furthering academic discussion and debate of important issues. All of which, of course, the First Amendment protects. In the end, the

state has no constitutional justification for the viewpoint-based Stop WOKE Act.

### 3.    *The Stop WOKE Act also fails scrutiny under* **National Treasury Employees Union.**

When a public employer's regulations burden broad categories of employees' expression on matters of public concern, the regulation is evaluated under *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 462–63 (1995) (*NTEU*). Under the *NTEU* standard, a public employer bears the "heavy" burden to show that "that the interests of both" the "potential audiences" (here, students) and employees (here, faculty) "in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of" the agency. *NTEU*, 513 U.S. at 466, 468 (cleaned up). To do so, the agency "must demonstrate that the recited harms are real, not merely conjectural" *and* the restriction "will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475.

The Stop WOKE Act does not survive this standard. First, students and faculty enjoy exceptionally strong interests in unfettered discourse. *Keyishian*, 385 U.S. at 603. Second, the state cannot demonstrate anything more than "conjectural" harm. Given that the legislature failed to make factual findings identifying any needs for the Act, it does no more than "posit

the existence of the disease sought to be cured," addressing only "conjectural" harms already alleviated by existing anti-discrimination law. *NTEU* at 475 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994)).

While the state has an important interest in addressing discrimination, the mere utterance of an idea, however offensive a listener finds it, is not alone discrimination. *See, e.g.*, *Rodriguez v. Maricopa Cty. Comm. Coll. Dist.*, 605 F.3d 703, 708–09 (9th Cir. 2009) ("the desire to maintain a sedate academic environment does not justify limitations on a teacher's freedom to express himself on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms." (quoting *Adamian v. Jacobsen*, 523 F.2d 929, 934 (9th Cir. 1975))). Indeed, it is a "bedrock First Amendment principle" that "[s]peech may not be banned on the ground that it expresses ideas that offend." *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017). And in passing the Campus Free Expression Act, Florida already acknowledged that shielding students from uncomfortable ideas conflicts with the purpose of a university. Fla. Stat. § 1004.097(2)(f), (3)(a), (3)(f).

Existing anti-discrimination law demonstrates that discriminatory conduct can be remedied without wholesale restrictions on protected

speech. Categorically declaring certain ideas *de facto* discrimination, like the Stop WOKE Act does, only "raise[s] the specter of Government control over the marketplace of ideas." *NTEU*, 513 U.S. at 462 (Rehnquist, C.J., dissenting). To that end, the Act is a blanket restriction on speech—a prior restraint posing "the most serious and the least tolerable infringement on" freedom of expression. *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

Contrast, for example, *Bishop v. Aronov*, which involved a university's response to a solitary professor's proselytization during human physiology classes. 926 F.2d 1066, 1068 (11th Cir. 1991). That challenge involved the response by a university—not a legislature—tailored to address "particular conduct" by a single person's comments having little (if any) connection to the course subject matter. *Id.* at 1069–71. The university's concerns stemmed from its obligations under the First Amendment itself, as the comments implicated the Establishment Clause. *Id.* at 1077.

Here, the Stop WOKE Act is not a university addressing a single professor's comments, but a one-size-fits-all, categorical objection to viewpoints offered by any of the thousands of educators—even reaching speakers who are *not* employees.[11] Nor does it stem from an interest drawn

---

[11]   Stop WOKE reaches any "employee *or* a person authorized to provide instruction." Bd. of Govs. Reg. No. 10.005(1)(c) (emphasis added). That means it reaches guest speakers and emeritus faculty, demonstrating its overbreadth.

from constitutional obligations; instead, it targets a phantom the state struggles to describe. And where the university in *Bishop* sought to limit comments with uncertain relevance to an anatomy course, the Stop WOKE Act broadly applies to *any* courses, no matter how pedagogically-relevant to the discussion.

Importantly, *Bishop* considered not *whether* faculty have First Amendment rights, but "*to what degree* a school may control classroom instruction" without violating the First Amendment. *Id.* at 1073 (emphasis added). The *Bishop* Court would have understood a state law broadly banning "advancing" arguments about religion to present a fundamentally different question than the discrete personnel matter it considered.

