*Novoa v. Diaz* et al.,

# Exhibit C to Declaration of Adriana Novoa in Support of Plaintiffs' Motion for Preliminary Injunction



Collective Guilt and the Crucifixion

Author(s): Geoffrey Turner

Source: *New Blackfriars*, March 1989, Vol. 70, No. 825 (March 1989), pp. 124-136

Published by: Wiley

Stable URL: https://www.jstor.org/stable/43248358

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Wiley* is collaborating with JSTOR to digitize, preserve and extend access to *New Blackfriars*

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms

Case 4:22-cv-00324-MW-MAF   Document 19-34   Filed 09/15/22   Page 3 of 15

# Collective Guilt and the Crucifixion

## Geoffrey Turner

> 'There is no such thing as collective guilt' —Kurt Waldheim

Well, he would say that, wouldn't he? Waldheim is one of a generation of Austrians and Germans who have a vested interest in excusing themselves from guilt by association in mass murder, in the absence of hard evidence that they pulled the trigger or signed the warrant or turned the gas on. But the evasions and moral insensitivity of the Austrian President do not merit further discussion here. What is more important is whether it is the case that 'there is no such thing as collective guilt', because if there is not then certain aspects of traditional Christian theology are in big trouble.

Of course, collective guilt is a deeply unpopular idea. It involves the suggestion that someone who has not perpetrated a crime or some other shameful act in some way carries the guilt for that act by virtue of sharing a social identity with the criminal. Is our reluctance to accept this idea the result of genuine moral difficulties with attributing guilt to someone who might with some justification claim to be innocent, or is it the result of two centuries of social conditioning in a liberal individualistic society? It may be both.

Western liberal democratic society *is* individualistic in a cultural tradition that was traced by C.B. Macpherson some years ago to Hobbes and John Locke, who had prepared a philosophical account of the lone individual who observes the world and constructs a language to talk about it. An essential characteristic and the main weakness of liberal-democratic theory, according to Macpherson, is not just its individualism but its

> possessive quality (which) is found in its conception of the individual as essentially the proprietor of his own person or capacities, owing nothing to society for them. The individual was seen neither as a moral whole, nor as part of a larger social whole, but as an owner of himself. The relation of ownership, having become for more and more men the critically important relation determining their actual freedom and actual prospect of realizing their full potentialities, was read back into the nature of the individual. The individual, it was thought, is free inasmuch as he is proprietor of his person and capacities. The human essence is freedom from dependence on the wills of others, and

124

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms

> freedom is a function of possession. Society becomes a lot of free equal individuals related to each other as proprietors of their own capacities and of what they acquired by their exercise. Society consists of relations of exchange between proprietors. Political society becomes a calculated device for the protection of this property and for the maintenance of an orderly relation of exchange.[1]

Macpherson goes on to argue that these assumptions, which do correspond substantially to the actual relations of a market society,

> were what gave liberal theory its strength in the seventeenth century, but that they became the source of its weakness in the nineteenth, when the development of the market society destroyed certain prerequisites for deriving a liberal theory from possessive assumptions, while yet the society conformed so closely to those assumptions that they could not be abandoned. They have not been abandoned yet, nor can they be while market relations prevail.[2]

It is clear that we in Britain, as in Western Europe and North America generally, are still very much in the tradition described by Macpherson and that Margaret Thatcher has attempted with some short-term success to revivify the liberal tradition as possessive individualism by overcoming some of the problems of nineteenth-century capitalism. Far from having Victorian values, Thatcher seems to have her philosophical and economic (and religious) roots in the seventeenth and eighteenth centuries. Then, as now, society was perceived to be made of individuals free to own property; individuals who are free economic units in a competitive labour market; individuals who are free to worship God in the privacy of their own conscience; and moral individuals who bear the guilt of any crime they have committed and suffer its punishment, but who conversely are free of any stigma for crimes they have not been directly involved in.

