# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

|  |  |
|---|---|
| ADRIANA NOVOA, et al., | |
| *Plaintiffs*, | Case No. 4:22-cv-324-MW-MAF |
| v. | |
| MANNY DIAZ, JR., et al., | |
| *Defendants*. | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Charles J. Cooper (Bar No. 248070DC)
John D. Ohlendorf (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601

*Counsel for Defendants Manny Diaz, Jr., et al.*

September 30, 2022

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ............................................................................................. 1

FACTUAL BACKGROUND ............................................................................ 2

ARGUMENT .................................................................................................... 4

I.    Plaintiffs Have Failed To Establish Standing Sufficient to Support a Preliminary Injunction with Respect to Several Provisions of the Act. ....... 4

II.   Because the Act Regulates Government Speech, It Does Not Implicate the First Amendment. ........................................................................................... 4

    A. The Instruction Offered by State Employees in the State-Sponsored Curriculum at State Institutions Is Government Speech. ........................ 4

    B. Students Do Not Have a First Amendment Right to Regulate the Content of a Public School's Curriculum. ................................................ 8

III.  The IFA Satisfies Any Form of First Amendment of Scrutiny. ................... 9

    A. The Act Is Not a Prior Restraint. ............................................................ 10

    B. The Act Satisfies Heightened Scrutiny. ................................................. 11

    C. The IFA Is Not Overbroad. .................................................................... 17

IV.   The Act Is Not Unconstitutionally Vague. ................................................ 19

V.    Plaintiffs' Claim under the Campus Free Expression Act Is Unlikely to Succeed. ...................................................................................................... 21

CONCLUSION .............................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page**

*Alexander v. United States*, 509 U.S. 544 (1993) ...............................................10, 11

*Arce v. Douglas*, 793 F.3d 968 (9th Cir. 2015) .................................................12, 16

*Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209 (11th Cir. 2017) .......................10

*Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955).................................12

*Doe v. Valencia College*, 903 F.3d 1220 (11th Cir. 2018) ......................................17

*Fla. Virtual Sch. v. K12, Inc.*, 148 So. 3d 97 (Fla. 2014) ........................................22

*Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006)...........18

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*,
    466 U.S. 789 (1984)................................................................................................18

*NetChoice, LLC v. Attorney General, Fla.*, 34 F.4th 1196 (11th Cir. 2022)...........15

*Paresky v. United States*, 995 F.3d 1281 (11th Cir. 2021) ......................................17

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) ..................................6

*Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533 (2002)...............................21, 22

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995)...............6

*Shurtleff v. City of Boston, Mass.*, 142 S. Ct. 1583 (2022)................................5, 6, 7

*United States v. Dean*, 635 F.3d 1200 (11th Cir. 2011) ..........................................18

*United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995).................10, 11

*Virginia v. Hicks*, 539 U.S. 113 (2003) ...................................................................17

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*,
    576 U.S. 200 (2015)..................................................................................................6

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
    900 F.3d 250 (6th Cir. 2018) .............................................................................4, 5

*Wollschlaeger v. Gov., Fla.*, 848 F.3d 1293 (11th Cir. 2017) .................................12

**Constitutions, Statutes, and Legislative Materials**

FLA. CONST. art. IX, § 7(a)–(b) ...................................................................................7

FLA. CONST. art. IX, § 7(d) .........................................................................................7

FLA. CONST. art. IX, § 8(a)–(b) ...................................................................................7

Fla. Stat.

§ 1000.05(1)...............................................................................................13
§ 1000.05(2)(a) ..........................................................................................13
§ 1000.05(4)(a) ..............................................................................12, 13, 19
§ 1000.05(4)(a)(1)–(8)...................................................................................3
§ 1000.05(4)(b) ..............................................................14, 15, 17, 19, 21
§ 1004.097 ......................................................................................................4
§ 1004.097(2)(f)...................................................................................8, 9, 21
§ 1004.097(3)(f)........................................................................................8, 9

2022 Fla. Laws 72 .......................................................................................2

## <u>Regulations</u>

Regulation 10.005(4)(d)..............................................................................16

## <u>Other Authorities</u>

Daniel R. Cahoy, *Toward a Fair Social Use Framework for College and University Intellectual Property*, 41 J.C. & U.L. 485 (2015)....................................7

**INTRODUCTION**

The Plaintiffs' challenge to Florida's Individual Freedom Act ("IFA") in this case is substantially similar to the challenge brought in *Pernell v. Florida Board of Governors*, No. 22-cv-304, and their overlapping arguments fail for the same reasons they fail in *Pernell*—primarily, that the curricular speech at issue is *government speech* and thus not subject to any heightened scrutiny. And even if some form of heightened scrutiny did apply, the Act amply justifies any burden on such speech. Moreover, the Act uses common and plain terms that are easily understood and more than satisfy the vagueness requirement that applies to government's regulation of its own employees.

