## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| ADRIANA NOVOA, *et al.*, | |
| *Plaintiffs,* | |
| v. | Case No. 4:22cv324-MW/MF |
| MANNY DIAZ, JR., in his official capacity as the Commissioner of the Florida State Board of Education, *et al.*, | |
| *Defendants.* | |

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

GREG HAROLD GREUBEL*
PA. Bar No. 321130; NJ No. 171622015
ADAM STEINBAUGH*
PA. Bar No. 326475
JT MORRIS*
TX Bar No. 2409444
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut Street; Suite 1250
Philadelphia, PA 19106
Tel:   (215) 717-3473
Fax:   (215) 717-3440
greg.greubel@thefire.org
adam@thefire.org
JT.Morris@thefire.org
*Admitted *Pro Hac Vice*

GARY S. EDINGER, ESQUIRE
Fla. Bar No. 0606812
BENJAMIN, AARONSON, EDINGER &
    PATANZO, P.A.
305 N.E. 1st Street
Gainesville, Florida 32601
Tel:   (352) 338-4440
Fax:   (352) 337-0696
GSEdinger12@gmail.com

*Counsel for Plaintiffs Adriana Novoa, Sam Rechek, and the First Amendment Forum*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................. iv

INTRODUCTION .............................................................................1

ARGUMENT ................................................................................. 3

I.   Defendants Fail to Show That the Stop WOKE Act Survives First
     Amendment Scrutiny. ........................................................... 4

     A.   The Stop WOKE Act restricts expression protected by the
          First Amendment. ......................................................... 4

          1.   Faculty, not governments, speak in the classroom,
               and the First Amendment limits restrictions on
               academic speech. ................................................... 4

          2.   The Stop WOKE Act abridges students' right to
               receive information untrammeled by laws imposing
               the "pall of orthodoxy" over higher education. ....... 11

     B.   Defendants cannot meet their burden to show the Stop
          WOKE Act is necessary and narrowly tailored to advance
          any cognizable government interest. .........................................12

     C.   The STOP Woke Act is overbroad, notwithstanding
          Defendants' textual contortions. ...............................................14

     D.   The Act and the Board's Regulations are impermissibly
          vague. ........................................................................................17

II.  The Stop WOKE Act Is a Broad Restriction on the Protected Speech of
     Thousands of Academics. ................................................................ 20

     A.   The Act is a sweeping statutory impediment to faculty
          speech. ......................................................................................21

     B.   Defendants fail to carry their "heavy burden" to show that
          the Act, in fact, alleviates real harms in a direct and
          material way. ........................................................................... 23

ii

III.    The Balance of Equities Tips Firmly in Plaintiffs' Favor....................24

CONCLUSION ..........................................................................................24

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F) .................26

CERTIFICATE OF SERVICE.......................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. United States,*
　　250 U.S. 616 (1919) .......................................................................... 1, 25

*Adams v. Trs. of the Univ. of N. Carolina-Wilmington,*
　　640 F.3d 550 (4th Cir. 2011) ................................................................. 20

*Amalgamated Transit Union Local 85 v. Port Auth. of Allegheny Cty.,*
　　39 F.4th 95 (3d Cir. 2022) ..................................................................... 21

*Arce v. Douglas,*
　　793 F.3d 968 (9th Cir. 2015) ................................................................. 17

*Austin v. Univ. of Fla. Bd. of Trs.,*
　　580 F. Supp. 3d 1137 (N.D. Fla. 2022) ................................................. 21

*Bethel Sch. Dist. v. Fraser,*
　　478 U.S. 675 (1986) ............................................................................... 17

*Bishop v. Aronov,*
　　926 F.2d 1066 (11th Cir. 1991) .................................................... 4, 9, 20

*Boring v. Buncombe Cty. Bd. of Educ.,*
　　136 F.3d 364 (4th Cir. 1998) ................................................................. 10

*Buchanan v. Alexander,*
　　919 F.3d 847 (5th Cir. 2019) ................................................................. 20

*Burson v. Freeman,*
　　504 U.S. 191 (1992) .................................................................................. 4

*Cohen v. California,*
　　403 U.S. 15 (1971) ..................................................................................... 2

*Crue v. Aiken,*
　　370 F.3d 668 (7th Cir. 2004) ................................................................. 21

*Demers v. Austin,*
　　746 F.3d 402 (9th Cir. 2014) .......................................................... 20, 23

*Evans-Marshall v. Bd. of Educ.*,
    624 F.3d 332 (6th Cir. 2010) ............................................................. 2

*Falls v. DeSantis*,
    No. 4:22cv166-MW-MJF (N.D. Fla. July 8, 2022) ............................ 4

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006) ....................................................................... 5, 9

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ............................................................................ 5

*Hardy v. Jefferson Cmty. Coll.*,
    260 F.3d 671 (6th Cir. 2001) ............................................................. 13

*Hazelwood Sch. Dist. v. Kuhlmeier*,
    484 U.S. 260 (1988) ........................................................................... 10

*Janus v. AFSCME, Council 31*,
    138 S. Ct. 2448 (2018) ...................................................................... 22

*Keyishian v. Bd. of Regents*,
    385 U.S. 589 (1967) ..................................................................... 1, 3, 7

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ........................................................................... 18

*Mahoney v. Hankin*,
    593 F. Supp. 1171 (S.D.N.Y 1984) ...................................................... 9

*Mailloux v. Kiley*,
    323 F. Supp. 1387 (D. Mass. 1971) ...................................................... 9

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) ......................................................................... 8