The Stop WOKE Act is a broad restraint on the academic expression of the tens of thousands of speakers—from tenured professors to graduate lecturers to guest speakers—teaching subjects from the hard sciences to social theory. It is not a university's individualized response to a particular faculty member, but a broad speech code imposed by the legislature. It cannot be said to advance "an adequate justification" commensurate with "the government's needs as an employer." *Lane v. Franks*, 573 U.S. 228, 242 (2014) (quoting and citing *Garcetti*, 547 U.S. at 418).

### 4. The Stop WOKE Act is unconstitutionally overbroad.

A statute is overbroad when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (cleaned up). The Stop WOKE Act lacks any legitimate purpose. Where a law serves no legitimate purpose, it is always overbroad in relation to its legitimate sweep. *See, e.g.*, *Fitzgerald v. Alcorn*, 285 F. Supp. 3d 922, 956 (W.D. Va. 2018), *aff'd*, *6th Cong. Dist. Republican Comm. v. Alcorn*, 913 F.3d 393 (4th Cir. 2019); *Stuart v. Loomis*, 992 F. Supp. 2d 585, 609 (M.D.N.C. 2014), *aff'd sub nom.*, *Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014). Further, by employing the operative terms "espouses, promotes, advances, inculcates, or compels," the Stop WOKE Act reaches any speech which merely supports or introduces for consideration one of the prohibited viewpoints. The Act also lacks any meaningful limiting definitions or principles. The use of nebulous terms like "objective" sweeps up even the teaching of well-accepted ideas. This overbreadth is yet another reason to enjoin the Stop WOKE Act now.

>    **5.    The Stop WOKE Act is unconstitutionally vague and conflicts with the Campus Free Expression Act.**

The Stop WOKE Act violates the Due Process Clause of the Fourteenth Amendment because it is unconstitutionally vague. A law is void for vagueness where it either lacks "sufficient definiteness that ordinary people can understand what conduct is prohibited" or "encourage[s] arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357 (1983).

These faults are acute in the context of free expression, where the "substantial impairment of those [First Amendment] rights may be critical, since those covered by the statute are bound to limit their behavior to that which is unquestionably safe." *Keyishian*, 385 U.S. at 609 (cleaned up). "Content-based regulations thus require 'a more stringent vagueness test.'" *Wollschlaeger*, 848 F.3d at 1320 (citation omitted).

The Stop WOKE Act fails both tests imposed by *Kolender*.

First, and leaving aside the abstruse descriptions of prohibited "concepts,"[12] the statute's authorization of debate only in an "objective manner without endorsement" is inherently vague. It suggests that speech

---

[12] As *Honeyfund* observed, the enumerated "concepts" are replete with language "bordering on unintelligible" and "a rarely seen triple negative, resulting in a cacophony of confusion." *Honeyfund* at *35.

*condemning* a viewpoint is objective, but *approving* a viewpoint renders the teaching unobjective. Certainly, Florida's legislature did not intend to suggest that faculty may not tell students that advocacy of racial superiority is *wrong*. Moreover, whether a discussion is "objective" is an inherently subjective evaluation. That's pointedly so where those rendering the decision disagree with the speaker.

This vagueness chills speech as faculty must second-guess whether their teaching will be seen by budget-conscious administrators or culture-warrior lawmakers as sufficiently "objective." Imposing rules of debate with stark penalties discourages faculty from discussing even the subjects implicated by the Act—and incentivizes universities not to offer courses that *might* broach these concepts at all. *See Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) (a vague regulation "raises special First Amendment concerns because of its obvious chilling effect on free speech").

Second, the Stop WOKE Act works in tandem with the Campus Free Expression Act to simultaneously prohibit faculty from speaking and to require them to speak. The former prohibits viewpoints in order to shield students from views lawmakers believe offensive; the latter mandates that faculty not "shield" students from "ideas and opinions" because they are "uncomfortable, unwelcome, disagreeable, or offensive." Fla. Stat.

§ 1004.097(2)(f), (3)(a), (3)(f). Faculty members who guess wrong about what the Stop WOKE Act prohibits violate the Campus Free Expression Act; a faculty member who guesses wrong about what the Campus Free Expression Act protects risks institutional funding. This inconsistency invites arbitrary and discriminatory enforcement.

## II. Plaintiffs Satisfy the Remaining Requirements to Obtain a Preliminary Injunction.

Plaintiffs satisfy the remaining preliminary injunction factors, namely: they will suffer irreparable harm; the balance of equities tips in their favor; and an injunction is in the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

### A. Plaintiffs will suffer irreparable injury absent an injunction.

The Stop WOKE Act's invasion of the First Amendment will continue to harm Novoa, Rechek, and the First Amendment Forum if not enjoined. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Stop WOKE Act will keep harming their right to speak on and receive information and ideas.[13]

---

[13] Compl. ¶¶ 165, 173, 182, 190, 196, 214, 234–235, 238.