If the worst effects of the competitive individualism of the last century have been mitigated in recent years, the Thatcher government has clearly reversed the trend by releasing a rampant individualism under the name of 'enterprise'. In this cultural climate, in the Britain of the 1980's, it is particularly difficult to see that there might be something in the idea of collective guilt or a collective anything. Yet those who suffer in these political circumstances—many of those in the North, in Scotland, Wales and Northern Ireland, the unemployed, one-parent families, the old—might see things differently. If they suffer, it is not (it is generally accepted, though in reality it is not so simple) because affluent Southerners intend it, but because they are locked in a social economy where some do well and where they, alas, catch the fallout. Where they indeed *are* the fallout. Paradoxically it is precisely in Thatcherite Britain, which has pushed 'freedom for the individual' so hard for nine years, that we might begin to see that we are locked into a

125

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms

system where well-intentioned (and some not so well intentioned) affluent Southerners who are out there 'enterprising' and making money are inflicting a burden on the poor, a burden which is not inevitable. Perhaps there is something in collective guilt after all. Perhaps to be comfortable in present-day Britain is to carry a stigma, namely the guilt for those who suffer the consequences of our society when there is no need for it. That we are operating in 'structures of sin' is an idea rightly pressed hard in John Paul II's recent encyclical *Sollicitudo Rei Socialis* (1988).

Nevertheless there are genuine moral difficulties about the idea of collective guilt. The problem lies in transferring a forensic term 'guilt' from the law courts to the language of ethics. Clearly there is a close connection between the law and morals—law breakers are often immoral and vice versa—but sometimes law and morals are independent and sometimes in opposition. To use familiar examples: it is not (in most people's opinion) immoral to break the law by riding a motorbike without a crash helmet or to drink outside licensing hours; and it is not illegal any more to commit the sins of adultery or sodomy. However, a guilty law breaker reaps punishment, and by using the same word 'guilt' we suppose that someone who bears moral guilt deserves to be punished or chastised, and this need not be the case.

Even in juridical law there can be extenuating circumstances affecting guilt. A child or a lunatic does not have full moral and therefore legal responsibility. Someone who is ignorant of the law or ignorant of the circumstances of a felony might be partially relieved of guilt. Intentions can make a difference. If I kill someone while carelessly cleaning a shotgun, I will be charged with manslaughter rather than murder.

So there are degrees of culpability in law breaking. Similarly there are distinctions to be made in moral guilt. Because of the juridical background we feel that we can only be guilty if we have *done* something that we *know* to be forbidden. We would not be found guilty in a court of law for something that someone else had done; though if we were to passively aid a criminal by not, for example, giving information to the police, we could be guilty of an offence. The idea of collective guilt, however, asks us to believe that a person may share the guilt of others who have committed a crime by being a member of the same 'collective', the same social group. Here the whole weight of English individualism, of the liberal democratic tradition, is against the idea. The idea of collective guilt cannot get a firm purchase in a culture that is in different ways both empiricist and rationalist. The concept of collective guilt defies empiricist testing and cannot be demonstrated by *a priori* reasoning. In the absence of that kind of proof the idea may seem so much hot air. But we are dealing here with moral intuitions and psychological insights, and the reality of collective guilt persists for those

126

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms

not completely taken over by a philosophical positivism which is still widely influential, even if officially discredited. There is a real sense in which a morally sensitive German of the post-1945 generation will feel some guilt for what his ancestors and his nation did in Central Europe four and a half decades ago. It is not my aim, however, simply to point the finger at foreigners (I write as someone who is British and more specifically English) because the British carry the guilt of many things that went on in the construction of their Empire. Take, for example, those families who made their money out of the slave trade. Would that more English and Scotsmen were prepared to admit to a collective guilt for what earlier generations have done in Ireland.