After Plaintiffs filed their motion for a preliminary injunction, the Court established a briefing schedule providing for this case to be briefed in tandem with *Pernell*, with Defendants filing a supplemental brief that discusses only those issues and arguments that are unique to the *Novoa* Plaintiffs—fully incorporating the briefs filed on behalf of Defendants in *Pernell*. *See* Defs.' Mem. of Law in Supp. of Mot. to Dismiss, *Pernell v. Fla. Bd. of Govs. of the State Univ. Sys.*, No. 4:22-cv-304-MW-MAF, Doc. 51-1 (Sept. 22, 2022) ("*Pernell* MTD"); Defs.' Resp. in Opp. to Pls.' Mot. for Prelim. Inj., *Pernell v. Fla. Bd. of Govs. of the State Univ. Sys.*, No. 4:22-cv-304-MW-MAF, Doc. 52 (Sept. 22, 2022) ("*Pernell* PI Opp."). Defendants therefore fully incorporate their *Pernell* briefs, and all arguments and defenses

asserted therein, and they submit this brief to address additional points raised by Plaintiffs in this action.

The additional arguments raised by Plaintiffs here likewise provide no basis for enjoining the Act. First, the Act is not an unconstitutional "prior restraint" because it does not regulate speech *before it occurs*. Second, many of Plaintiffs' arguments rest on patently erroneous readings of the Act and implementing regulation. And third, Plaintiffs' argument regarding Florida's Campus Free Expression Act fails because the Court lacks jurisdiction to hear it, and because the IFA does not conflict with the Free Expression Act in any event. The Free Expression Act ensures that students *may be exposed to and discuss* all ideas while the IFA's effect is comparatively narrow: It merely prohibits the State's educators from *endorsing* the concepts *when speaking on behalf of the State of Florida*. The upshot is that while students will be free to form their own opinions about the concepts, the State of Florida has formed *its opinion* on them and has decided that its educators may not endorse those concepts when speaking on behalf of the State.

For these reasons, as well as those stated in Defendants' *Pernell* briefing, the Court should deny Plaintiffs' motion for a preliminary injunction.

## FACTUAL BACKGROUND

This is the latest in a series of challenges to Florida's Individual Freedom Act. *See* 2022 Fla. Laws 72. As relevant here, the Act prohibits the practice of

"subject[ing] any student or employee to training or instruction that espouses, promotes, advances, inculcates, or compels such student or employee to believe" any of eight enumerated concepts related to "race, color, national origin, or sex." *See* FLA. STAT. § 1000.05(4)(a)(1)-(8). Although the Act prohibits *endorsement* of these concepts, it expressly permits "discussion" of the concepts "in an objective manner." FLA. STAT. § 1000.05(4)(b). The pertinent provisions of the Act are set out in full in the briefing in *Pernell*, *Honeyfund.com v. DeSantis*, No. 22-cv-227, *Falls v. DeSantis*, No. 22-cv-166, and this Court's previous orders and opinions in those cases.

Plaintiffs here are a college professor, a college student, and the college student's organization at the University of South Florida (USF). *See* Verified Compl. for Declaratory and Inj. Relief, ¶¶ 10, 14, 16, Doc. 1 (Sept. 6, 2022) ("Compl."). The professor, Adriana Novoa, teaches several courses, including "Science in Cultural Context," "History of Sports from National to Global Contexts," and "Modern Latin America." *Id.* ¶ 11. She alleges that the Act violates her First Amendment rights, is overbroad, and is unconstitutionally vague. *See id.* ¶¶ 264, 284, 303, 332, 351.

The student plaintiff, Samuel Rechek, is an undergraduate student at USF who intends to take Professor Novoa's "Science in Cultural Context" course in the spring semester. *Id.* ¶ 14. He also serves as the founder and president of the organization-plaintiff, First Amendment Forum at USF. *Id.* ¶ 16. On behalf of himself and his

3

organization, Rechek alleges that the Act violates his First Amendment right to receive information and his statutory rights under Florida's Campus Free Expression Act, FLA. STAT. § 10004.097. *See* Compl. ¶¶ 264, 313, 362.