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) .................................................. 2, 20, 23

*O'Laughlin v. Palm Beach Cnty.*,
    30 F.4th 1045 (11th Cir. 2022) ........................................................... 21

*Papish v. Bd. of Curators of the Univ. of Mo.*,
    410 U.S. 667 (1973) ............................................................................. 2

*Phillips v. Collin Cmty. Coll. Dist.*,
   No. 4:22-cv-184, 2022 U.S. Dist. LEXIS 174098
   (E.D. Tex. Sept. 26, 2022) ..................................................................... 21

*Rankin v. McPherson*,
   483 U.S. 378 (1987) ............................................................................ 22

*Rodriguez v. Maricopa County Cmty. Coll. Dist.*,
   605 F.3d 703 (9th Cir. 2009) .............................................................. 13

*Rosenberger v. Rectors & Visitors of the Univ. of Va.*,
   515 U.S. 819 (1995) ....................................................................... 10, 14

*Shurtleff v. Boston*,
   142 S. Ct. 1583 (2022) ................................................................. 5, 6, 9

*Speech First v. Fenves*,
   979 F.3d 319 (5th Cir. 2020) .............................................................. 13

*Speech First, Inc. v. Cartwright*,
   32 F.4th 1110 (11th Cir. 2022) .......................................................... 10

*Sweezy v. New Hampshire*,
   354 U.S. 234 (1957) .............................................................................. 6

*U.S. v. National Treasury Employees Union*,
   513 U.S. 454 (1995) ............................................................... 20, 22, 23

*W. Va. State Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943) ............................................................................ 25

*Wollschlaeger v. Gov. of Fla.*,
   848 F.3d 1293 (11th Cir. 2017) .......................................................... 18

## Statutes

Fla. Stat. § 1001.706(13)(b) ............................................................................ 7

Fla. Stat. § 1003.41 ...................................................................................... 8

Fla. Stat. § 1003.42 ...................................................................................... 8

Fla. Stat. § 1003.421 .................................................................................... 8

Fla. Stat. § 1003.44 ......................................................................... 8

## Regulations

Bd. of Govs. Reg. No. 10.0005(3)(c) ...............................................19

Bd. of Govs. Reg. No. 10.0005(4)(d)..............................................19

## Other Authorities

2021 – 2024 Collective Bargaining Agreement Between the USF
   Board of Trustees and United Faculty of Florida ............................. 20

Brief of the States of Texas, *et al.*, as *amici curiae*, *Penn. v. Devos*, No.
   20-cv-01468-CJN (D.C.D. July 15, 2020) ECF No. 74......................12

Fla. Bd. of Govs., *State University System Free Expression Statement*
   (Apr. 15, 2019)...............................................................................7

Fla. Dept. of Educ., Policies & Procedures Specifications for the
   Florida Instructional Materials Adoption (effective Aug. 18,
   2020) ............................................................................................ 8

Käri Knutson, *Sifting and winnowing turns 125: The tumultuous
   story of three little words*, Univ. of Wisc.-Madison (Sept. 17,
   2019)............................................................................................. 6

Keith E. Whittington, *Professorial Speech, the First Amendment, and
   the 'Anti-CRT' Laws*, 58 Wake Forest L.R. (forthcoming 2023) ......... 6

Report of the Board of Regents, University of Wisconsin, 1894 .................. 6

Univ. of S. Fla., Faculty Handbook (rev. Aug. 2022)...................... 8

Under Local Rule 7.1(I) and this Court's Orders of September 21, 2022 (ECF No. 29) and October 6, 2022 (ECF No. 37), Plaintiffs respectfully submit this reply memorandum in support of their motion for a preliminary injunction.

## **INTRODUCTION**

Truth is discovered not from legislative mandate but from the "competition of the market." *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). Nowhere is that competition more vital than in higher education, where the "classroom is peculiarly the 'marketplace of ideas.'" *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

Yet Defendants push a bleak alternative for higher education: campuses deprived of the vigorous search for truth, where faculty parrot government scripts and students are mere vessels for the State's opinion. And why? Because the State has "formed *its opinion*" and identified "egregious" ideas too "offensive" for students to hear. Defs.' Resp. in Opp'n to Pls.' Mot. for Prelim. Inj., ECF No. 34, (*Novoa* PI Opp'n) at 2, 13 (emphasis in original). Indeed, Defendants urge that the Stop WOKE Act is necessary because professors, left unchecked, might otherwise "raise a controversial topic" like the "virtues of one theory of government over another," or assign materials to which "members of the community" might object. Defs.' Resp.

in Opp'n to Pls.' Mot. for Prelim. Inj., *Pernell v. Fla. Bd. of Govs.*, No. 4:22-cv-304-MW-MAF (N.D. Fla. Sept. 22, 2022), ECF No. 52 (*Pernell* PI Opp'n) at 13 (quoting *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 341–42 (6th Cir. 2010)).[1]

The Stop WOKE Act does not survive strict scrutiny under the First Amendment because it reaches beyond discriminatory conduct—already prohibited by existing law—and instead targets pure speech. It is not *necessary* to advance the purpose ascribed to it by Defendants, much less narrowly tailored to advance that interest without suppressing protected speech. Laws that suppress the expression of ideas violate the First Amendment, no matter how "controversial" or "offensive" lawmakers might find those ideas. Government officials "cannot make principled distinctions" between what is or is not too "offensive" to hear[2]—especially when it comes to the "dissemination of ideas" at state universities.[3]

---

[1]   *Evans-Marshall* is, like many cases marshaled by defendants, a case concerning teaching in K–12 institutions, where the community's interests sharply differ from those of students and faculty in higher education. That case's rationale has been explicitly limited, by the circuit from which it hails, to primary and secondary schools, not universities. *Meriwether v. Hartop*, 992 F.3d 492, 505 n.1 (6th Cir. 2021).