**B.    The Balance of Equities and Public Interest Sharply Favor Plaintiffs.**

When the "nonmovant is the government, the third and fourth requirements" are "consolidated because neither the government nor the public has any legitimate interest in enforcing an unconstitutional" law. *LaCroix v. Town of Fort Myers Beach*, No. 21-10931, 38 F.4th 941, at *22 (11th Cir. 2022). Florida has no legitimate interest in silencing professors and students in public colleges. Conversely, the public has an overwhelming interest in unfettered discourse in universities, as academic freedom "is of transcendent value to all of us and not merely to the teachers concerned." *Keyishian*, 385 U.S. at 603.

**C.    Plaintiffs Should Be Excused from Posting Security.**

Plaintiffs respectfully request that this Court not require the posting of security pursuant to Federal Rule of Civil Procedure 65(c). "[T]he amount of security . . . is a matter within the discretion of the trial court," which "may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (cleaned up). Here, there is no risk of monetary loss to defendants and ordering plaintiffs to post a bond would make students and a professor pay to ensure their right to free speech.

## CONCLUSION

Florida has attempted what other censors wouldn't dare. Instead of barring speakers or groups because of their ideas, Florida simply declares those ideas harassment and bans them. This result is un-American and unconstitutional, teaching students a "rotten lesson" about citizenship in a "free society."[14]

## REQUEST FOR ORAL ARGUMENT

Under Local Rule 7.1(K), Plaintiffs request oral argument on this motion and estimate that one hour will be required for oral argument. Additional time will be required if this Court prefers testimony.

DATED:      September 15, 2022

Respectfully Submitted,

/s/ Greg H. Greubel                      /s/ Gary S. Edinger
GREG HAROLD GREUBEL*                     GARY S. EDINGER, ESQUIRE
PA. Bar No. 321130; NJ No. 171622015     Fla. Bar No.: 0606812
ADAM STEINBAUGH*                         BENJAMIN, AARONSON, EDINGER &
PA. Bar No. 326475                           PATANZO, P.A.
JT MORRIS*                               305 N.E. 1st Street
TX Bar No. 2409444                       Gainesville, Florida 32601
                                         Tel:   (352) 338-4440

---

[14] Kurt Vonnegut, *Books Into Ashes*, N.Y. Times (Feb. 7, 1982), *available at* https://timesmachine.nytimes.com/timesmachine/1982/02/07/166621.html?pageNumber=195 (letter to school burning *Slaughterhouse-Five*).

FOUNDATION FOR INDIVIDUAL RIGHTS AND
   EXPRESSION
510 Walnut Street; Suite 1250
Philadelphia, PA 19106
Tel:   (215) 717-3473
Fax:   (215) 717-3440
greg.greubel@thefire.org
adam@thefire.org
JT.Morris@thefire.org

Fax:   (352) 337-0696
GSEdinger12@gmail.com

*Admitted *Pro Hac Vice*

   *Counsel for Plaintiffs Adriana Novoa, Sam Rechek, and the First
   Amendment Forum*

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)**

On September 13, 2022, counsel for the Plaintiffs contacted the Defendants' counsel to inform them of Plaintiffs' intent to file a motion for preliminary injunction. Defendants confirmed their intent to oppose Plaintiffs' motion.

/s/ Gary S. Edinger
Gary S. Edinger

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 24.1**

Plaintiffs certify that they have complied with the requirements of Local Rule 24.1 by serving the Attorney General, Ashley Moody, with a copy of Plaintiffs' Motion for Preliminary Injunction and Supporting Memorandum of Law by U.S. Mail sent to the Office of the Attorney General, PL-01, The Capitol, Tallahassee, Florida, 32399, this 15th day of September, 2022.

/s/ Greg H. Greubel
Greg H. Greubel

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

I hereby certify that this motion and memorandum of law contains

7,993 words.

/s/ Greg H. Greubel
Greg H. Greubel

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2022, a copy of this document was filed electronically through the CM/ECF system and furnished by email to all counsel of record.

/s/ Greg H. Greubel
Greg H. Greubel