At this point it might be objected that ascribing collective guilt to another nation might become a grotesque excuse for punishing their guilt and persecuting them in some way that goes beyond the imposition of penalties on actively guilty individuals. This is difficult because at one level the objection seems to be perfectly legitimate. It is, on the one hand, I suggest, quite proper that the Federal Republic of Germany should continue to pay reparations to European Jews (though not, I think, to the state of Israel as such). It was also proper that President Nixon should promise reparations to the Government of Vietnam for the damage the US Army did there, and quite shameful that neither he nor any subsequent US President has ever paid them a cent. Yet it is nefarious to punish a nation or a race for a crime committed by one member or a small clique of that nation, such as the fatuous excuse for persecuting the Jews over many centuries because they were 'Christ killers'. Of course, there is more to anti-semitism than Christian anti-semitism, but the point stands. Perhaps the distinction that needs to be made here is that collective guilt is only appropriate where a nation or similar group is officially involved—as with the United States in Vietnam or the British in Ireland or the Turks in Armenia—but not where small-scale crimes are involved like the Jewish Sanhedrin or the Roman Governor bringing about the execution of an innocent man. Similarly, collective guilt is not appropriate for conventional crimes but only for crimes against humanity, because the practical value of such a diffuse idea as collective guilt is that later generations might be prepared to stop the crime recurring and might compensate the victims of earlier crimes, though you have to be an optimist to believe that either might actually happen.

The example of Christian anti-semitism makes it clear that we Christians cannot without hypocrisy accuse others of a collective guilt. It can only be that members of the guilty group themselves feel the guilt; self-accusation is the appropriate forum for collective guilt. In relation to anti-semitism (whatever might or might not have happened in first-century Palestine) those who should feel guilt in the twentieth century are Christians whose forebears have done such dreadful things to the Jews in

127

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms

the name of Christ.

If collective guilt is something we can only accuse ourselves of perhaps 'guilt' is not the best word, because guilt is not what I personally feel for what Christians have done to Jews, or the British to the Irish and to African slaves. Collective guilt is not a conventional guilt. It is rather a collective shame, a collective responsibility and a collective sin. At any rate it involves a sense that we are all in this together, like it or not, even if the idea is likely to remain incomprehensible to a crass individualist like Margaret Thatcher who thinks 'there is no such thing as society: there are only individual men and women, and there are families'.

I am convinced that collective guilt, as it continues to be known, is a valuable moral construct if used with the qualifications described above. It also needs to be said that it represents a way of thinking that is deeply embedded in Christian and to some extent Jewish thought, and, as I have already said, some heavy deconstruction of traditional Christian theology would have to take place if we were to abandon the idea. In fact it would imply such a change in our understanding of the crucifixion and resurrection of Jesus Christ that such a move is, I suggest, unthinkable, at least within Catholic orthodoxy. Put simply, if there is no such thing as shared guilt, there can be no such thing as shared virtue and we cannot have benefited from the death and resurrection of one man.

•  •  •  •  •

The idea of shared guilt and shared virtue goes back to the earliest stage of Jewish religion. One of the principle ideas of the Old Testament is that of the holy people of God who are obliged to expunge contamination from their community in order to fulfil the destiny they have covenanted with their God. In the ordinary way this involved an individual offering a sacrifice, usually an animal sacrifice, as a sign of reparation for sin. The norm is that the individual offers sacrifice for his own sin; but sins would often have been committed by a junior member of a family and presumably the sacrifice would normally have been offered on his behalf by the *paterfamilias*. So sin must have been understood to pollute the family. Similarly at a later stage we find the High Priest offering sacrifice in the Temple for the whole nation (Leviticus 16.17; Hebrews 9.7). Just as the guilt of sin can be inherited across time, 'visiting the iniquities of the fathers upon the children to the third and fourth generation of those who hate me' (Exodus 20.5), it is also clear that guilt can be shared synchronically across the community, as is shown by the ritual associated with the Day of Atonement (Leviticus 16.29—34), particularly with the scapegoat on whose head are heaped the sins of the nation once a year before it is driven into the desert, where the sins perish with the animal (Leviticus 16.20—22).