## ARGUMENT

## I.      Plaintiffs Have Failed To Establish Standing Sufficient to Support a Preliminary Injunction with Respect to Several Provisions of the Act.

Plaintiffs fail at the threshold to show a likelihood of success with respect to several provisions of the Act because they lack standing. As shown in Defendants' motion to dismiss ("MTD"), filed contemporaneously with this brief, no Plaintiff has adequately alleged any injury resulting from the First, Second, Third, Fourth, Fifth, Sixth, or Eighth concepts, MTD 4-11, and Plaintiffs Recheck and First Amendment Forum lack standing altogether, *id.* at 11-14. Even if Plaintiffs alleged standing sufficient to survive a motion to dismiss with respect to these provisions, they have failed to meet "'the heightened standard for evaluating a motion for summary judgment'" that applies at the preliminary-injunction stage. *See* Order, *Falls v. DeSantis*, 4:22-cv-166-MW-MJF, Doc. 62 at 11 (June 27, 2022) (quoting

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 n.3 (6th Cir. 2018)).

## II. Because the Act Regulates Government Speech, It Does Not Implicate the First Amendment.

As shown in previous briefing, the Act regulates pure government speech—the instruction provided by state employees in the state-established curriculum at state institutions. *See Pernell* PI Opp. 10-21. The Act therefore does not implicate any Plaintiff's First Amendment rights. *See id.* Plaintiffs' additional arguments to the contrary lack merit.

### A. The Instruction Offered by State Employees in the State-Sponsored Curriculum at State Institutions Is Government Speech.

The in-class instruction offered by state-employed educators is government speech, not the speech of the educators themselves. *See Pernell* PI Opp. 10-14. Plaintiffs argue that the three-factor analysis applied by the Supreme Court in *Shurtleff v. City of Boston, Mass.*, 142 S. Ct. 1583, 1589-90 (2022), shows that the "government speech doctrine is inharmonious with higher education." *See* Pls.' Mot. for Prelim. Inj. and Supporting Mem. of Law 20 n.9 (Sept. 15, 2022) ("Pls.' Br."). But that analysis is inapplicable here because it applies only when the regulated speech is the result of a "government-public engagement," meaning the government has "invite[d] the people to participate in a program" that results in the relevant speech. *Shurtleff*, 142 S. Ct. at 1589. That is why the Supreme Court cases applying

the three-factor analysis all involve speech created in part by *private persons*. *Shurtleff*, 142 S. Ct. at 1587 (relevant speech was a private group's flag on the flagpole outside city hall); *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 213 (2015) (relevant speech was a license-plate design that had been proposed by private groups); *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470-73 (2009) (relevant speech was the message on privately funded and donated monuments).

Here, in contrast, the State *hires* educators—as government employees—to teach the State's curriculum. It does not invite private persons to try their hand at leading university classes. Therefore, there is no "blur" in the "boundary between government speech and private expression," and the three-factor analysis is simply inapposite; it is unnecessary to determine that the Florida public-university curriculum is clearly the government "speak[ing] for itself." *Shurtleff*, 142 S. Ct. at 1589. Instead, as the Supreme Court has held, "[w]hen the University determines the content of the education it provides, it is the University speaking." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995). Because the Act applies only to curricular speech in the classroom and other instructional settings, it regulates government speech and thus does not violate professors' First Amendment rights.

6

But even if the *Shurtleff* three-factor analysis applies to curricular speech, it would yield the same result: public-university curriculum is government speech. First, as a matter of history, *Shurtleff*, 142 S. Ct. at 1590, the "first public colleges and universities date back to the founding of the country." Daniel R. Cahoy, *Toward a Fair Social Use Framework for College and University Intellectual Property*, 41 J.C. & U.L. 485, 512 & n.135 (2015) (noting that the University of North Carolina, described as the country's first public university, was chartered in 1789 and opened in 1795). Second, with respect to "whether the public would tend to view the speech at issue as the government's," *Shurtleff*, 142 S. Ct. at 1591, there can be little doubt that Floridians know that the government—university administrators, acting pursuant to and in accord with standards and guidelines established by law and regulation—sets the public-university curriculum given the Florida Constitution's express provision for "a system of governance for the state university system of Florida" that is "comprised of all public universities." FLA. CONST. art. IX, § 7(a)-(b); *see also* FLA. CONST. art. IX, § 8(a)-(b) (same). And third, the government exerts *complete* "control," *Shurtleff*, 142 S. Ct. at 1592, over public universities—as required by law. *See* FLA. CONST. art. IX, § 7(d) (The Florida Board of Governors "shall operate, regulate, control, and be fully responsible for the management of the whole university system."). Thus, under any analysis, Florida's public-university curriculum is government speech and does not implicate the First Amendment.