[2]   *Cohen v. California*, 403 U.S. 15, 25 (1971).

[3]   *Papish v. Bd. of Curators of the Univ. of Mo.*, 410 U.S. 667, 670 (1973) (per curiam).

So while the State can have its "opinions," it cannot prevent faculty members from expressing their own or deprive students of the chance to receive them. In any case, to enjoin the Stop WOKE Act and its speech-chilling harm, the Court need not delineate the precise contours of academic freedom, a "special concern of the First Amendment[.]" *Keyishian*, 385 U.S. at 603. It is enough that the State has imposed a speech code over *every* class and subject—perhaps the starkest example of "laws that cast a pall of orthodoxy over the classroom." *Id.* No matter the constitutional scrutiny applied, the State's sweeping speech code handcuffs faculty and college students to State-sanctioned viewpoints and thus violates the Constitution.

The Court should grant Plaintiffs' motion to enjoin the Stop WOKE Act.

## **ARGUMENT**

Defendants, having conceded that Professor Novoa has standing to challenge the Stop WOKE Act,[4] invite this Court to be the first to hold that faculty speak for the government. But faculty speak as academics, educators, and subject-matter experts, not as mouthpieces for the government. And the Act—a viewpoint discriminatory and presumptively unconstitutional

---

[4]   *See* Defs.' Mem. of Law in Supp. of Mot. to Dismiss, ECF No. 33-1 at 6. Plaintiffs debunk the rest of Defendants' standing argument in their concurrently filed Opposition to Defendants' Motion to Dismiss (*Novoa* MTD Opp'n) at 9–17.

regulation of pure speech—fails strict scrutiny because it is not "necessary" to serve a "compelling state interest" and "narrowly drawn to achieve that end." *Burson v. Freeman*, 504 U.S. 191, 198 (1992). And, to be sure, the law would fail any level of scrutiny applied to it.

## I.   Defendants Fail to Show That the Stop WOKE Act Survives First Amendment Scrutiny.

Although the Stop WOKE Act's regulation of pure speech fails strict scrutiny, that is not its only constitutional defect: it is also overbroad and unconstitutionally vague.

### A.   The Stop WOKE Act restricts expression protected by the First Amendment.

Florida's Stop WOKE Act targets faculty expression—which is not government speech—and violates students' corollary First Amendment rights to receive information unabridged by legislation, like the Stop WOKE Act, proscribing ideas the State deems too "offensive" to entertain.

#### 1.   *Faculty, not governments, speak in the classroom, and the First Amendment limits restrictions on academic speech.*

The First Amendment requires *some* level of scrutiny for professorial speech. *Falls v. DeSantis*, No. 4:22cv166-MW-MJF, at *5–6 (N.D. Fla. July 8, 2022) (citing *Bishop v. Aronov*, 926 F.2d 1066, 1074–75 (11th Cir. 1991)). Despite spilling a sea of ink arguing a "government speech" theory, Defendants  come up empty, failing to identify a single case suggesting that

*Garcetti v. Ceballos*, 547 U.S. 410, 425 (2006),  renders faculty teaching *government* speech. That is because faculty speech is not government speech. To hold otherwise would eviscerate the unique role academics and universities fill in our society.

Defendants chafe at *Shurtleff v. City of Boston*, 142 S. Ct. 1583 (2022), arguing that it does not apply because this matter arises in the context of government-employee speech. Yet *Shurtleff* simply acknowledged that the government speech doctrine's application is inappropriate when it is not clear the government intends to "transmit [its] *own* message" through a speaker, as opposed to inviting other "speakers' views[.]" *Shurtleff*, 142 S. Ct. at 1589  (emphasis added). As Justice Alito put it, government speech requires a "purposeful communication of a governmentally determined message[.]" *Id.* at 1598 (Alito, J., concurring).

That is not the case for faculty filling universities' "special niche in our constitutional tradition," owing to "the expansive freedoms of speech and thought associated with the university environment." *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003). Just as their academic speech is constitutionally treated as that of speech by a private citizen under *Pickering*, faculty members are properly understood as on par with private speakers.[5] Faculty

---

[5]   *See infra* pp. 19–20; *see also* n.20, *infra* (collecting cases).

convey *a* message, but it is one springing from their academic expertise, not a message the government selects *for* them.

Moreover, the "holistic inquiry" in evaluating "whether the government intends to speak for itself," *Shurtleff*, 142 S. Ct. at 1589, tips sharply in favor of Plaintiffs. Faculty historically have not spoken for the government. They are not held out as speaking for the government. And they have not been subject to active government control of their message.[6]

On the first factor, the "history of the expression at issue," *id.*, Defendants make no attempt to account for the historic, "self-evident" essentiality of academic freedom in higher education. *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Faculty, by tradition and history, are employed to speak for themselves and to disagree with one another—to engage in the academic "sifting and winnowing" that discovers truth through disagreement, not dictation.[7] They are not hired to be the government's

---

[6]    For a timely analysis on the First Amendment's application to faculty speech, including an evaluation of its relation to government speech, *see* Keith E. Whittington, *Professorial Speech, the First Amendment, and the 'Anti-CRT' Laws*, 58 Wake Forest L.R. (forthcoming 2023), *available at* https://ssrn.com/abstract=4188926.