Eventually Ezekiel protested against this early understanding of

128

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms

guilt in favour of individual responsibility and individual punishment (see Ezekiel 18.5—18; also Deuteronomy 24.26 and Jeremiah 31.30). There remains, however, a text more significant for Christian theology, Isaiah 52.13—53.12, the fourth of the servant songs, though interestingly a text not used in synagogue worship, presumably because of its Christian appropriation.

The servant of the Lord, whom the synagogue has traditionally interpreted collectively as Israel herself, has always been seen retrospectively in the Christian tradition as Jesus, the messiah who 'emptied himself, taking on the form of a servant ... who humbled himself and became obedient unto death, even death on a cross' (Philippians 2.7—8).

In a discussion of collective guilt, the key verses from Isaiah are:

> Surely he has borne our griefs
> and carried our sorrows;
> yet we esteemed him stricken,
> smitten by God, and afflicted.
>
> But he was wounded for our transgressions,
> he was bruised for our iniquities;
> Upon him was the chastisement that made us whole,
> and with his stripes we are healed.
>
> All we like sheep have gone astray;
> we have turned everyone to his own way;
> and the Lord has laid on him
> the iniquity of us all.                (verses 4—6)
>
> By oppression and judgment he was taken away;
> and as for his generation, who considered
> that he was cut off out of the land of the living,
> stricken for the transgression of my people?
>
> And they made his grave with the wicked
> and with a rich man in his death,
> although he had done no violence
> and there was no deceit in his mouth.  (verses 8—9)
>
> Yet it was the will of the Lord to bruise him;
> he has put him to grief;
> when he makes himself an offering for sin (*asham*)
> he shall see his offspring, he shall prolong his days,
> the will of the Lord shall prosper in his hand;
> he shall see the fruit of the travail of his soul and be
> satisfied;
> by his knowledge shall the righteous one, my servant,
> make many to be accounted righteous;

129

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms

>            and he shall bear their iniquities.           (verses 10—11)
>
> ... he poured out his soul to death
>         and was numbered with the transgressors;
>     yet he bore the sin of many,
>         and made intercession for the transgressors.
>                                                          (verse 12b)

If ever a prophecy could be said to have been fulfilled in Jesus, this, it would seem, is it, but the idea of shared guilt and shared virtue has come under a second form of attack, not now from liberal individualist philosophy but from Old Testament scholarship. In traditional Christian exegesis of the Old Testament, Isaiah 53 is seen as the prime example of vicarious suffering whereby the servant, an individual, with hindsight seen as Jesus, an innocent man, suffers and dies on behalf of the guilty and is finally vindicated. R.N. Whybray, however, has argued that there is no idea of vicarious suffering in Isaiah 53 nor anywhere in the Old Testament. He first excludes the idea of vicarious suffering quite properly from passages such as Numbers 14.34; Ezekiel 4.4—6; Exodus 28.38; Leviticus 10.17 and the scapegoat ritual for the Day of Atonement, Leviticus 16.22, where we do not have an individual choosing to die for the sins of others but an animal burdened with a community's sin and sent to perish in the wilderness. However, *shared* guilt and *shared* remission are still to be found there, as it is in the passages listed above with perhaps the exception of Numbers 14.34.

Whybray further argues that the servant of God in Isaiah 53 did not die.

> The mass of statements in the poem about the Servant, taken together, make it quite clear that he was subjected to violence and humiliation, but that these stopped short of death.
>
> This conclusion is made even more inescapable by verses 10 to 12. If the earlier part of the poem spoke of the Servant's having died, verses 10 to 12 would necessarily have to refer to his expected resurrection. But ... this is impossible: the concept of the resurrection of the individual either in this life or beyond the grave was not current in Israel in the 6th century BC, and there is nothing in these verses to suggest that the author expected such an unheard-of occurrence: they simply anticipate that the Servant, whose life has hitherto been so wretched, will at last receive the due reward for his faithfulness in the form of an honoured and prosperous old age.[3]

The earliest references to the resurrection, and even then this is not the resurrection of an individual, come from the 2nd century BC (Isaiah 26.19; Daniel 12.2), and the author of Isaiah 53 cannot have imagined the servant being restored to a life after death. It is possible that the poem envisages the restoration of the servant's *reputation* some time

130

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms

after his death, but this does not fit with the literal sense of verses 10 to 11 where it is said that he will see his offspring, shall prolong his days, shall see the fruit of the travail of his soul and be satisfied. In which case, while it is an ambiguous passage, Whybray is surely right that the servant did not die, though the one line that does not fit this interpretation is verse 12, 'he poured out his soul to death'.