7

### B.    Students Do Not Have a First Amendment Right to Regulate the Content of a Public School's Curriculum.

Plaintiffs argue that Florida's Campus Free Expression Act "recognizes" that students "have a First Amendment right to receive information and ideas in the classroom." Pls.' Br. 23 (citing FLA. STAT. § 1004.097). They are mistaken. Students have no independent constitutional right to "receive information" that dictates a public university's curriculum, and the Free Expression Act does not somehow give them such a right. *Pernell* PI Opp. 19-21.

The Campus Free Expression Act underscores Florida's commitment to ensuring students are permitted to decide for themselves what ideas they should reject or endorse. The Free Expression Act prohibits public colleges and universities from "shield[ing] students, faculty, or staff from expressive activities." FLA. STAT. § 1004.097(3)(f). The statute defines "shielding" as the act of "limit[ing] students', faculty members', or staff members' access to, or observation of, ideas and opinions that they may find uncomfortable, unwelcome, disagreeable, or offensive." *Id.* § 1004.097(2)(f). Thus, the Free Expression Act prohibits colleges and universities from *censoring—i.e.*, from prohibiting even the *discussion* of—"ideas and opinions that" others "may find uncomfortable, unwelcome, disagreeable, or offensive." *Id.* The Free Expression Act sits comfortably alongside the Individual Freedom Act, and the point is clear: While the State of Florida wants students to form their own views with respect to all ideas, including controversial ones, the State of Florida has

8

already formed *its view* with respect to the prohibited concepts and has thus decided that educators may not endorse those concepts while speaking on behalf of the State. Plaintiffs say that college students are adults and should be free to "decide for themselves whether" particular ideas "have merit." Compl. ¶ 227. As the Free Expression Act shows, the State of Florida agrees, and the IFA does not suggest otherwise.

But the Free Expression Act does not, and could not, confer a constitutional right. Nor does the Free Expression Act suggest the State of Florida "agrees" that students "have a First Amendment right to receive information and ideas in the classroom." Pls.' Br. 23. As demonstrated, the provisions Plaintiffs cite, FLA. STAT. §§ 1004.097(2)(f), (3)(f), merely show that it is the policy of Florida that universities and colleges should not censor ideas merely because others may disagree with them. Thus, students (still) do not have a First Amendment right to control the curriculum at a public university.

## III.   The IFA Satisfies Any Form of First Amendment of Scrutiny.

The IFA satisfies any standard of heightened scrutiny, including strict scrutiny. *See Pernell* PI Opp. 21-24. It serves the compelling government interest in complying with the constitutional command to eliminate discrimination on the basis of race and other immutable characteristics at public schools. *See id.* And the Act's provisions are narrowly drawn to achieve that end. *See id.* at 23-24.

### A.     The Act Is Not a Prior Restraint.

Plaintiffs offer, however, the novel argument that the Act is "a prior restraint" that runs afoul of *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) (*NTEU*). *See* Pls.' Br. 29-31. This argument fails for two reasons. First, and most obviously, the Act is not in fact a prior restraint, which (as the term suggests) is a regulation of speech *before* it occurs. A prior restraint is distinct from a "subsequent punishment" for speech. *See, e.g., Alexander v. United States*, 509 U.S. 544, 553-54 (1993) ("[O]ur decisions have steadfastly preserved the distinction between prior restraints and subsequent punishments."); *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017) ("Prior restraints contrast with subsequent punishments, which regulate a given type of speech by penalizing the speech only *after* it occurs" (cleaned up)). Here, any "punishment" or adverse consequences that may be brought to bear on educators under the Act would *only* be brought to bear *after they engaged in teaching that endorses a concept prohibited by the Act*. Plaintiffs' argument—which effectively, and erroneously, equates a regulation that (they say) *chills* speech with a prior restraint—"would undermine the time-honored distinction between barring speech in the future and penalizing past speech" that