[7]    Report of the Board of Regents, University of Wisconsin, 1894; *see* Käri Knutson, *Sifting and winnowing turns 125: The tumultuous story of three little words*, Univ. of Wisc.-Madison (Sept. 17, 2019), https://news.wisc.edu/sifting-and-winnowing-turns-125.

mouthpiece, but to be one of "a multitude of tongues" providing "wide exposure to [the] robust exchange of ideas[.]" *Keyishian*, 385 U.S. at 603.[8]

Second, our long national tradition of academic freedom informs what the public understands about faculty speech. Defendants contend the public knows about an obscure provision of the state constitution establishing a "system of governance" of universities. *Novoa* PI Opp'n at 7 (citing Fla. Const. art. IX, § 7(a)–(b)). The public, however, is more likely to be far more familiar with universities' unique role in society, particularly when Defendants themselves hold out their faculty as speaking independently of the university. The State has enshrined in statute that faculty are independent speakers.[9] Defendants have publicly recognized that the availability of "divergent ideas, opinions and philosophies, new and old," even if those ideas are "abhorrent," is a "fundamental purpose" of universities.[10] USF, too, recognizes that faculty members "are not speaking

---

[8]    Some are not *hired* at all. The law is not limited to compensated employees, but prohibits "instruction" irrespective of its source. Fla. Stat. § 1000.05(4)(a). Universities have interpreted this to reach even guest speakers. Steinbaugh Decl. ¶ 6, Exs. 5, 6.

[9]    *See, e.g.*, Fla. Stat. § 1001.706(13)(b) (requiring the Board of Governors to conduct an annual survey of "intellectual freedom and viewpoint diversity" to gauge whether "competing ideas and perspectives are presented and . . . faculty . . . feel free to express *their* beliefs and viewpoints on campus *and in the classroom*." (emphasis added)).

[10]    Fla. Bd. of Govs., *State University System Free Expression Statement* (Apr. 15, 2019), https://www.flbog.edu/2019/04/15/state-university-system-free-expression-statement.

as a representative" of the university in classroom teaching.[11] If the divergent viewpoints that faculty use to educate students in public university classrooms constitute *government* speech, then Florida's government "is babbling prodigiously and incoherently," expressing at once "contradictory views." *Matal v. Tam*, 137 S. Ct. 1744, 1758 (2017).

Third, faculty speak from their academic competencies, not from a government script. Consider the contrast between the laws and policies governing Florida K–12 schools and the academic freedom possessed by college faculty. The State tightly controls K–12 instruction (*e.g.*, Fla. Stat. §§ 1003.41–.42), even specifying the number of hours students are to spend studying freedom's blessings (Fla. Stat. § 1003.421), what material of "patriotic nature" may be displayed on the walls (Fla. Stat. § 1003.44), and exacting specifications for the textbooks used in every class.[12] In contrast, university faculty have "independent traditions, [] broad discretion as to teaching methods," and "intellectual qualifications" typically beyond those found in primary and secondary schools. *Mailloux v. Kiley*, 323 F. Supp.

---

[11]   Univ. of S. Fla., Faculty Handbook 64 (rev. Aug. 2022), *available at* https://www.usf.edu/provost/faculty-success/documents/forms-policies-handbook/faculty-handbook-final.pdf.

[12]   *See, e.g.*, Fla. Dept. of Educ., Policies & Procedures Specifications for the Florida Instructional Materials Adoption (effective Aug. 18, 2020), *available at* https://www.fldoe.org/core/fileparse.php/5574/urlt/PoliciesandProceduresSpecifications.pdf.

1387, 1392 (D. Mass. 1971). Faculty in higher education are regulated by academic officers—not apparatchiks and minders—and are left to design and teach their classes according to their professional competency, even where administrators may "establish the parameters of focus and general subject matter of curriculum." *Bishop*, 926 F.2d at 1073 (quoting *Mahoney v. Hankin*, 593 F. Supp. 1171, 1174 (S.D.N.Y 1984)). In short, faculty at the undergraduate and graduate level are not subject to the "active control[]" indicative of government speech. *Shurtleff*, 142 S. Ct. at 1592.

*Garcetti*, *Rosenberger*, or *Hazelwood* do not alter this faculty freedom from state control. If the *Garcetti* majority—citing *Rosenberger* throughout its majority opinion—believed *Rosenberger* foreclosed Justice Souter's concern that *Garcetti* applied to university faculty, it would have answered as much in response to Souter. Instead, the Court acknowledged that there was "some argument that expression related to . . . classroom instruction implicates additional constitutional interests" and expressly left the question open. *Garcetti*, 547 U.S. at 425. If the *Garcetti* Court treated *Rosenberger*'s offhand reference to university curricular decisions as *dicta*, and none of the four circuits addressing the question left open by *Garcetti* have thought *Rosenberger* pertinent to their analysis, this Court need not accept Defendants' invitation to enter uncharted waters. Further, both *Rosenberger*

and *Hazelwood* are concerned with whether the message may be erroneously "attributed to" the institution. *Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819, 841–42 (1995); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988).[13] But this is not a reasonable fear here given the breathing room afforded by academic freedom and the extent to which Defendants hold faculty out as *independent* speakers.

Finally, Defendants offer the puzzling rejoinder that the State has, in barring *some* opinions, simply expressed "*its* opinion." *Novoa* PI Opp'n at 21. The State has any number of avenues to voice its opinions; silencing others is not among them.