It is by no means clear who the servant is meant to be, but Whybray identifies the servant with the Isaianic prophet himself and says that he *shared* the sufferings of his fellow exiles in Babylon. Whybray adds, 'if Israel had not sinned, the Servant would not have had to suffer, but he did not suffer in the place of others to allow them to escape from the consequences of their sin.'[4]

The most important line for the Christian tradition is verse 10, 'he makes himself an offering for sin (*asham*)'. *Asham* here refers to the guilt offering or sacrifice of reparation described in Leviticus 5, where it is said to be for unwitting sin, and in Leviticus 7, where we are told that it is covered by the same law as for sin offerings. Whybray suggests that the efficacy of the *asham* sacrifice was extremely limited and was to atone for those who sinned 'with a high hand' (Numbers 15.30), a phrase which is interpreted as denoting contempt for the word of Yahweh and the breaking of his commandments (Numbers 15.31).[5] The sense of most English translations of Isaiah 53 is that the servant makes *himself* a guilt offering and dies in accordance with the will of God to 'bear the sin of many' (i.e. everyone). This incorporates a shared guilt and shared virtue whereby the servant becomes our guilt and frees everyone of us from sin. It is this idea which is locked into the traditional Christian understanding of the crucifixion and which, Whybray says, *cannot* be derived from Isaiah 53.

The precise meaning of *asham* as distinct from other Old Testament sacrifices is not important here, and de Vaux is surely right to point out that the editors of the Pentateuch no longer themselves fully understood the meaning of the ancient texts they were preserving. What is a serious difficulty is that the Hebrew of Isaiah 53.10 can be translated either as a second person masculine: 'if you make him a guilt offering', or as a third person feminine: 'if he makes a guilt offering'.[6] Whybray chooses the second as the more natural and he finds no evidence for an understanding of a vicarious human sacrifice here or anywhere else in the Jewish scriptures; he believes that the sacrifice had already been offered at the time of the writing of Isaiah 53; that the sacrifice was not himself, the prophet; and that, anyway, the text is so uncertain that it is difficult to pin any clear meaning onto it.

It seems, then, that we are not on firm ground if we try to base a theory of Jesus's death as a servant-like atonement for sin on Isaiah 53. Whybray regards Isaiah 53 as a theologically more ordinary passage than it has formerly been understood to be, that fits more easily into the

131

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms

pattern of Old Testament thought, and he supports the view of the Jewish scholar H.M. Orlinsky that, 'Were not for the theological needs of early Christianity that brought emphasis for the first time to the concept "servant" in Isaiah 52 to 53, it is altogether doubtful that the scholars would subsequently have paid special attention and granted special status to Second Isaiah's servant passages.'[7]