10

creates "the distinction between prior restraints and subsequent punishments." *Alexander*, 509 U.S. at 553-54.[1]

Second, *NTEU*'s heightened standard would not apply even if the Act imposed a prior restraint on government employees. *NTEU* applied a heightened standard only "[b]ecause the vast majority of the speech at issue" did "not involve the subject matter of Government employment and takes place outside the workplace." 513 U.S. at 470; *see also id.* at 475 ("With few exceptions, the content of [the employees'] messages *has nothing to do with their jobs*." (emphasis added)). Therefore, to the extent *NTEU* imposes a higher burden on the government, it also requires a higher burden from Plaintiffs: a showing that the regulated speech occurs outside the workplace and has essentially no relevance to their employment. Because the speech restrictions here govern *only* the employees' employment-related, in-school curricular speech, *NTEU* does not apply on its own terms.

## B. The Act Satisfies Heightened Scrutiny.

Turning to a typical heightened scrutiny analysis, Plaintiffs make the puzzling assertion that "[w]hat interest the Act serves is unclear." Pls.' Br. 27. But on its face, the Act explains that it concerns examples of what "constitute[s] discrimination on the basis of race, color, national origin, or sex" in public education. *See* FLA. STAT.

---

[1] Plaintiffs bring a standalone "prior restraint" claim. *See* Compl. ¶¶ 286-304. Because the Act is not a prior restraint, this claim should be dismissed under Federal Rule 12(b)(6). *See* MTD 16.

§ 1000.05(4)(a). The elimination of racial discrimination in public education is indisputably compelling; indeed, it is enshrined in our Nation's highest law. *Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294, 294 (1955) (acknowledging the "fundamental principle that racial discrimination in public education is unconstitutional"). And as the Ninth Circuit has held, educational statutes that, among other things, prohibit teaching that "[p]romote[s] resentment toward a race or class of people" or "[a]dvocate[s] ethnic solidarity instead of the treatment of pupils as individuals" serve, at the very least, "the state's legitimate pedagogical interest in reducing racism." *Arce v. Douglas*, 793 F.3d 968, 973, 985-86 (9th Cir. 2015).

To the extent Plaintiffs believe a regulation of government speech must be supported by empirical evidence, they are mistaken. Empirical evidence may be relevant to a means-ends assessment of whether a challenged regulation on speech advances a State's proffered interest. *See, e.g.*, *Wollschlaeger v. Gov., Fla.*, 848 F.3d 1293, 1312 (11th Cir. 2017) (en banc) (asking whether a speech restriction on medical professionals regarding their patients' firearm ownership "directly advance[d]" the State's proffered interest in protecting Second Amendment rights (cleaned up)). But here, Defendants do not seek to justify the Act's curricular speech restrictions on the State's own employees as furthering some end other than eliminating the discriminatory speech at issue. The Florida Legislature does not need

12

to make "findings" before prohibiting the State's own educators from, for example, using racial slurs to address students. Nor does it need to make findings to prohibit endorsement of the concepts at issue here, which it has likewise deemed to be egregious and offensive.

Plaintiffs next assert that the Act is not "necessary" because "anti-discrimination laws like FEEA and Title IX provide adequate remedies for hostile environment harassment." Pls.' Br. 27. But the Act is a *definitional provision* fleshing out FEEA's general prohibition of "discrimination." *See* FLA. STAT. §§ 1000.05(1), (2)(a), (4)(a) (defining what "shall constitute discrimination" and thus be "prohibited" by "the 'Florida Educational Equity Act'"). Surely when a State adds *more clarity* to what constitutes "discrimination" under a general anti-discrimination provision, the State has not acted "unnecessarily." Moreover, Plaintiffs cite nothing for the proposition that a federal statute like Title IX— which reaches only "severe" racially hostile environments—sets the constitutional floor for the amount of discrimination that a State must tolerate. The First Amendment does not require a State to sit on its hands until racial discrimination *by its own employees* and *in its own schools* becomes sufficiently "severe or pervasive," *see* Pls.' Br. 27, to constitute a violation of federal law.