---

[13] Defendants cite cases applying *Hazelwood*. *See, e.g.*, *Pernell* PI Opp'n at 15. But *Hazelwood* is a K–12 student speech case evaluating the "emotional maturity" of students and limited by its terms to "elementary" through "high school" students. *Hazelwood*, 484 U.S. at 272–73. In leaning heavily on *Hazelwood,* Defendants infantilize adult students, demonstrating why the *Tinker* line of K–12 student speech cases is not appropriate for application to collegiate speech generally, and particularly collegiate faculty speech. *See, e.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022); *Boring v. Buncombe Cty. Bd. of Educ.*, 136 F.3d 364, 373 (4th Cir. 1998) ("*Hazelwood*'s test for evaluating restrictions on *student* speech within curricular activities" is inapplicable to "*teacher* speech *through* the curriculum itself") (emphasis in original). In any event, Defendants effectively concede that restrictions on faculty classroom speech are subject to First Amendment scrutiny by their invocation, however inapt, of those cases.

### 2. The Stop WOKE Act abridges students' right to receive information untrammeled by laws imposing the "pall of orthodoxy" over higher education.

Just as the Act implicates faculty members' protected expression, it also burdens students' corollary right under the First Amendment to receive information.

Defendants charge that student plaintiffs Rechek and the First Amendment Forum are trying to "dictate a public university's curriculum." *Novoa* PI Opp'n at 8. But the students are not the ones trying to suppress viewpoints on college campuses. Rather, the student plaintiffs seek only what *Keyishian* says the First Amendment guarantees to them: a learning environment untrammeled by "laws that cast a pall of orthodoxy over the classroom." 385 U.S. at 603.

Defendants also cannot escape the Campus Free Expression Act. Defendants argue the CFEA means universities *cannot* limit student access to ideas and opinions expressed in "faculty research, lectures, writings, and commentary"—but the Legislature itself *can. Novoa* PI Opp'n at 8–9; Fla Stat. § 1004.097(3)(a). Defendants' reading betrays the very essence of the CFEA. Moreover, a government-issued list of *verboten* opinions, restricted under threat of punishment, is exactly what the First Amendment prohibits, especially in our public universities.

**B.    Defendants cannot meet their burden to show the Stop WOKE Act is necessary and narrowly tailored to advance any cognizable government interest.**

Defendants do not counter that the Stop WOKE Act, which targets pure speech, is viewpoint-neutral. To the contrary, they boast that it effectuates State suppression of "egregious" and "offensive" ideas. *Novoa* PI Opp'n at 13–15. As such, Defendants confirm the law is presumptively unconstitutional. *Rosenberger*, 515 U.S. at 828.

Defendants fail to overcome this presumption because they cannot show the Act is both "necessary" to serve a "compelling state interest" and "narrowly drawn to achieve that end." *Burson*, 504 U.S. at 198. Indeed, Defendants have no answer for why it is necessary to prohibit particular concepts expressed through speech in order to proscribe discriminatory conduct already prohibited by the same statute, federal law, and university policy.

Instead, Defendants contend—here, anyway[14]—that the First Amendment does not require them to justify their restriction on pure speech by adopting the narrowing features that valid discrimination laws include to

---

[14]    In an *amicus* brief, Florida urged that "the *Davis* standard for actionable sexual harassment under Title IX is necessary to ensure" that speech in higher education "is limited only when necessary and to avoid First Amendment concerns." Brief of the States of Texas, *et al.*, as *amici curiae*, *Pennsylvania v. Devos*, No. 20-cv-01468-CJN (D.D.C. July 15, 2020) ECF No. 74, *available at* https://bit.ly/3dYiQrj.

avoid abridging important First Amendment rights. *Novoa* PI Opp'n at 13. That's wrong. The First Amendment requires *some* threshold before pure speech may be sanctioned, or antidiscrimination measures would allow suppression of *any* speech about "race, gender, and power conflicts in our society," which are "matters of overwhelming public concern." *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679 (6th Cir. 2001); *Rodriguez v. Maricopa County Cmty. Coll. Dist.*, 605 F.3d 703, 710 (9th Cir. 2009) (doubting "that a college professor's expression on a matter of public concern, directed to the college community, could ever constitute unlawful harassment," as harassment law "generally targets conduct, and it sweeps in speech as harassment only when consistent with the First Amendment").[15]

That's why, for example, the Third Circuit in *DeJohn* held that university restrictions on offensive speech, including core political and religious speech "such as gender politics," were constitutional only if they required a showing of severity, pervasiveness, and both subjective and objective offense. *DeJohn v. Temple Univ.*, 537 F.3d 301, 317–18 (3d Cir.

---

[15]   *See also, Speech First v. Fenves*, 979 F.3d 319, 337 n.6 (5th Cir. 2020) (arguing that it is "self-evidently dubious" that even discriminatory-harassment law may be sufficient to justify restrictions on pure speech); *see also, e.g.*, *Doe v. Univ. of Mich.*, 721 F.Supp. 852, 862–63 (E.D. Mich. 1989) (public university's "power to regulate so-called pure speech is far more limited" and could not "establish an anti-discrimination policy which had the effect of prohibiting certain speech because it disagreed with ideas or messages sought to be conveyed.").

2008). Otherwise, a harassment policy would provide "no shelter for core protected speech" under the First Amendment. *Id.*

### C.   The STOP Woke Act is overbroad, notwithstanding Defendants' textual contortions.

The Act broadly targets pure speech and Defendants concede—as the plain text makes clear—that the State's objection is to the messages it prohibits, rendering it presumptively unconstitutional. *Rosenberger*, 515 U.S. at 828.