If it is doubtful that we can extract vicarious suffering from Isaiah's servant or any other part of the Old Testament, this does not rule out the validity of the idea as such, particularly as shared guilt and shared virtue certainly are to be found in aspects of the Jewish sacrificial system, as they are in some measure in Isaiah 53. One is, then, compelled to say that with the understanding of the death of Jesus as a vicarious sacrifice the first Christians introduced a novel idea into the history of the concept of forgiveness/remission and that here there is to be found a disjunction between Jewish and Christian thought. In retrospect it is easy to see how the Christian Church read its interpretation of Jesus back into the suffering servant of Isaiah, but Morna Hooker suggested some years ago that not only is there no idea of vicarious suffering in Isaiah 53 but that the New Testament does not interpret the apparent death of the servant in Isaiah as a vicarious sacrifice and that such interpretations are a later (and, by implication, illegitimate) import. This latter view, however, should be rejected, because there are a considerable number of references to Isaiah 53 in the New Testament and most of these are related to the death of Jesus as a guilt offering, even if this can now be seen to be an unjustifiable exegesis of the Old Testament in terms of modern critical-historical method. We should beware of connecting any and every verbal resemblance between a New Testament passage and Isaiah 53, as Jeremias tends to do, but it is true that while there are no full quotations from Isaiah 53 anywhere in the New Testament, there are many clear allusions to it.[8] These include the *huper* formula: *huper pollon,* for many (Isaiah 53.12), and derived from it *huper hemon,* for us, both being abbreviations of 'for the sins of many' and 'for our sins', as in Mark 10.45 ('For the son of man came to be served but to serve, and to give his life as a ransom for many') and 1 Corinthians 15.3 ('Christ died for our sins'). Often these two phrases are linked with the verb *didonai* or *paradidonai,* as in Mark 10.45 above and Galatians 1.4: 'our Lord Jesus Christ who gave himself for our sins'. Elsewhere the verb can be used with a different ending, and here in Romans 4.25 in the passive, 'Who was given up for our trespasses and raised for our justification'.

The Marcan passage 10.45 introduces the idea of 'ransom' where *lutron* is probably being used as an equivalent of the Hebrew *asham* which we found in Isaiah 53.10. *Lutron* is not derived from the wayward translation found in the Greek Septuagint, and it represents an attempt to translate the Hebrew of Isaiah into the current Greek of an early Christian tradition which is semitic and almost certainly Palestinean.

132

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms

This attempt to make sense of the death of Jesus as a redemption and an atonement, *apolutrosis,* is to be found also in Paul and in Hellenistic Christian traditions. This means that the New Testament is permeated with sacrificial language derived from the Hebrew scriptures and with connections with Isaiah 53, which is used to interpret the death of Jesus. The main examples not already mentioned are: 'Christ redeemed us from the curse of the law' (Galatians 3.13); God sent his son 'to redeem those who are under the law' (Galatians 4.5); all who believe 'are justified through the redemption which is in Christ Jesus whom God put forward as an expiation by his blood' (Romans 3.24f.); 'you know that you were ransomed ... with the precious blood of Christ' (1 Peter 1.18f.) and 1 Timothy 2.6, 'who gave himself as a ransom for all'.

While all this language is of redemption and atonement (*apolutrosis*), with the idea of paying off a debt or buying back a hostage held captive, we also find in the New Testament an alternative language of expiation and propitiation (*hilasmos, hilasterion*), with the idea of pacifying an angry God. For example, the Letter to the Hebrews we find, 'so that he might become a merciful and faithful high priest in the service of God to make expiation for the sins of the people' (Hebrews 2.17), and particularly in the First Letter of John: 'he is the expiation for our sins, and not for ours only but for the sins of the whole world' (1 John 2.2 and also 1 John 4.10). Elsewhere we find play on the word 'blood'—'the blood of Jesus ... cleanses us from all sin' (1 John 1.7)—for it is the understanding of the author of Hebrews that 'under the law almost everything is purified with blood and without the shedding of blood there is no forgiveness of sins' (Hebrews 9.22). So he also tells us that Christ as our high priest, 'entered once and for all into the Holy Place, taking not the blood of goats and calves but his own blood, thus securing an eternal redemption' (Hebrews 9.12).

Because Jesus died bloodily on the cross it was inevitable in first-century Palestine that the death should have been interpreted by his followers as a bloody sacrifice, even though at a literal level his death was a judicial execution by the Romans and even though for most Jews it was an offensive death, firstly because when spoken of as a sacrifice it was a human sacrifice and, secondly, because as a crucifixion it bore the curse of the Deuteronomic law: 'everyone who hangs from a tree is under a curse' (Deuteronomy 21.22—23). Insofar as this sacrifice was voluntary (in that Jesus could have avoided it) and in conformity with the will of God (authenticated by the resurrection as God's response to Jesus's execution) it was inevitable that it became related, and related at a very early stage in Christian tradition, to Isaiah 53, even if that perhaps involved doing less than justice to the original 'prophecy'. If relating Isaiah's suffering servant of God to Jesus does not help us to understand what Isaiah meant by his 'servant', it *does* help us to understand the

133

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms

death of Jesus Christ, and we might here point to a verse in Paul which has a clear allusion to Isaiah 53.10: 'For our sake he made him to be sin who knew no sin, so that in him we might become the righteousness of God' (2 Corinthians 5.21).