Many of Plaintiffs additional arguments—throughout their brief—are premised upon patently incorrect readings of both the Act and implementing

regulation, and they completely disregard § 1000.05(4)(b), which expressly permits "discussion" of the prohibited concepts, "without endorsement." Plaintiffs effectively read Section 1000.05(4)(b) out of the IFA—asserting repeatedly that the Act prohibits "discussion" of the concepts, Pls.' Br. 8, 12, 28; prevents students from "encounter[ing]" the concepts, Pls.' Br. 12; "driv[es]" the concepts "out of the classroom," Pls.' Br. 23; "ban[s] views from college classrooms," Pls.' Br. 1; prohibits "debate" of the concepts, Pls.' Br. 28; applies to "the mere utterance of an idea," Pls.' Br. 30; or bans speech that "introduces" a prohibited concept "for consideration," Pls.' Br. 33. These assertions fly in the face of § 1000.05(4)(b).

That conclusion is underscored by Plaintiffs' own exhibits. For example, the University of Florida web page summarizing the Act, which Plaintiffs include as an exhibit, states in no uncertain terms that the University's "recommendations" for ensuring class instruction complies with the Act "make clear that faculty can continue to address the full spectrum of academic topics in their classes[.]" Doc. 19-6, at 2. "HB 7 is clear that issues of 'race, color, national origin, or sex' can be discussed in employee training, but must be discussed in an objective manner." Doc. 19-6, at 4. "Faculty retain the freedom in the classroom to discuss academic subjects related to the curriculum[.]" Doc. 19-6 at 6. Plaintiffs also cite statements by the bill's legislative supporters, but they make clear that the Act prohibits only curricular speech that seeks to "push students to adopt the personal or political viewpoints of

teachers or textbook authors" or to "indoctrinate students with a particular point of view." Doc. 19-19 at 2-3. But "[n]othing in the [Act] bans the teaching of historical facts about slavery, sexism, racial oppression, racial segregation, and racial discrimination." *Id.* at 3. Indeed, the Act's principal sponsor made clear that the Act "does not ignore or whitewash history, as is frequently misreported; it does the opposite." Doc. 19-20 at 2.[2] "We expect important history lessons about slavery, the Holocaust, and the suffrage struggle to be taught," the article continued. *Id.* Expressly permitting "discussion" of a topic is the opposite of "banning" it from the classroom.

Plaintiffs' misreading of the relevant provisions continues when they claim that the Act is not narrowly tailored because "a concept is *per se* discrimination . . . even if it is mentioned only once." Pls.' Br. 27. Again, merely "mentioning" a concept does not violate the Act—as the express provision permitting classroom "discussion" of the concepts, without endorsement, makes clear. *See* FLA. STAT. § 1000.05(4)(b). Indeed, the Board's regulation shows that a university risks losing

---

[2] Defendants do not concede that lawmakers' public statements are relevant to the legal issues in this case. The Eleventh Circuit has "held—'many times'—that 'when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose.'" *NetChoice, LLC v. Attorney General, Fla.*, 34 F.4th 1196, 1224 (11th Cir. 2022) (quoting *In re Hubbard*, 803 F.3d 1298, 1312 (11th Cir. 2015)). They quote this article only to respond to Plaintiffs' contention that the Act's sponsors intended to "ban" controversial ideas from the classroom.

funding only if the Board determines that the university "failed to take appropriate corrective action" against a substantiated violation of the Act. *See* Regulation 10.005(4)(d). Plaintiffs also contend that the Act's effect is not "limited to intentional or knowing violations." Pls.' Br. 27-28. That is wrong too. The Act's text uses terms that clearly imply scienter. *See Arce*, 793 F.3d at 988-89 (noting that verbs like "advocate" and "promote" "impl[y] an affirmative act and intent"). And here too, the Board's regulation makes clear that a university is at risk only if the Board determines the university "*willfully and knowingly* engaged in conduct at the institutional level that constituted a substantiated violation." *See* Regulation 10.005(4)(d) (emphasis added).

Compounding their distortions of the Act, Plaintiffs also adopt a definition of the verb "advance"—which they isolate from the other verbs surrounding it and then seize upon as the lynchpin of their argument—that is foreclosed by the statutory text. In their complaint (though not their preliminary-injunction papers), Plaintiffs state that the "[o]rdinary definitions of 'advance' include 'to bring forward for notice, consideration, or acceptance,' to 'propose, and 'to accelerate the growth or progress of.'" Compl. ¶¶ 51-52. But there is obviously a difference between bringing a concept forward for "notice" or "consideration" and bringing a concept forward for "acceptance" or in order to "accelerate the growth or progress of" the concept.