Defendants, having conceded that Novoa has standing to challenge at least one of the eight concepts,[16] attempt to whittle back the scope of the law in a manner inconsistent with its plain text. For example, Defendants argue that the statute's prohibition on "advanc[ing]" concepts is superfluous, merely a repetition of its prohibition on *endorsing* a given concept as true. *Novoa* PI Opp'n at 16. This is wrong for two reasons.

---

[16]   Defendants' severability argument depends entirely on standing, making no argument that any of the eight concepts is constitutional because it is substantively distinguishable from any other. Novoa's challenge, however, is to the entirety of the statute, which prohibits instruction on "any" of the eight concepts. FLA. STAT. § 1000.05(4)(a). Further, even if any of the concepts were severable on the basis that Novoa lacked standing to challenge it, the student plaintiffs have standing to challenge each of the concepts, as each represents an incursion on their First Amendment rights under *Keyishian*. Plaintiffs incorporate by reference the standing arguments advanced in their concurrently filed opposition to the motion to dismiss. *Novoa* MTD Opp'n at 9–17. As Plaintiffs' arguments are supported by the Verified Complaint, this Court may accept those references as evidence to support a preliminary injunction.

First, Defendants now object to the dictionary definition of "advance" they relied on in *Honeyfund*, urging this court to focus instead on one word of the definition—"acceptance"—and one definition of acceptance: to "accelerate the growth or progress of" an idea. *Novoa* PI Opp'n at 16; Defs.' Mem. in Opp'n to Mot. for Prelim. Inj., *Honeyfund.com, Inc. v. DeSantis*, No. 4:22-cv-227 (N.D. Fla. July 21, 2022), ECF No. 49 at 31. This construction is not supported by the *noscitur a sociis* canon that an ambiguous word's meaning can be understood with reference to other words with which it is grouped, as it would deprive the word "advances" of independent meaning from its neighbors. *Babbitt v. Sweet Home Chapter of Cmtys. For a Great Or.*, 515 U.S. 687, 702 (1995). So, too, would it render superfluous the "without endorsement" language. In essence, Defendants' argument leads to a nonsensical construction, prohibiting endorsement of a concept unless the endorsement is made in an "objective manner without endorsement." Relying on the plain meaning of "advance" avoids this incoherent result.

Second, even if Defendants' new definition of "advance" were accepted, reading it in the statute's context reveals the Act's overbreadth:

> It shall constitute discrimination [...] to subject any student [to] instruction that [**accelerate[s] the growth or progress of**] any of the [...] concepts.

Under this reading, bringing concepts forward for discussion will *always* "accelerate" their growth because some people will accept them, even absent overt endorsement. The result is that faculty can only—if ever— discuss these concepts by denouncing them. Even in that instance, faculty risk being found in violation of the "objective" requirement by sharing an opinion on the concept at all.

Nor is the Stop WOKE Act's breadth adequately cabined by its "objective manner without endorsement" language. Fla. Stat. § 1000.05(4)(b). That language demonstrates that the law fails to advance any legitimate purpose—after all, what actual harm is prevented by prohibiting a faculty member from uttering the words "I agree" or "good point"? What state interest is served? According to the Act's drafters and the state agencies charged with interpreting it, this language prohibits faculty from ever expressing an individual perspective is, thereby sidelining faculty from participating in higher education's deliberative process. *Pernell* PI Opp'n at 28 (invoking, as an "obvious[] description of the distinction

16

between discussion and endorsement," a Florida Department of Education regulation's requirement that instructors not "share their personal views"); Steinbaugh Decl. ¶¶ 10, 13–14. So, too, does the "objective manner without endorsement" language deprive faculty of the breathing room to deploy important pedagogical tools, including the ability to engage in devil's advocacy by feigning agreement for the sake of argument. Pls.' Mot. for Prelim. Inj., ECF No. 19, at p. 28.

As a result, the Act sweeps far beyond any legitimate interest not already addressed by existing law.[17]

### D.   The Act and the Board's Regulations are impermissibly vague.

This Court correctly held that the Act is unconstitutionally vague. *Honeyfund.com, Inc. v. DeSantis*, No. 4:22cv227, 2022 WL 3486962, at *14 (N.D. Fla. Aug. 18, 2022) (*Honeyfund*).[18] Defendants offer no reason to depart from that holding here.

---

[17] *Arce v. Douglas*—an out-of-circuit case considering the "primary legitimate purpose" of a statute intended to teach "pupils" in primary and secondary schools "to treat and value" others—does not supply a legitimate, much less *compelling*, interest that would justify broad restrictions on pedagogically relevant material and discussion among adults. 793 F.3d 968, 986 (9th Cir. 2015). The pedagogical concerns in educating children (instilling community values, as in *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 681 (1986)) and higher education (providing unfettered exposure to divergent views (*Keyishian*, 385 U.S. at 603)) are profoundly different.

[18] *O'Laughlin*'s dicta, concerning an abandoned vagueness claim not reached by the district court, is not to the contrary. Instead, it merely acknowledges the crucial

---

Defendants assert that both the Act and the Board's Regulations "easily" satisfy the vagueness standard due to their plain text, scienter requirements, and the regulation's "limitation" on enforcement. *Novoa* PI Opp'n at 19. Yet this Court has already correctly rejected the notion the Act's plain language clearly identifies the conduct it prohibits. *See Honeyfund* at *35 ("[F]ew terms are as loaded and contested as 'objective.'"). And while a scienter requirement can help temper arbitrary enforcement, its mere inclusion does not automatically render an otherwise vague restriction constitutional. *See, e.g.*, *Keyishian* 385 U.S. at 599–600 (holding statute denying employment to persons who "willfully and deliberately advocate[] forceful overthrow of the government" vague). Thus, even implied scienter does not provide fair notice as to whether instructor's classroom discussions are sufficiently objective.