It need only be added that a case has been put forward by Joachim Jeremias that the identification of Jesus as the servant of Yahweh can be traced back to Jesus himself, though a paucity of evidence leads Jeremias to make the unsubstantiated claim that it was through his private essoteric teaching that Jesus instructed the disciples about his identification with the suffering and dying servant, as his death seemed ever more likely to be a violent one.[9] We do know that Jesus began to recite Psalm 22 on the cross, according to Mark's Gospel, 'My God, my God, why have you forsaken me', though in his death agony he may not have got beyond the opening words. It is possible that the Christian community put these words in Jesus's mouth, but much more likely that Jesus said them because the psalm fits so well the circumstances of the death he was experiencing:

> Why are you so far from helping me,
>     from the words of my groaning?
> O my God, I cry by day, but you do not answer;
>     and by night, but I find no rest.
> I am a worm and no man;
>     scorned by men and despised by the people.
> All who see me mock at me,
>     they make mouths at me, they wag their heads.
> I am poured out like water,
>     and all my bones are out of joint;
> my heart is like wax,
>     it is melted within my breast;
> my strength is dried up like a potsherd,
>     and my tongue cleaves to my jaws;
> they lay me in the dust of death.
>
> Yes, dogs are round about me;
>     a company of evildoers encircles me;
> they have pierced my hands and my feet —
>     I can count all my bones —
>     they stare and gloat over me;
> they divide my garments among them,
>     and for my raiment they cast lots.
>                         (Psalm 22.vv. 1—2, 6—8, 14—18)

If anything has been invented by the Gospel tradition here it is likely to be the description of the soldiers casting lots by the cross to fit the psalm. And as the opening words of the psalm spoken by Jesus imply the rest which fit his death, so Jesus prayed (by implication at least) for his vindication which is found in verses 19 to 31:

134

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms

> You who fear the Lord, praise him ...
> For he has not despised or abhorred the affliction of the
>                                                           afflicted;
>     and he has not hid his face from him,
>     but has heard, when he cried to him.
>
>                                                                  (vv.23—24)

If Jesus could identify himself with the afflicted man of Psalm 22 who is heard by God, it is quite possible that Jesus would have seen himself as Isaiah's servant at least at the time of his dying, because the texts of Psalm 22 and Isaiah 53 are so similar, even though he does not quote Isaiah at this point. And it is entirely understandable that the first Christians made this identification.

A much stronger case than Jeremias's has been made by Martin Hengel that the identification of Jesus with the servant can be traced back to Jesus himself.[10] Hengel argues that the understanding of the death of Jesus as an atoning sacrifice is to be traced back to the words of Jesus at the last supper: 'This is my blood of the covenant which is poured out for many' (Mark 14.24).

The fact that 'sacrifice' is a central way of understanding the death of Jesus in the New Testament leads us to our biggest problem: whether we can appropriate the language of bloody sacrifice to make sense of Christ's death when we are culturally so far removed from the offering of bloody sacrifices to gain forgiveness of sins. We are familiar with making moral and spiritual sacrifices as satisfaction for personal sin, but that is not how the New Testament understands the death of Christ. Paradoxically it is theological ideas in the New Testament, particularly in the Letter to the Hebrews, which have produced this problem. For Hebrews states that Christ is both priest and sacrificial offering, he who offers a perfect sacrifice 'made perfect through suffering', once and for all, so that future bloody sacrifices are made redundant, as indeed are made redundant all priests in the sense of necessary mediators without whom penitents and worshippers cannot have access to God. After Christ, bloody sacrifices are finished with, and, even though the Jewish Christians continued to worship in the Jerusalem temple for a time (Acts 2.46; 3.1), it is scarcely conceivable that they participated in sacrificial rituals. And because Christians have never sacrificed it is all but impossible two thousand years later to grasp the religious significance of sacrifice. Of course, most people do not think twice about the meaning of expiation, redemption or atonement; but that is because these words have become little more than religious jargon even for Christians. Insofar as theologians struggle to understand the terms, it is a question of reconstructing ancient history rather than dealing with living ideas.