Plaintiffs seemingly adopt the definition of bringing something forward for "consideration." But while the word "advance" may bear that peculiar meaning in some idiosyncratic contexts, here the Act's surrounding text forecloses that definition. Section 1000.05(4)(b)'s express provision for *discussing* the prohibited concepts would clearly allow professors to bring the prohibited concepts "forward for notice" or "consideration." And the other verbs surrounding "advance"—espouse, promote, inculcate, and compel—demonstrate that the term plainly refers to advocating the "acceptance" of one of the concepts by students, or to "accelerat[ing] the growth or progress of" a concept on campus. *See Paresky v. United States*, 995 F.3d 1281, 1288 (11th Cir. 2021) (discussing the *noscitur a sociis* canon). Given the language of the Act as a whole, an instructor obviously does not "advance" a concept when he puts it forward for discussion *without advancing it*.

## C.    The IFA Is Not Overbroad.

Lastly, Plaintiffs raise an "overbreadth" challenge, Pls.' Br. 33, they do not come close to demonstrating "from the text of the law and from actual fact," *Doe v. Valencia College*, 903 F.3d 1220, 1232 (11th Cir. 2018), that the Act "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep," *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (internal quotation marks omitted).

17

Apart from their false mantra that the Act "serves no legitimate purpose," Pls.' Br. 33, Plaintiffs offer a single paragraph that, again, is based on a misreading of the Act. They argue that the "use of nebulous terms like 'objective' sweeps up even the teaching of well-accepted ideas," seemingly suggesting that the Act's *prohibitions* contain the word "objective." Pls.' Br. 33. But the Act expressly *permits* discussing the concepts in an "objective manner." Thus, to the extent that "the teaching of well-accepted ideas" is covered by the term "objective," the Act *allows* them. Plaintiffs also state that the Act "lacks any meaningful limiting definitions or principles," *id.*, but it is unclear what this statement means, and Plaintiffs provide no explanation (or even citation) to support it. The "'mere fact that one can conceive of *some* impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.'" *United States v. Dean*, 635 F.3d 1200, 1206 (11th Cir. 2011) (quoting *United States v. Williams*, 553 U.S. 285, 303 (2008) (emphasis added)). And here, Plaintiffs offer *none*.

Essentially, "Plaintiffs' 'overbreadth' argument is nothing more than a restatement of the First Amendment argument they make on their own behalf." *Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1105 (10th Cir. 2006). Their overbreadth claim is thus unlikely to succeed. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 802 (1984).

18

## IV.    The Act Is Not Unconstitutionally Vague.

Given the Act's plain text, the scienter requirement in both the Act and Regulation 10.005, and the Regulation's limitation on enforcement to university failures to correct substantiated violations, the Act easily satisfies the vagueness standard for regulation of public employment—and, indeed, the vagueness standard even for regulation of private speech. *See Pernell* PI Opp. 24-31.

Plaintiffs make two new points in support of their vagueness claim. *See* Pls.' Br. 34-35. First, they contend that Section 1000.05(4)(b)'s authorization for discussing a concept in an "objective manner" is vague because it "suggests that speech *condemning* a viewpoint is objective, but *approving* a viewpoint renders the teaching unobjective." *Id.* (emphasis in original). As an initial matter, this is not a vagueness argument; Plaintiffs are merely restating their position that the Act results in viewpoint discrimination. But the argument fails on its own terms in any event, because a professor neither personally condemns nor approves a topic when the professor teaches it in an "objective manner." Thus, although Plaintiffs are correct that the Act permits educators to say that the concept of "racial superiority is *wrong*," Pls.' Br. 35, that is a result of the Act's prohibition on teaching that *endorses the enumerated concepts*, FLA. STAT. § 1000.05(4)(a)—not the Act's protection of "objective" discussion of the concepts, *id.* § 1000.05(4)(b), or any purported vagueness in the term "objective."