Regulation 10.005 does not resolve the Act's vagueness. Defendants contend that the Regulation requires universities to *first* order faculty to modify their instruction or teaching *before* issuing disciplinary measures. *Pernell* PI Opp'n at 31. Not so. The Regulation provides no clear opportunity

---

concerns of the vagueness standard, even in the context of employee conduct: (1) fair notice of the conduct prohibited; and (2) protection against arbitrary and discriminatory enforcement. *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022); *see, e.g.*, *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293, 1319–20 (11th Cir. 2017).

for modification. Bd. of Govs. Reg. No. 10.005(3)(c). Instead, it sets forth a range of arbitrary options, including disciplinary measures, and reserves to the Board the right to rescind millions of dollars in funding if it subjectively determines that the university's response was not "appropriate." *Id.* at 10.005(3)(c), (4)(d). If anything, the Regulation *encourages* arbitrary zero tolerance of prohibited concepts and the imposition of substantial sanctions.

Defendants further insist the regulations provide clarity because they allow faculty to ascertain whether their teaching complies with the law, citing a case in which a federal agency allowed employees to inquire about their own compliance with a regulation. *Pernell* PI Opp'n at 31 (citing *U.S. Civil Serv. Comm'n* v. *Nat'l Ass'n of Letter Carriers AFL-CIO*, 413 U.S. 548, 580 (1973)). But here, faculty have no means of *asking* beforehand: to find out if the stove is hot, faculty must first touch the burner.

Finally, the Court should disregard Defendants' reliance on collective bargaining agreements and university policies irrelevant to Novoa. Defendants trumpet that Novoa cannot "credibly claim" she cannot ascertain the meaning of "objectivity" because she has "long been required to adhere to" an "objectivity" standard by virtue of her CBA and university's policy, citing ECF No. 19-7 and 19-9. *Novoa* PI Opp'n at 20. This assertion is false.

Defendants invoke guidance offered by Florida State University and Valencia College—institutions where Novoa has never been employed.

Defendants point out no similar CBA provision or policy at USF, where Novoa *is* employed. Nor can they. Unlike the CBAs Defendants point to, the USF CBA recognizes the "freedom of an employee to discuss all relevant matters in the classroom [...] without institutional discipline or restraint."[19]

## II.   The Stop WOKE Act Is a Broad Restriction on the Protected Speech of Thousands of Academics.

When evaluated as a restriction on employee speech, the question is not whether the First Amendment applies to classroom speech, but which of the *Pickering-Connick* cases applies. Indeed, *Bishop*—like each of the four circuits rejecting *Garcetti*'s application to academic expression in higher education[20]—returns to the default *Pickering* balancing test. *Bishop v. Aronov*, 926 F.2d 1066, 1072 (11th Cir. 1991). Here, *United States. v. Nat'l Treasury Emps. Union*, 513 U.S. 454 (1995) (NTEU), decided after *Bishop*, supplies the appropriate standard, as it "applies when a prior restraint is

---

[19]   2021–2024 Collective Bargaining Agreement Between the USF Board of Trustees and United Faculty of Florida, Art. 5.2, *available at* https://www.usf.edu/hr/documents/employment-resources/employee-labor-relations/2021-2024-uff-collective-bargaining-agreement.pdf.pdf.

[20]   *See Adams v. Trs. of the Univ. of N. Carolina-Wilmington*, 640 F.3d 550, 564 (4th Cir. 2011); *Buchanan v. Alexander*, 919 F.3d 847, 853 (5th Cir. 2019); *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021); *Demers v. Austin*, 746 F.3d 402, 406 (9th Cir. 2014).

placed on employee speech"[21] on matters of public concern. *Austin v. Univ. of Fla. Bd. of Trs.*, 580 F. Supp. 3d 1137, 1170 (N.D. Fla. 2022) (quoting *Crue v. Aiken*, 370 F.3d 668, 678 (7th Cir. 2004)).

The Act fails this scrutiny, imposing an advance prohibition on the speech of faculty of every level—from graduate-student instructors to tenured professors, and even reaching *non*-employees like guest lecturers and *emeritus* faculty. That statutory prohibition is not narrowly tailored to redress *real* harms—an important consideration in the *NTEU* balancing test. *See, e.g.*, *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 106 (3d Cir. 2022) (holding that *NTEU* balancing requires a showing that a "policy is narrowly tailored to the 'real, not merely conjectural' harm it identified").

## A.   The Act is a sweeping statutory impediment to faculty speech.

Defendants do not dispute that the Act restricts speech on matters of profound public concern, that the restriction binds thousands of faculty

---

[21]   Whether the Stop WOKE Act is described as a "prior restraint" or a "policy that prospectively limits speech," *NTEU* applies. *O'Laughlin*, 30 F.4th at 1050 n.1 & 1054 (11th Cir. 2022); *see also, e.g.*, *Phillips v. Collin Cmty. Coll. Dist.*, No. 4:22-cv-184, 2022 U.S. Dist. LEXIS 174098 at *12–13 (E.D. Tex. Sept. 26, 2022) (applying *NTEU* to a policy prospectively limiting speech of college professors).

members in dozens of institutions, and that it restricts speech to a large audience of undergraduate and postgraduate students.