However, the sacrificial model is not an absolute one in Christian theology, for there are others ways of trying to make sense of Christ's death (though Roman Catholics have a particularly intransigent cultural inheritance when they speak of the re-enactment of Calvary at the *sacrifice*

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms

of the Mass). The most important alternative is Paul's juridical model based on notions of guilt and innocence, justice and condemnation in relation to Old Testament law and grace. Paul's legal model does away with law (in one sense), just as the sacrificial model of Hebrews does away with sacrifice. Clearly these models drawn from the Jerusalem temple and from jurisprudence are provisional, and there is no reason why other models should not be tried even if they are not rooted in the Old or New Testaments.

While these models are culture-bound and dispensable, some aspects of them are not. First, we cannot dispense with the idea that freedom/salvation is available through the death and resurrection of Christ, and, second, that Jesus Christ has some representative function in making salvation available for all. On the one hand we are collectively involved in sin and guilt; on the other hand we all have available the possibility, the real possibility, of salvation, freedom, reconciliation with God, call it what you will. This can only be possible if there is some reality to collective guilt and collective virtue in which we participate in a way which does not necessarily depend on our active culpability or merit. 'As in Adam *all* die, so also in Christ shall *all* be made alive' (1 Corinthians 15.22). Remove collective guilt and you remove collective virtue. Then Christ would have no representative value; his death would not be vicarious, indeed the word 'vicarious' would be emptied of meaning. Salvation would, then, depend on our own efforts, a dependence which Paul warned us was destined to failure. Pelagius would be right after all and we would be left with Thatcher's version of Christianity, where we all have to pull ourselves up by our moral bootstraps and hard luck on the losers; where success is determined by how much wealth you create and how much you distribute to the destitute. If ever there was a socio-centric religion it is Margaret Thatcher's Christianity—religion for the wealth creators. But where do the poor fit in, other than as a means to advance the virtue of the philanthropic middle class?

In reality the abiding attractiveness of Christianity is that it is a religion for failures, for those who cannot cope, who cannot save themselves, but who are open to the grace of God.

1   C.B. Macpherson, *The Political Theory of Possessive Individualism: Hobbes to Locke*, Oxford 1964, p.3.
2   *Ibid.*, p.4.
3   R.N. Whybray, 'Thanksgiving for a Liberated Prophet: an Interpretation of Isaiah Chapter 53', *Journal for the Study of the Old Testament;* Supplement Series 4, Sheffield 1978, p. 106.
4   *Ibid.*, p.62.
5   *Ibid.*, p.65f.
6   *Ibid.*, p.64.
7   H.M. Orlinsky, 'The So-Called "Servant of the Lord" and "Suffering Servant" in Second Isaiah' in H.M. Orlinsky and N.H. Snaith, *Studies on the Second Part of the Book of Isaiah, Vetus Testamentum* Supplement 14, 1967, p.75 referred to in Whybray, *op. cit.*, p. 140.
8   M. Hengel, *The Atonement*, London 1981, p. 60.
9   J. Jeremias, 'Pais theou' in G. Kittel, *Theological Dictionary of the New Testament*, trans. by G.W. Bromiley, Grand Rapids, Michigan 1968, Vol 5, p.717.
10  M. Hengel, *op. cit.*, p.71ff.

This content downloaded from
131.247.112.3 on Thu, 01 Sep 2022 22:45:57 UTC
All use subject to https://about.jstor.org/terms