19

Apart from this point, Plaintiffs simply reiterate the argument that the meaning of the word "objective" is unknowable. *See* Pls.' Br. 35. Defendants have already addressed this argument. *See Pernell* PI Opp. 27-28. But Plaintiffs' own exhibits undermine their claim even further. For example, Plaintiffs point out that professors are *already required*, by their Collective Bargaining Agreement and longstanding University policy, to teach "in an objective . . . manner." *See* Doc. 19-7 at 2 ("The University interprets this language according to its plain meaning and as being consistent with faculty members' existing obligations to teach their academic subjects in an *objective* and skillful manner." (emphasis added)); Doc. 19-9 at 5 ("We see this requirement as consistent with our existing policy on academic freedom in that 'a . . . professor must present such matters *objectively* and skillfully." (emphasis added)). Plaintiffs cannot credibly claim they are unable to ascertain the meaning of a term they have long been required to adhere to as a matter of their CBA and University policy.

Next, Plaintiffs argue that the Campus Free Expression Act renders the Individual Freedom Act vague. Pls.' Br. 35-36. Plaintiffs contend that the two Acts "work[] in tandem" to "simultaneously prohibit faculty from speaking and to require them to speak." Pls.' Br. 35. But as demonstrated above, the Free Expression Act and the IFA comfortably coexist. The Free Expression Act prohibits universities from *censoring*—*i.e.*, from prohibiting even the *discussion* of—ideas that others

"may find uncomfortable, unwelcome, disagreeable, or offensive" so that students may be exposed to all ideas and form their own opinions. FLA. STAT. § 1004.097(2)(f). Meanwhile, the IFA shows the State of Florida has formed *its* opinion with respect to the prohibited concepts and has thus determined that its own educators may not endorse those concepts when teaching on behalf of the State of Florida.

Plaintiffs' argument again completely ignores the IFA's Section provision stating that it does *not* prohibit "discussion" of the concepts in an objective manner. FLA. STAT. § 1000.05(4)(b). Thus, no faculty member is forced to "guess" what the IFA prohibits and, in turn, risk violating the Campus Free Expression Act: Discussing an idea in an objective manner without endorsing it is plainly *not* the same as limiting access to the idea. There is no vagueness.

## V.   Plaintiffs' Claim under the Campus Free Expression Act Is Unlikely to Succeed.

In addition to arguing that the Campus Free Expression Act creates vagueness in the meaning of the IFA, Plaintiffs also bring a standalone claim under that statute, alleging that the Individual Freedom Act "violate[s]" the Campus Free Expression Act. *See* Compl. ¶ 363. This argument is unlikely to succeed for three reasons.

First, the Court lacks jurisdiction to hear it because "the Eleventh Amendment bars the adjudication of pendent state law claims against nonconsenting state defendants in federal court." *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533,

21

540-41 (2002) (quoting *Pennhurst State Sch. And Hosp. v. Halderman*, 465 U.S. 89, 120 (1984)); *see* MTD 14-15. Second, as demonstrated above, the two statutes are not in conflict: One statute ensures students will have the opportunity to form their own opinion on all ideas, even controversial ones; and the other merely shows the State of Florida has formed *its own* opinion with respect to the prohibited concepts and has thus prohibited its own educators from endorsing those concepts while teaching the State's curriculum. And finally, even to the extent the statutes did conflict with respect to the specific concepts addressed by the Individual Freedom Act, the Individual Freedom Act would govern because, under Florida law, "a specific statute will control over a general statute" and "a more recently enacted statute will control over older statutes." *Fla. Virtual Sch. v. K12, Inc.*, 148 So. 3d 97, 102 (Fla. 2014). Thus, the Court should deny Plaintiffs' request for a preliminary injunction based on the Campus Free Expression Act.

## CONCLUSION

For the foregoing reasons, and the reasons presented in the *Pernell* PI Opp. and the *Pernell* MTD, Plaintiffs' motion for a preliminary injunction should be denied.

Date: September 30, 2022                  Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper (Bar No. 248070DC)
John D. Ohlendorf (*Pro Hac Vice*)
Megan M. Wold (*Pro Hac Vice*)
John D. Ramer (*Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 220-9600
Facsimile:  (202) 220-9601
ccooper@cooperkirk.com
johlendorf@cooperkirk.com
mwold@cooperkirk.com
jramer@cooperkirk.com

*Counsel for Defendants Manny Diaz, Jr., et al.*

23

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to Northern District of Florida Rule 7.1(F), the undersigned counsel hereby certifies that the foregoing Defendant's Response in Opposition to Plaintiffs' Motion for a Preliminary Injunction, including body, headings, quotations, and footnotes, and excluding those portions exempt by Local Rule 7.1(F), contains 5,105 words as measured by Microsoft Office for Word 365.

<u>/s/Charles J. Cooper</u>
Charles J. Cooper