Defendants are tasked with the "heavy" burden of justifying a "sweeping statutory impediment to speech," *NTEU*, 513 U.S. at 466–67, and "entitled to considerably less deference in [their] assessment that a predicted harm justifies" that impediment. *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2472 (2018). This burden is all the more so in light of the Supreme Court's admonition that "[v]igilance is necessary" in the *Pickering* balancing test "to ensure" that a policy is not intended to "silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987).

The balancing test under *NTEU*, however, presents a steeper burden for the government and introduces a paramount consideration not at issue in *Bishop*'s application of the *Pickering* balancing test to a single professor: the interests of the potential audience. *NTEU*, 513 U.S. at 468. Here, the audience of potential students is vast and imbued, in light of *Keyishian*, with a fundamental interest in access to information free from State censorship.

**B.**   **Defendants fail to carry their "heavy burden" to show that the Act, in fact, alleviates real harms in a direct and material way.**

Defendants insist that only the State's opinions matter. *Novoa* PI Opp'n at 21. But that does not carry their heavy burden. Defendants offer no legislative findings, they offer no evidence of any "necessary impact" flowing from the airing of ideas they find offensive,[22] and they fail to explain how the Stop WOKE Act will "*in fact* alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 468, 475 (emphasis added). Defendants wrongly frame *NTEU* as applicable only to speech unrelated to employees' jobs. *Novoa* PI Opp'n at 11. *NTEU*, concerned with broad restrictions prohibiting speech before it occurs, extends from the *Pickering-Connick* line of cases. *NTEU*, 513 U.S. at 465–67. Courts regularly apply *Pickering-Connick* when addressing restrictions of college faculty's classroom expression, which inherently involves on-the-job speech.[23] So if the *Pickering-Connick* line applies when the government restricts faculty speech, *NTEU* applies when those restrictions broadly restrict speech in advance, as the Stop WOKE Act does.

---

[22]   *See, e.g.*, *Cochran v. City of Atlanta*, 289 F. Supp. 3d 1276, 1299 (N.D. Ga. 2017) (city failed to produce "any evidence" outside of a policy's stated purpose, which "does not include any specific factual findings").

[23]   *See, e.g.*, *Demers*, 746 F.3d at 406 ("scholarship or teaching"); *Meriwether*, 992 F.3d at 505 ("core academic functions, such as teaching"); *Buchanan v. Alexander*, 919 F.3d at 853 (in-class speech).

### III.   The Balance of Equities Tips Firmly in Plaintiffs' Favor.

Defendants offer no argument specific to Plaintiffs concerning the balance of the equities or irreparable injury, but fault the *Pernell* plaintiffs for risking "chaos" in the fall semester by not suing sooner. *Pernell* PI Opp'n at 33. Plaintiffs sued within days of the adoption of the implementing regulations. *Cf.* Decl. Steinbaugh ¶ 4 (regulations issued Aug. 26, 2022); *Novoa* Compl., ECF No. 1 (filed Sept. 6, 2022). Defendants' speculation about "chaos" is unrealistic: Enjoining the Act only allows people to speak. It would not deprive universities of tools already at their disposal to address discriminatory conduct.

### CONCLUSION

Our constitutional system affords faculty the breathing room to consider ideas and views some—including elected officials—find noxious. While the State submits that this list of ideas is limited to only the most "egregious" and "offensive," the authority it claims will not be limited to *these* ideas alone.  Left unchecked, Florida will add to it. Other states, too, will craft their own.

The First Amendment does not permit this result, instead requiring that courts be "eternally vigilant against attempts to check the expression of opinions that we loathe[.]" *Abrams v. United States*, 250 U.S. 616, 630

(1919) (Holmes, J. dissenting). Truth flows from the exchange of ideas, not prescription by state officials, "high or petty," about what is "orthodox" in any "matters of opinion[.]" *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

For these reasons, Plaintiffs ask the Court to enjoin enforcement of the Stop WOKE Act's higher education provisions.

DATED:     October 7, 2022

Respectfully Submitted,

/s/ Greg H. Greubel
GREG HAROLD GREUBEL*
PA. Bar No. 321130; NJ No. 171622015
ADAM STEINBAUGH*
PA. Bar No. 326475
JT MORRIS*
TX Bar No. 2409444
FOUNDATION FOR INDIVIDUAL RIGHTS AND
    EXPRESSION
510 Walnut Street; Suite 1250
Philadelphia, PA 19106
Tel:   (215) 717-3473
Fax:   (215) 717-3440
greg.greubel@thefire.org
adam@thefire.org
JT.Morris@thefire.org
*Admitted *Pro Hac Vice*

/s/ Gary S. Edinger
GARY S. EDINGER, ESQUIRE
Fla. Bar No. 0606812
BENJAMIN, AARONSON, EDINGER &
    PATANZO, P.A.
305 N.E. 1st Street
Gainesville, Florida 32601
Tel:   (352) 338-4440
Fax:   (352) 337-0696
GSEdinger12@gmail.com

*Counsel for Plaintiffs Adriana Novoa, Sam Rechek, and the First Amendment Forum*

25

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

I hereby certify that this motion and memorandum of law contains 5,497 words in compliance with this Court's October 6, 2022 Order granting leave to file a reply brief of up to 5,500 words.

/s/ Greg H. Greubel
Greg H. Greubel

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 7, 2022, a copy of this document was filed electronically through the CM/ECF system and furnished by email to all counsel of record.

/s/ Greg H. Greubel
Greg H. Greubel